Mooney Dec. opp. dismiss

03cv905 exh A
B
C

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

Plaintiff,

v.

AON RE, INC.

Defendant.

Civil Action No. 303 CV 905 RNC

**DECLARATION OF RICHARD MOONEY**

**IN SUPPORT OF THE LINCOLN NATIONAL LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS OF AON RE, INC.**

(October 24, 2003)

**ORAL ARGUMENT REQUESTED**

SF\437755.1

I, Richard J. Mooney, declare as follows.

1.    I am an attorney admitted to practice in the State of California, and admitted *pro hac vice* before this Court (bar number ct25231). I am associated with the law firm of Latham & Watkins LLP, counsel to Plaintiff The Lincoln National Life Insurance Company ("Lincoln") in this matter. I make this declaration in support of Lincoln's Opposition to the Motion to Dismiss of Aon Re, Inc. ("Aon"). I have personal knowledge of the facts stated in this declaration and, if called upon to do so, I could and would testify competently thereto.

2.    Attached hereto as Exhibit A is a true and correct copy of the complaint filed by Lincoln against Aon and Rattner in the United States District Court for the District of New Jersey.

3.    Attached hereto as Exhibit B is a true and correct copy of the complaint filed by Phoenix and Cologne against Aon, Rattner, and others in the United States District Court for the District of New Jersey.

4.    Unicover demanded arbitration against Lincoln approximately two months after Lincoln filed this action, and approximately one month prior to Lincoln's counterdemand against Unicover.

5.    Prior to the Three-Year Whole Account agreement, the Pool members entered into an earlier whole account agreement providing retrocessional protection for one year effective March 1997. That agreement was terminated as of December 1997, when the Three-Year Whole Account agreement came into effect.

6.   Attached hereto as Exhibit C are true and correct copies of material from Aon's website, showing Aon activity and offices within the State of Connecticut.


I declare under penalty of perjury under the laws of the United States and the State of California and the State of Connecticut that the foregoing is true and correct and this declaration was executed on October 23, 2003 in San Francisco, California.

Richard J. Mooney

SF\437755.1

LATHAM & WATKINS LLP
  Keith Weingold (Bar No. KW-8934)
  Eric Westenberger (Bar No. EW-1488)
One Newark Center, 16th Floor
Newark, NJ 07101
Telephone: (973) 639-1234
Facsimile: (973) 639-7298
Attorneys for Plaintiff The Lincoln National
  Life Insurance Company

RECEIVED-CLERK
U.S. DISTRICT COURT

2003 MAY 22 P 12:16

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY, an Indiana
corporation,

          Plaintiff,

    v.

AON RE, INC., an Illinois corporation; and
RATTNER MACKENZIE LIMITED, an
English corporation,

          Defendants.

CIVIL ACTION NO. 03-CV-2394 (DMC)

COMPLAINT AND
DEMAND FOR JURY TRIAL

      Plaintiff, The Lincoln National Life Insurance Company ("Lincoln"), by its

attorneys, Latham & Watkins LLP, hereby alleges as follows:

### THE PARTIES

      1.      Lincoln is an Indiana corporation with its principal place of business in

Fort Wayne, Indiana.

      2.      Defendant, Aon Re, Inc. ("Aon"), is an Illinois corporation with its

principal place of business in Chicago, Illinois. Aon is a licensed insurance and reinsurance

intermediary in the state of New Jersey.

      3.      Defendant, Rattner Mackenzie Limited ("Rattner"), is a corporation

organized and existing under the laws of England with its principal place of business in London,

England. At all relevant times, Rattner conducted business with entities in the United States, including in the State of New Jersey.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.

5.  This Court has personal jurisdiction over Aon and Rattner (together, "defendants"), because each has conducted business in New Jersey, and thereby purposefully availed itself of the benefits and protections of this jurisdiction.

6.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because defendants reside here.

## BACKGROUND

7.  This action arises out of a pooling arrangement by life and health insurers for the reinsurance of the accident and health portions of workers' compensation insurance policies, otherwise known as workers' compensation carve-out reinsurance.

8.  Reinsurance is a transaction whereby one insurance company, the "reinsurer," in exchange for the payment of a premium, agrees to indemnify or reimburse another insurance company, the "reinsured" or "cedent," against all or part of a loss that the reinsured may sustain under insurance policies issued by the reinsured.

9.  A reinsurer may further reinsure its risk with another reinsurer. The reinsured in such situations is called the "retrocedent," and the reinsurer that receives the premium and assumes risk from the retrocedent is called the "retrocessionaire."

10. A "reinsurance intermediary" is an industry professional that holds itself out as being fully conversant with the customs and practices of the reinsurance industry. Reinsurance intermediaries typically handle all dealings and communications between a ceding company and a reinsurer, or between a retrocedent and a retrocessionaire, throughout the term of the reinsurance or retrocession. Reinsurance intermediaries are responsible for administering and maintaining the reinsurance or retrocession contract.

2

11.    A "managing general underwriter" ("MGU") is an entity that has the authority to underwrite insurance or reinsurance risks on behalf of an insurer or reinsurer. An MGU earns fees for underwriting business for its principal.

12.    A "reinsurance pool" is a group of companies that provide reinsurance protection to reinsureds. Each member of the pool assumes a specified interest in the reinsurance business underwritten on behalf of the pool.

13.    A "pool manager" is an MGU that is given authority by the pool members to manage the business of the reinsurance pool. The duties of a pool manager are established by agreement and typically include underwriting insurance or reinsurance risks on behalf of a pool and obtaining reinsurance or retrocessional coverage for the pool.

## GENERAL FACTUAL ALLEGATIONS

14.    At all relevant times, Lincoln was a member of the Unicover Occupational Accidental Reinsurance Pool (the "Pool"), which was formed, managed, and operated by an MGU, Unicover Managers, Inc. ("Unicover"). In addition to Lincoln, the other members of the Pool during the relevant time were Connecticut General Life Insurance Company ("Connecticut General," General & Cologne Life Re of America f/k/a the Cologne Life Reinsurance Company ("Cologne"), Phoenix Life Insurance Companies f/k/a Phoenix Home Life Mutual Insurance Company ("Phoenix"), and ReliaStar Life Insurance Company ("Reliastar") (collectively, the "Pool members"). The Pool entered into contracts to reinsure accident and health insurance liability arising from workers' compensation insurance policies issued in the United States.

15.    Lincoln became a member of the Pool with the expectation and understanding that its risks as a member of the Pool would be substantially reduced by retrocessional reinsurance purchased on behalf of the Pool. Each of the other Pool members joined the Pool with the same expectation and understanding.

16.    The Pool members executed an Occupational Accident Reinsurance Pool Management Agreement (the "Management Agreement"), which governed the relationship between and among Unicover and the Pool members. Pursuant to the terms of the Management

3

Agreement, Unicover would receive a management fee of 7.5% of the premium ceded by an insurer to the Pool for each risk accepted on behalf of the Pool.

17.     Pursuant to the Management Agreement, Unicover was obligated to secure retrocessional reinsurance protection for the Pool. On behalf of the Pool members, Unicover engaged Aon and Rattner as intermediaries to secure this coverage. For their services, Aon and Rattner collected a fee based on a percentage of the premium for the retroceded business.

18.     Aon and Rattner also were actively involved with Unicover in managing the Pool – describing themselves as "co-facilitators," for which they received a share of Unicover's 7.5% management fee. At one point, defendants' share amounted to one-third of Unicover's fee, *i.e.*, 2.5% of premium. These monies were in addition to the fees they received for their services as reinsurance intermediaries for the Pool. Aon and Rattner obtained greater fees as more premium was accepted on behalf of the Pool.

19.     In December, 1997, (1) Sun Life Assurance Company of Canada ("Sun"), (2) Phoenix (also a pool member), and (3) American Phoenix Life and Reassurance Company ("American Phoenix"), through their MGU, Centaur Underwriting Management Ltd. ("Centaur"), and (4) Cologne (also a Pool member), through its MGU, CRF Underwriting Underwriting Agency, Ltd. ("CRF Underwriting"), agreed to provide retrocessional coverage to the Pool for a term of three years beginning in December, 1997 (the "Three-Year Whole Account"). (Sun, Phoenix, American Phoenix, and Cologne are collectively referred to as "the Retrocessionaires.")

*A. Defendants' Misconduct*

20.     As intermediaries acting on behalf of the Pool members, Aon and Rattner owed duties to the Pool members. They shared a duty to act prudently and with the skill and diligence customarily required of one in their position. In particular, they were each under a duty to take all necessary steps to procure and maintain retrocessional protection for the Pool members, and to disclose to the Pool members and the Retrocessionaires all information that

4

might be material to the Retrocessionaires' willingness to perform pursuant to the Three-Year Whole Account Agreement.

21.     In 1998, Aon and Rattner recognized that they could earn substantial fees at the expense of the Pool members. Because they earned more fees with each dollar of premium ceded to the Pool, Aon and Rattner chose to present Unicover with accounts involving excessive volumes of premium and encouraged Unicover to reinsure them. Aon and Rattner knew that the Pool members and the Retrocessionaires expected Unicover to reinsure only a certain level of business and that they would object to the excessive levels of business Aon and Rattner were convincing Unicover to reinsure. Thus, in an effort to continue earning substantial commissions on the business, Aon and Rattner intentionally concealed from the Pool members and the Retrocessionaires the full extent of the business being written by Unicover.

22.     Although they were unaware of the full extent of the business that Aon and Rattner were convincing Unicover to write, the Retrocessionaires did in fact complain to Aon and Rattner about the level of business that they did know was being written. For example, by Fall 1998, Centaur informed Aon that it was "very keen" about "Unicover stopping underwriting." Aon and Rattner knew that if the Pool members were made aware of the full extent of the Retrocessionaires' complaints, they would insist that Aon and Rattner cease referring business to the Pool and that Unicover cease writing it.

23.     But since this would foreclose Aon and Rattner from continuing to reap illicit and improper commissions amounting to tens of millions of dollars, defendants concealed from the Pool members the full extent of the Retrocessionaires' complaints and instead led Unicover and the Pool members to believe that the Retrocessionaires were not dissatisfied with the business being retroceded to them. For example, in Fall 1998 – long after becoming aware of the Retrocessionaires' substantial concerns – Aon blithely and falsely assured Unicover that "Cackett [the Retrocessionaires' principal broker] is calm."

24.     Based on complaints from the Retrocessionaires, Aon and Rattner knew by August 1998 that the Pool members' retrocessional protection under the Three-Year Whole Account Agreement was in jeopardy. Specifically, Sun and Centaur advised Aon and Rattner no

later than early August 1998 that they had significant concerns about the levels of business that were being written and retroceded, that they wanted no additional business to be written or retroceded, and that they were considering legal action to terminate or limit their liability under the Three-Year Whole Account. Indeed, Centaur specifically informed Aon that Centaur believed the levels of premium being ceded amounted to "white collar fraud" and a "get rich quick scheme" perpetrated by "rogues."

25.     Nonetheless, Aon and Rattner failed fully to disclose to the Pool members the Retrocessionaires' concerns and, in a quest for more fees, encouraged Unicover to continue writing and retroceding more business. In fact, even after the Retrocessionaires' raised concerns about the level of premium being written and particularly about the increase in premium relating to the aggressive use of "buffers," Aon encouraged Unicover to "pump [th]em in!!!"

### B. Damage to Plaintiff

26.     By letter of January 25, 1999, Sun advised the Pool that it was unilaterally terminating, and reserving its right to rescind, the Three-Year Whole Account. (After receiving that letter, Roger Smith of Aon forwarded a copy to Rattner, with the comment: "As little as you want to talk to me at the moment, I think we should catch upon the attached, as, at its worst, we are all implicated.")

27.     The Retrocessionaires later demanded arbitration against the Pool, seeking to eliminate or reduce their obligations under the Three-Year Whole Account.

28.     A hearing on the claims of the Retrocessionaires was held from July 8 through August 7, 2002. On October 8, 2002, the arbitration panel issued an award which, in relevant part, relieved the Retrocessionaires of the responsibility to provide retrocessional coverage to the Pool under the Three-Year Whole Account for business bound or renewed on behalf of the Pool after August 31, 1998.

29.     Due to the loss of retrocessional coverage for business bound or renewed after August 31, 1998, Lincoln suffered tens of millions of dollars in losses that would not have been suffered absent defendants' wrongful conduct.

## FIRST CLAIM FOR RELIEF

### (Fraud by Aon and Rattner)

30.     Lincoln re-alleges and incorporates each allegation contained in the preceding paragraphs as if fully set forth herein.

31.     As detailed above, defendants owed duties to the Pool members, obligating them to act prudently and with the skill and diligence customarily required of one in their position.  In particular, defendants were each under a duty to take all necessary steps to procure and maintain retrocessional protection for the Pool members, and to disclose to the Pool members and the Retrocessionaires all information that might be material to the Retrocessionaires' willingness to perform pursuant to the Three-Year Whole Account Agreement.

32.     Despite these duties, defendants (in a quest for greater fees generated through the large amounts of business being written into the Pool and ceded to the Retrocessionaires), among other things, intentionally concealed material information from the Retrocessionaires and the Pool members concerning the volume of business written into the Pool and retroceded to the Retrocessionaires, and failed to provide full disclosure to the Pool members of the Retrocessionaires' concerns related to the volume of business being retroceded to the Retrocessionaires.  In addition to failing to disclose the above material information, defendants affirmatively represented to the Pool members that the Retrocessionaires were not dissatisfied with the amount of premium being ceded to them, despite knowing that such representations were false.  Furthermore, in an attempt to collect more fees, defendants continued to encourage Unicover to write more business on behalf of the Pool despite the precarious state of the Pool's retrocessional coverage.

33.     Lincoln reasonably relied upon defendants' representations and omissions, in light of, *inter alia*, the fiduciary relationship of trust and confidence between Lincoln and defendants.  As defendants knew, had they fully disclosed to the Pool the Retrocessionaires' concerns and/or the excessive volumes of business being written and retroceded, Lincoln would

7

have instructed Unicover to stop writing additional business on its behalf. In that event, the business for which the Pool has lost retrocessional coverage would never have been written.

34.    As a direct and proximate result of defendants' fraud, Lincoln has sustained significant damages, amounting to at least tens of millions of dollars.

35.    In committing the fraudulent conduct detailed above, defendants acted jointly, as each others' agents, and in conspiracy, thus making each defendant liable jointly and severally for the entire damage to Lincoln caused by such fraud.

36.    Defendants' conduct was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

## SECOND CLAIM FOR RELIEF

### (Negligent Misrepresentation by Aon and Rattner)

37.    Lincoln re-alleges and incorporates each allegation contained in the preceding paragraphs as if fully set forth herein.

38.    Defendants (in a quest for greater fees generated through the large amounts of business being written into the Pool and ceded to the Retrocessionaires), among other things, concealed material information from the Retrocessionaires and the Pool members concerning the volume of business written into the Pool and retroceded to the Retrocessionaires, and failed to provide full disclosure to the Pool members of the Retrocessionaites' concerns related to the level of business being retroceded to the Retrocessionaires. In addition to failing to disclose the above material information, defendants affirmatively represented that the Retrocessionaires were not dissatisfied with the amount of premium being retroceded to them, when they knew or should have known that such representations were false. Furthermore, in an attempt to collect more fees, defendants continued to encourage Unicover to write more business on behalf of the Pool despite the precarious state of the Pool's retrocessional coverage.

39.    Lincoln reasonably relied upon defendants' representations and omissions, in light of, *inter alia*, the fiduciary relationship of trust and confidence between Lincoln and defendants. Had defendants fully disclosed to the Pool the Retrocessionaires' concerns and/or the excessive volume of business being written and retroceded, Lincoln would have instructed

8

Unicover to stop writing additional business on its behalf. In that event, the business for which the Pool has lost retrocessional coverage would never have been written.

40.     As a direct and proximate result of defendants' negligent misrepresentation, Lincoln has sustained significant damages, amounting to at least tens of millions of dollars.

41.     In committing the wrongful conduct detailed above, defendants acted jointly, as each others' agents, and in conspiracy, thus making each defendant liable jointly and severally for the entire damage to Lincoln caused by such wrongful conduct.

### THIRD CLAIM FOR RELIEF

### (Breach of Fiduciary Duty by Aon and Rattner)

42.     Lincoln re-alleges and incorporates each allegation contained in the preceding paragraphs as if fully set forth herein.

43.     Aon and Rattner stood in a fiduciary relationship of trust and confidence with the Pool members, pursuant to which they owed duties of good faith, utmost loyalty, candor, integrity, and care.

44.     Defendants breached these duties by engaging in self-dealing practices to preserve their inflow of fees, including: (a) concealing the excessive volume of business written into the Pool and retroceded to the Retrocessionaires; (b) failing fully to disclose to the Pool members the Retrocessionaires' concerns regarding the level of business being retroceded; (c) affirmatively representing that the Retrocessionaires were not dissatisfied with the amount of premium being retroceded to them, knowing that such representations were false; and (d) encouraging Unicover to write more business on behalf of the Pool despite the precarious state of the Pool's retrocessional coverage.

45.     Defendants' breach caused the failure of the majority of the Pool's retrocessional protection. Absent defendants' breach, the business for which the Pool has lost retrocessional coverage would never have been written.

46.     As a direct and proximate result of defendants' breach, Lincoln has sustained significant damages, amounting to at least tens of millions of dollars.

9

47.    In committing the breaches detailed above, defendants acted jointly, as each others' agents, and in conspiracy, thus making each defendant liable jointly and severally for the entire damage to Lincoln caused by such breaches.

48.    Defendants' conduct was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

## FOURTH CLAIM FOR RELIEF

### (Negligence by Aon and Rattner)

49.    Lincoln re-alleges and incorporates each allegation contained in the preceding paragraphs as if fully set forth herein.

50.    Defendants owed a duty to the Pool members to exercise due care under the circumstances and to carry out their obligations in a commercially reasonable manner. By virtue of their role as reinsurance intermediaries and Pool managers, defendants also stood in a fiduciary relationship of trust and confidence with the Pool members, pursuant to which they owed duties of good faith, utmost loyalty, candor, integrity, and care. Defendants were each under a duty to take all necessary steps to procure and maintain retrocessional protection for the Pool members, and to disclose to the Pool members and the Retrocessionaires all information that might be material to the Retrocessionaires' willingness to perform pursuant to the Three-Year Whole Account Agreement.

51.    Defendants breached these duties by, among other things: (a) concealing the excessive volume of business written into the Pool and retroceded to the Retrocessionaires; (b) failing fully to disclose to the Pool members the Retrocessionaires' concerns regarding the level of business being retroceded; (c) affirmatively representing that the Retrocessionaires were not dissatisfied with the amount of premium being retroceded to them, knowing that such representations were false; and (d) encouraging Unicover to write more business on behalf of the Pool despite the precarious state of the Pool's retrocessional coverage.

52.    Defendants' breach caused the failure of the majority of the Pool's retrocessional protection. Absent defendants' breach, the business for which the Pool has lost retrocessional coverage would never have been written.

10

53.    As a direct and proximate result of defendants' breach, Lincoln has sustained significant damages, amounting to at least tens of millions of dollars.

54.    In committing the breaches detailed above, defendants acted jointly, as each others' agents, and in conspiracy, thus making each defendant liable jointly and severally for the entire damage to Lincoln caused by such breaches.

55.    Defendants' conduct was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

## FIFTH CLAIM FOR RELIEF

### (Unjust Enrichment by Aon and Rattner)

56.    Lincoln re-alleges and incorporates each allegation contained in the preceding paragraphs as if fully set forth herein.

57.    Defendants entered into an agreement with Unicover whereby defendants, for the benefit of the Pool members, would serve as reinsurance intermediaries for the Pool. Defendants collected a fee for such services.

58.    Defendants also entered into an agreement with Unicover whereby defendants, for the benefit of the Pool members, would assist in managing the Pool.  Defendants collected additional fees in exchange for their services in connection with this agreement.

59.    Pursuant to these agreements, defendants were each under a duty to the Pool members to exercise due care under the circumstances and to carry out their obligations in a commercially reasonable manner.  Specifically, they were obligated to take all necessary steps to procure and maintain retrocessional protection for the Pool members, and to disclose to the Pool members and the Retrocessionaires all information that might be material to the Retrocessionaires' willingness to perform pursuant to the Three-Year Whole Account Agreement.

60.    In an effort to reap more commissions, defendants breached these duties by, among other things:  (a) concealing the excessive volume of business written into the Pool and retroceded to the Retrocessionaires; (b) failing fully to disclose to the Pool members the Retrocessionaires' concerns regarding the level of business being retroceded; (c) affirmatively

11

representing that the Retrocessionaires were not dissatisfied with the amount of premium being retroceded to them, knowing that such representations were false; and (d) encouraging Unicover to write more business on behalf of the Pool despite the precarious state of the Pool's retrocessional coverage.

61.     Defendants' breach caused the failure of the majority of the Pool's retrocessional protection.  Absent defendants' breach, the business for which the Pool has lost retrocessional coverage would never have been written.

62.     Defendants' conduct has allowed it to unjustly reap tens of millions of dollars to Lincoln's detriment, and defendants' retention of this benefit violates the fundamental principles of justice, equity, and good conscience.

63.     In committing the wrongful conduct detailed above, defendants acted jointly, as each others' agents, and in conspiracy, thus making each defendant liable jointly and severally for the entire damage to Lincoln caused by such wrongful conduct.

64.     Defendants' conduct was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

## SIXTH CLAIM FOR RELIEF

### (Breach of Contract by Rattner as Reinsurance Intermediary)

65.     Lincoln re-alleges and incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

66.     Rattner entered into an agreement with Unicover whereby Rattner, for the benefit of the Pool members, would serve as a reinsurance intermediary for the Pool.  As a reinsurance intermediary for the Pool, Rattner stood in a fiduciary relationship of trust and confidence with the Pool, and undertook certain duties, including, to secure and maintain retrocessional protection for the Pool, and to disclose to the Pool members and the Retrocessionaires all information it had which might be material to the Retrocessionaires' willingness to perform under the Three-Year Whole Account.

67.     The Pool members have duly performed all the conditions of the agreement on their part.

12

68.   Rattner breached the agreement by, among other things:  (a) concealing the excessive volume of business written into the Pool and retroceded to the Retrocessionaires; (b) failing fully to disclose to the Pool members the Retrocessionaires' concerns regarding the level of business being retroceded; (c) affirmatively representing that the Retrocessionaires were not dissatisfied with the amount of premium being retroceded to them, knowing that such representations were false; and (d) encouraging Unicover to write more business on behalf of the Pool despite the precarious state of the Pool's retrocessional coverage.

69.   As a result of Rattner's breach, the majority of the Pool members' retrocessional protection was rescinded, leaving the Pool members exposed to substantial unreinsured risks.

70.   As a direct and proximate result of Rattner's breach, Lincoln has sustained significant damages, amounting to at least tens of millions of dollars.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Contract by Rattner as a Pool Manager)

71.   Lincoln re-alleges and incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

72.   Rattner entered into an agreement with Unicover whereby Rattner, for the benefit of the Pool members, would assist in managing the Pool in exchange for a percentage of the Pool management fee.   As a Pool manager, Rattner stood in a fiduciary relationship of trust and confidence with the Pool, and undertook the duties set forth in the Pool Management Agreement.  Among other duties, Rattner agreed to keep the Pool members fully informed of all material facts that might jeopardize the continued stability and secure operation of the Pool.

73.   The Pool members have duly performed all the conditions of the agreement on their part.

74.   Rattner breached the agreement by, among other things:  (a) concealing the excessive volume of business written into the Pool and retroceded to the Retrocessionaires; (b) failing fully to disclose to the Pool members the Retrocessionaires' concerns regarding the level of business being retroceded; (c) affirmatively representing that the Retrocessionaires were

13

not dissatisfied with the amount of premium being retroceded to them, knowing that such representations were false; and (d) encouraging Unicover to write more business on behalf of the Pool despite the precarious state of the Pool's retrocessional coverage.

75.     As a result of Rattner's breach, the majority of the Pool members' retrocessional protection was rescinded, leaving the Pool members exposed to substantial unreinsured risks.

76.     As a direct and proximate result of Rattner's breach, Lincoln has sustained significant damages, amounting to at least tens of millions of dollars.

## EIGHTH CLAIM FOR RELIEF

### (Breach of the Duty of Good Faith and Fair Dealing by Rattner)

77.     Lincoln re-alleges and incorporates the allegations contained in the preceding paragraphs as if fully set forth herein.

78.     By virtue of its contractual relations with the Pool members, Rattner was obligated to act in accordance with the duty of good faith and fair dealing. In particular, Rattner was under a duty to avoid conduct which would have the effect of destroying or injuring Lincoln's ability to receive the fruits of its agreements with Rattner.

79.     Rattner breached the duty of good faith and fair dealing it owed the Pool members by, among other things:  (a) concealing the excessive volume of business written into the Pool and retroceded to the Retrocessionaires; (b) failing fully to disclose to the Pool members the Retrocessionaires' concerns regarding the level of business being retroceded; (c) affirmatively representing that the Retrocessionaires were not dissatisfied with the amount of premium being retroceded to them, knowing that such representations were false; and (d) encouraging Unicover to write more business on behalf of the Pool despite the precarious state of the Pool's retrocessional coverage.

80.     As a result of Rattner's breach, the majority of the Pool members' retrocessional protection was rescinded, leaving the Pool members exposed to substantial unreinsured risks.

14

MAY-22-2003 THU 05:08 PM    EDWARDS&ANGELL LLP    FAX NO.    P. 04/63

NO.227    P.6

Andrew P. Fishkin (#AF-7571)
Edwards & Angell, LLP
51 John F. Kennedy Parkway
Short Hills, NJ 07078
Attorneys for the plaintiffs

RECEIVED-CLERK
U.S. DISTRICT COURT

2003 JUN 22  P 2: 51

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

PHOENIX LIFE INSURANCE COMPANY
and GENERAL & COLOGNE LIFE RE
OF AMERICA,

    Plaintiffs,

v.

UNICOVER MANAGERS, INC.,
UNICOVER MANAGERS, LLC, CRAGWOOD
MANAGERS, LLC, JOHN E. PALLAT III,
THOMAS J. DUNN, JR., ROBERT J.
WOJTOWICZ, JOSEPH P. WOJTOWICZ,
KENNETH C. GRIBBELL, AON RE, INC.,
and RATTNER MACKENZIE LIMITED,

    Defendants.

Civil Action No. _____

**COMPLAINT**

Plaintiffs Phoenix Life Insurance Company and General & Cologne Life Re of America
(collectively, the "Plaintiffs"), by their attorneys, Edwards & Angell, LLP, hereby allege:

## NATURE OF THE ACTION

1.     This is an action for damages arising out a complex pooling arrangement for the
reinsurance of the accident and health portions of workers' compensation insurance policies by
life and health insurers, otherwise known as workers' compensation carve-out reinsurance.

2.     Reinsurance is a transaction whereby one insurance company, the "reinsurer," in
exchange for payment of a premium, agrees to indemnify or reimburse another insurance

company, the "reinsured," against all or part of a loss that the reinsured may sustain under insurance policies the reinsured has issued. Reinsurance arrangements are common among insurers.

3.    A reinsurer may further reinsure its risk with another reinsurer. The reinsured in such situations is called the "retrocedent," and the reinsurer that receives the premium and assumes risk from the retrocedent is called the "retrocessionaire." A retrocessionaire can, in turn, cede risks to another reinsurer, the former labeled a first-level retrocessionaire and the latter labeled a second-level retrocessionaire. Additional levels of reinsurance are also possible.

4.    A reinsurer or retrocessionaire is dependent upon its reinsured or retrocedent to provide information material to the reinsured risk and to carefully underwrite and manage the reinsured business. Every reinsured or retrocedent owes its reinsurer or retrocessionaire a duty of "utmost good faith" in performing its duties.

5.    A "broker" is often retained by the reinsured or retrocedent to arrange for reinsurance for all or part of the reinsured's book of business. In brokered transactions, the broker typically handles all dealings between a reinsured and a reinsurer, or between a retrocedent and a retrocessionaire. Although the broker is not a party to the reinsurance contract, its proper understanding of the risk reinsured and handling of funds and transmittal of information is crucial to the transaction of business between the seller and the buyer of reinsurance.

6.    In the context of a reinsurance transaction, a "slip" is a short document memorializing the essential terms of the parties' reinsurance agreement.

7.    A managing general underwriter or "MGU" is a legal entity that has the authority to underwrite insurance or reinsurance risks on behalf of an insurer. An MGU is an agent of the

- 2 -

insurer and earns management fees for underwriting business for its principal. It is not uncommon for an insurer to retain an MGU to underwrite insurance or reinsurance on the insurer's behalf, and to obtain reinsurance when desired.

8.    A "reinsurance pool" is comprised of a group of insurance and/or reinsurance companies that provide reinsurance protection to reinsureds. Each member of the pool assumes a predetermined and fixed interest in the reinsurance business underwritten on behalf of the pool.

9.    A "pool manager" is an MGU that has authority, pursuant to a pool management agreement, to underwrite insurance or reinsurance risks on behalf of its pool members and, in many instances, to obtain reinsurance or retrocessional coverage for the pool members for all or a portion of those risks.

10.    For the purposes of this Complaint, "gross premium" is the total premium written under the original policies of workers' compensation insurance, without regard to reinsurance. In addition, for purposes of this Complaint, "gross subject premium" is that portion of the gross premium to which a reinsurance contract applies; that is, gross premium multiplied by the reinsurer's or retrocessionaire's percentage of participation on the account. For example, for accounts where a reinsurer's participation is 100%, the gross subject premium would be equal to the gross premium, but the gross subject premium would be less than the gross premium where a reinsurer's participation is less than 100%.

11.    As more fully set forth below, the Plaintiffs were members of a reinsurance pool formed, managed and operated by the MGU defendants (Unicover Managers, Inc.; Unicover Managers, LLC; and Cragwood Managers, LLC) and their principals (John E. Pallat III; Thomas J. Dunn, Jr.; Robert J. Wojtowicz; Joseph P. Wojtowicz; and Kenneth C. Griebell) in conjunction with the broker defendants (Aon Re, Inc. and Rattner Mackenzie Limited). The broker

HAO_112561_14

MAY-22-2003 THU 05:09 PM    EDWARDSBANGELL LLP    FAX NO.                    P. 07/63
                                                                    NO.227   P.9

defendants also acted as brokers with respect to the placement of retrocessional reinsurance to protect the Plaintiffs. Due to defendants' breaches of contract, violations of their legal duty and tortious acts, as specified below, the retrocessional reinsurance protection in large part failed. The Plaintiffs bring this action to recover, among other things, all damages they sustained due to the loss of the retrocessional reinsurance protection, and the return of all monies held in trust by certain defendants and the consequential damages resulting from the misappropriation of such funds.

## PARTIES

12.    Plaintiff Phoenix Life Insurance Company, f/k/a Phoenix Home Life Mutual Insurance Company ("Phoenix"), is a corporation organized and existing under the laws of the State of New York with its principal place of business in Hartford, Connecticut.

13.    Plaintiff General & Cologne Life Re of America, f/k/a Cologne Life Reinsurance Company ("Cologne"), is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business in Stamford, Connecticut.

14.    Defendant Aon Re, Inc. ("Aon") is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois. Aon is a licensed insurance and reinsurance intermediary in the State of New Jersey.

15.    Defendant Rattner Mackenize Limited ("Rattner") is a corporation organized and existing under the laws of England with a principal place of business in London, England.

16.    Defendant Cragwood Managers, L.L.C., formerly known as Unicover Managers, L.L.C., and successor-in-interest to defendant Unicover Managers, Inc. (collectively, "Unicover"), is a limited liability company organized under the laws of the State of New Jersey with its principal place of business in South Plainfield, New Jersey.

- 4 -

17.    Defendant John E. Pallat III ("Pallat") is a citizen of the State of New Jersey.

18.    Defendant Thomas J. Dunn Jr. ("Dunn") is a citizen of the State of Illinois.

19.    Defendant Robert J. Wojtowicz ("Robert Wojtowicz") is a citizen of the State of New Jersey.

20.    Defendant Joseph P. Wojtowicz ("Joseph Wojtowicz") is a citizen of the State of New Jersey.

21.    Defendant Kenneth C. Griebell ("Griebell") is a citizen of the State of New Jersey.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs and any claim for punitive damages.

23.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the defendants are subject to personal jurisdiction here.

## GENERAL FACTUAL ALLEGATIONS

A.    Unicover, Its Shareholders and the Unicover Pool

24.    In December 1994, defendants Pallat, Dunn and Robert and Joseph Wojtowicz created Unicover, an MGU specializing in the reinsurance of the accident and health portions of workers' compensation insurance policies, otherwise known as workers' compensation carve-out insurance.

25.    Defendant Pallat is a founding shareholder and the current Chairman and CEO of Unicover.   Mr. Pallat was active in all aspects of Unicover's business and was responsible for

- 5 -

HFD_112581_14

MAY-22-2003 THU 05:10 PM
MAY.22.2003    3:53PM    EDWARDS&ANGELL LLP     FAX NO.     P. 09/63
NO.227    P.11

many of Unicover's business practices. Mr. Pallat controlled Unicover's operations from the company's New Jersey headquarters.

26.    Defendant Dunn is a founding shareholder and was formerly the President of Unicover. On information and belief, defendant Dunn began working in Unicover's New Jersey headquarters but later moved to Unicover's office in Lisle, Illinois. After the move and throughout the relevant time period, Mr. Dunn was in regular contact with defendant Pallat and the New Jersey office and frequently traveled to New Jersey to conduct Unicover-related business.

27.    On information and belief, Robert Wojtowicz is a founding shareholder and a director of Unicover and actively participated in the formation and management of the company.

28.    On information and belief, Joseph Wojtowicz is a founding shareholder and the Chief Financial Officer of Unicover.

29.    Defendant Griebell was actively involved in the early stages of Unicover's development. Throughout the relevant time period, Griebell participated in numerous aspects of Unicover's business including, without limitation, overseeing Unicover's marketing, corresponding with pool members and retrocessionaires and producing, structuring and negotiating treaty reinsurance programs. On information and belief, Griebell became a shareholder in Unicover effective June 1998.

30.    In 1995, Unicover, along with Chris Mays of Nicholson Leslie Group, Aon's London Market reinsurance brokerage affiliate ("Nicholson Leslie"), recruited the insurers to participate in the Unicover Managers Occupational Accident Reinsurance Pool (the "Pool"), a risk-bearing reinsurance pool formed to provide workers' compensation carve-out reinsurance. On information and belief, Unicover and its agent, Mr. Mays of Nicholson Leslie, represented to

-6-

potential participants in the Pool that the Pool was formed to provide reinsurance to the niche market of high quality, relatively small workers' compensation insurance policies.

31.    From March 1, 1995 to March 1, 1998 (Pool Year 1 through Pool Year 3), the members of the Pool were Connecticut General Life Insurance Company ("CIGNA"), Lincoln National Life Insurance Company ("Lincoln"), Phoenix and Life Reassurance Corporation of America ("Life Re").  Life Re withdrew from the Pool as of March 1, 1998.  Cologne and ReliaStar Life Insurance Company ("ReliaStar") joined the Pool beginning March 1, 1998 (Pool Year 4).  The other members of the original Pool continued to participate (collectively, with Life Re, ReliaStar and Cologne, the "Pool members").

32.    Phoenix and Cologne became members of the Pool with the expectation and understanding that the business accepted on their behalf would be protected in whole or in part by retrocessional coverage.

33.    In connection with their membership in the Pool, the Pool members executed an Occupational Accident Reinsurance Pool Management Agreement (the "Management Agreement"), which governed the relationship between and among Unicover and the Pool members.  By the terms of the Management Agreement, Unicover became the administrator and MGU for the Pool members.  The Management Agreement provided Unicover with exclusive authority to bind reinsurance risks on behalf of the Pool.  The Management Agreement also expressly required Unicover to "act in accordance with reasonable professional standards in all matters subject to [the Management Agreement]."

34.    The Management Agreement contains an arbitration provision applicable to disputes between Unicover and the Pool members arising out of the Management Agreement.

- 7 -

MAY-22-2003 THU 05:11 PM   EDWARDS&ANGELL LLP   FAX NO.   P. 11/83
NO.227   P.19

However, as described in the Fifth Claim for Relief of this Complaint, the arbitration provision does not apply to the sole claim for relief asserted by Phoenix and Cologne against Unicover.

35.   Pursuant to the Management Agreement, Unicover was obligated to hold all premiums and other Pool-related funds in an interest bearing account known as the Unicover Managers, Inc. Pool Trust Account (the "Pool Trust Account") and remit portions of such funds when necessary.  The Management Agreement required that Unicover retain in the Pool Trust Account a specific amount of premium to pay for claims arising from business underwritten on behalf of the Pool that was not retroceded.  The Management Agreement expressly required that Unicover hold all premium and other monies in a fiduciary capacity for the Pool members.

36.   Pursuant to the terms of the Management Agreement, Unicover earned a management fee of 7.5% of the gross premium ceded by an insurer to the Pool members for each piece of business accepted on their behalf.  Thus, Unicover would receive more money as more premium was accepted on behalf of the Pool members.  Unicover also had the right to earn an annual profit commission, which was calculated according to the net profit for each Pool year.

37.   In addition to the business written on behalf of the Pool members, Unicover separately wrote and managed business on behalf of Lincoln National Life Insurance Company and Lincoln National Health and Casualty Insurance Company (the "Lincoln Facility") and Reliance Insurance Company (the "Reliance Facility").  Through Aon and Ratner, Unicover obtained retrocessional protection for the Pool members, the Lincoln Facility and the Reliance Facility.

HFD_112501_14

**B.**    The Brokers and the Joint Venture

38.    Unicover engaged Chris Mays of Nicholson Leslie and Roger Smith of Aon as its chief brokers for securing retrocessional protection for the Pool members. In late 1995, both Mays and Smith worked for Nicholson Leslie. In early 1996, Smith was sent to Aon's Chicago office to develop a reinsurance brokerage practice. In the summer of 1997, Mr. Mays moved to Rattner where he continued to share the Unicover account with Aon. At that time, Rattner and Aon agreed to split the commissions on premiums received from the Pool. Rattner was removed as retrocessional broker for the Pool in December of 1998. Thereafter, Aon acted as the Pool members' sole retrocessional broker.

39.    As retrocessional brokers, Aon and Rattner were responsible for obtaining retrocessional protection for the Pool members in exchange for a brokerage fee – a percentage of the premium for the retroceded business. Aon and Rattner were obligated to act as a conduit to their principals, the Pool members, and to disclose to them all material information concerning the retrocessional protections. Aon and Rattner were also obligated to provide retrocessionaires with all material information concerning the business being retroceded by the Pool members.

40.    In addition to their roles as retrocessional brokers, Aon and Rattner entered into a joint venture with Unicover in which they shared Pool management fees in exchange for assisting in the management of the Pool. Through this additional role, informally termed "Pool broker," Aon and Rattner became, in essence, business partners with Unicover. As such, Aon and Rattner actively participated with Unicover in forming and managing the Pool. For example, Mr. Smith was a principal facilitator of the Pool's growth and was responsible for communicating directly with Pool members concerning Pool management issues such as developing the Management Agreement. Mr. Mays was a principal architect of the Pool and was

- 9 -

responsible for marketing the Pool within the industry and the London Market in an effort to secure a dominant position in the workers' compensation carve-out market. Both Mr. Smith, on behalf of Aon, and Mr. Mays, on behalf of Nicholson Leslie/Aon and then Rattner, acted as Unicover's conduits to the Pool members concerning all aspects of the Pool's business.

41.     In exchange for its efforts, and in furtherance of the joint venture, Aon initially took a one-third share of Unicover's 7.5% management fee for the Pool. Later, when Mr. Mays left Nicholson Leslie for Rattner, Aon and Rattner divided equally the one-third share of the management fee. These profits were in addition to the brokerage fees that Aon and Rattner received as retrocessional brokers for the Pool members. When Rattner was removed as broker in 1998, Aon became Unicover's sole business partner, and its share was increased to 20% of Unicover's management fee for Pool Year 4 (1998-99). Like Unicover, Aon and Rattner received greater fees as more premium was accepted on behalf of the Pool members, regardless of the profitability of the business that generated that premium.

42.     The Pool members did not have contemporaneous knowledge of the fee-sharing agreement between Unicover and Aon and Rattner. Without that knowledge, the Pool members were ignorant of Aon's and Rattner's divided loyalties throughout the relevant time period.

43.     On information and belief, Aon and Rattner earned no less than $40 million as a result of the Unicover joint venture.

44.     Throughout the relevant time period, Mr. Smith and Mr. Mays consistently conducted Pool-related business in the State of New Jersey. The two had regular contact with Mr. Pallat, who controlled Unicover's operations from the company's New Jersey headquarters. Unicover administered the Pool from its New Jersey headquarters, and Mr. Smith and Mr. Mays visited there regularly for Pool-related business.

- 10 -

45.    On information and belief, the commissions paid to Unicover arising from the Lincoln Facility and the Reliance Facility were also shared between Unicover and Rattner. These commissions were based upon the premiums paid for reinsurance accepted by the Lincoln and Reliance Facilities. As in the case of the Pool members, Rattner worked with Unicover in managing the Lincoln and Reliance Facilities to maximize the premiums received.

## C.    The Pool's Retrocessional Protection

46.    During Pool Years 1 and 2 (March 1, 1995 – February 28, 1997), Unicover, on behalf of the Pool members, obtained facultative retrocessional reinsurance, i.e., each risk underwritten on behalf of the Pool members was separately reinsured. Nicholson Leslie was Unicover's broker for these facultative retrocessional placements.

47.    Centaur Underwriting Management Ltd. ("Centaur"), acting as MGU for Sun Life Assurance Company of Canada ("Sun"), Phoenix and Phoenix's affiliate American Phoenix Life and Reassurance Company ("American Phoenix"), provided facultative reinsurance protection to the Pool members for a number of accounts arising out of Pool Years 1 and 2. John Cackett was a principal of Centaur and managed the company's operations.

48.    In the spring of 1997, Unicover, through its retrocessional brokers, sought to secure "whole account" retrocessional protection through a reinsurance agreement, also called a treaty. A whole account reinsurance treaty obligates a reinsured/retrocedent to cede, and a reinsurer/retrocessionaire to accept, all risks that fall within the terms of the reinsurance treaty. Thus, under a whole account treaty, an entire class of a reinsured's/retrocedent's business (often its entire book) is automatically ceded to the reinsurer/retrocessionaire. It is therefore customary in the industry for the reinsured/retrocedent to retain a financial risk in the business written so as

- 11 -

to provide the reinsured/retrocedent with a continuing stake in the quality of its underwriting analysis. It is also customary for the reinsured/retrocedent to provide the reinsurer/retrocessionaire a reliable, good faith estimate of premium volume because this information is crucial to the reinsurer/retrocessionaire in assessing exposure.

49. In the spring of 1997, Mr. Mays and Aon were instrumental in inducing Mr. Cackett of Centaur, on behalf of its principals, Sun and American Phoenix, to enter into a whole account retrocessional agreement with the Pool incepting March 1, 1997 (the "March Whole Account"). Under the March Whole Account, Sun American Phoenix and Lloyd's Syndicate 957 agreed to provide retrocessional cover to the Pool members for a period of one year. The March Whole Account slips set forth Unicover's gross subject premium volume estimate of $100,000,000.

50. Shortly after securing the March Whole Account, Unicover and Mr. Mays persuaded Mr. Cackett to agree to a significant alteration in the March Whole Account slips. Typically, within the reinsurance industry a cedent is required to retain a portion of the risk in order to ensure that the cedent is underwriting profitable business. Mr. Cackett, on behalf of the Retrocessionaires, agreed to the March Whole Account based, in part, on representations that Unicover would be retaining a portion of the carefully selected risks that it reinsured. Nevertheless, Unicover, through Mr. Mays, persuaded Mr. Cackett to change the retention limits language from "ultimate net loss" to "original gross loss" on the understanding that this would more fairly reflect an appropriate Unicover retention in cases where Unicover itself wrote less than a 100% of a particular risk. This representation was false. Unicover intended to use -- and did use -- the "original gross loss" language to eliminate or drastically reduce the Pool's retention. Unicover's retrocession of business without retaining a meaningful portion of the risk

- 12 -

resulted in Unicover simply selling reinsurance based on Centaur's rates without the need to conduct any underwriting. This reinsurance practice is the diametric opposite of the reinsurance business that Unicover and its brokers represented to Mr. Cackett would be ceded to the Retrocessionaires.

51.     After the March Whole Account had been operating for a few months, Centaur and Unicover, through Aon and Rattner, agreed to cancel the March Whole Account and replace it with a three-year contract incepting December 1, 1997 (the "December Whole Account"). Lloyd's Syndicate 957 did not participate in the December Whole Account and was replaced by Cologne. In addition, American Phoenix was replaced by Phoenix.

52.     Sun and Phoenix participated in the December Whole Account through Centaur, their MGU. Cologne was represented by its agent, CRF Underwriting Agency, Ltd., which did not possess binding authority on its behalf.

53.     Cologne became a Retrocessionaire at approximately the same time that it agreed to participate as a Pool member. In becoming both a Retrocessionaire and a Pool member, Cologne relied on certain representations, including, among others, that Unicover would be operating in a niche market and would not be writing business on a lowest-price basis and that the premium income to the December Whole Account would flow only from the Pool.

54.     The December Whole Account expanded the scope of the reinsured entities beyond the Pool members to include "any additional Pool(s) or Facility(ies) that may hereafter be created and managed by Unicover." At the time the December Whole Account was executed, however, Unicover had not disclosed to Cologne, Sun, or Phoenix (the "Retrocessionaires") its express intention to create additional facilities with Lincoln, Reliance and others. Nevertheless,

- 13 -

HFD_112501_14

when the Lincoln and Reliance Facilities were created, Unicover ceded business from those facilities to the December Whole Account.

55.    The December Whole Account placement slips expressly stated the estimated gross subject premium over the three-year period as:

| | |
|---|---|
| 1st December 1997 to 1st December 1998 ("Year 1"): | $150,000,000 |
| 1st December 1998 to 1st December 1999 ("Year 2"): | $200,000,000 |
| 1st December 1999 to 1st December 2000 ("Year 3"): | $250,000,000. |

Thus, the Retrocessionaires entered into the December Whole Account upon the express representation that the estimated gross subject premium for the entire three years of the December Whole Account would be no more than approximately $600,000,000. This representation was false when made.

56.    Following the establishment of the December Whole Account, Rattner issued cover notes confirming that the Pool members' reinsurance protection was in place and effective.

D.    **The Explosive Growth in the Pool's Premium**

57.    In the fall of 1997, Unicover developed bold expansion plans, including broader market initiatives, the creation of new reinsurance facilities and goals for increased writings in general. Accordingly, Unicover began to underwrite an increasingly large volume of business on behalf of the Pool members.

58.    Unicover deliberately engaged in an underwriting practice of providing reinsurance at rates that were certain to generate huge losses to the Pool members, but turning those losses into gains by ceding them to the Retrocessionaires. In other words, Unicover intentionally quoted prices that necessarily resulted in the retrocession of exposures far in excess

- 14 -