Andrew P. Fishkin (#AF-7571)
Edwards & Angell, LLP
51 John F. Kennedy Parkway
Short Hills, NJ 07078
Attorneys for the plaintiffs

RECEIVED-CLERK
U.S. DISTRICT COURT

2003 MAY 22 P 2: 51

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

PHOENIX LIFE INSURANCE COMPANY
and GENERAL & COLOGNE LIFE RE
OF AMERICA,

  Plaintiffs,

v.

UNICOVER MANAGERS, INC.,
UNICOVER MANAGERS, LLC, CRAGWOOD
MANAGERS, LLC, JOHN E. PALLAT III,
THOMAS J. DUNN, JR., ROBERT J.
WOJTOWICZ, JOSEPH P. WOJTOWICZ,
KENNETH C. GRIBBELL, AON RE, INC.,
and RATTNER MACKENZIE LIMITED,

  Defendants.

Civil Action No. _____

COMPLAINT

Plaintiffs Phoenix Life Insurance Company and General & Cologne Life Re of America (collectively, the "Plaintiffs"), by their attorneys, Edwards & Angell, LLP, hereby allege:

## NATURE OF THE ACTION

1.  This is an action for damages arising out a complex pooling arrangement for the reinsurance of the accident and health portions of workers' compensation insurance policies by life and health insurers, otherwise known as workers' compensation carve-out reinsurance.

2.  Reinsurance is a transaction whereby one insurance company, the "reinsurer," in exchange for payment of a premium, agrees to indemnify or reimburse another insurance

company, the "reinsured," against all or part of a loss that the reinsured may sustain under insurance policies the reinsured has issued. Reinsurance arrangements are common among insurers.

3. A reinsurer may further reinsure its risk with another reinsurer. The reinsured in such situations is called the "retrocedent," and the reinsurer that receives the premium and assumes risk from the retrocedent is called the "retrocessionaire." A retrocessionaire can, in turn, cede risks to another reinsurer, the former labeled a first-level retrocessionaire and the latter labeled a second-level retrocessionaire. Additional levels of reinsurance are also possible.

4. A reinsurer or retrocessionaire is dependent upon its reinsured or retrocedent to provide information material to the reinsured risk and to carefully underwrite and manage the reinsured business. Every reinsured or retrocedent owes its reinsurer or retrocessionaire a duty of "utmost good faith" in performing its duties.

5. A "broker" is often retained by the reinsured or retrocedent to arrange for reinsurance for all or part of the reinsured's book of business. In brokered transactions, the broker typically handles all dealings between a reinsured and a reinsurer, or between a retrocedent and a retrocessionaire. Although the broker is not a party to the reinsurance contract, its proper understanding of the risk reinsured and handling of funds and transmittal of information is crucial to the transaction of business between the seller and the buyer of reinsurance.

6. In the context of a reinsurance transaction, a "slip" is a short document memorializing the essential terms of the parties' reinsurance agreement.

7. A managing general underwriter or "MGU" is a legal entity that has the authority to underwrite insurance or reinsurance risks on behalf of an insurer. An MGU is an agent of the

insurer and earns management fees for underwriting business for its principal. It is not uncommon for an insurer to retain an MGU to underwrite insurance or reinsurance on the insurer's behalf, and to obtain reinsurance when desired.

8. A "reinsurance pool" is comprised of a group of insurance and/or reinsurance companies that provide reinsurance protection to reinsureds. Each member of the pool assumes a predetermined and fixed interest in the reinsurance business underwritten on behalf of the pool.

9. A "pool manager" is an MGU that has authority, pursuant to a pool management agreement, to underwrite insurance or reinsurance risks on behalf of its pool members and, in many instances, to obtain reinsurance or retrocessional coverage for the pool members for all or a portion of those risks.

10. For the purposes of this Complaint, "gross premium" is the total premium written under the original policies of workers' compensation insurance, without regard to reinsurance. In addition, for purposes of this Complaint, "gross subject premium" is that portion of the gross premium to which a reinsurance contract applies; that is, gross premium multiplied by the reinsurer's or retrocessionaire's percentage of participation on the account. For example, for accounts where a reinsurer's participation is 100%, the gross subject premium would be equal to the gross premium, but the gross subject premium would be less than the gross premium where a reinsurer's participation is less than 100%.

11. As more fully set forth below, the Plaintiffs were members of a reinsurance pool formed, managed and operated by the MGU defendants (Unicover Managers, Inc.; Unicover Managers, LLC; and Cragwood Managers, LLC) and their principals (John B. Pallat III; Thomas J. Dunn, Jr.; Robert J. Wojtowicz; Joseph P. Wojtowicz; and Kenneth C. Griebell) in conjunction with the broker defendants (Aon Re, Inc. and Rattner Mackenzie Limited). The broker

- 3 -

defendants also acted as brokers with respect to the placement of retrocessional reinsurance to protect the Plaintiffs. Due to defendants' breaches of contract, violations of their legal duty and tortious acts, as specified below, the retrocessional reinsurance protection in large part failed. The Plaintiffs bring this action to recover, among other things, all damages they sustained due to the loss of the retrocessional reinsurance protection, and the return of all monies held in trust by certain defendants and the consequential damages resulting from the misappropriation of such funds.

## PARTIES

12. Plaintiff Phoenix Life Insurance Company, f/k/a Phoenix Home Life Mutual Insurance Company ("Phoenix"), is a corporation organized and existing under the laws of the State of New York with its principal place of business in Hartford, Connecticut.

13. Plaintiff General & Cologne Life Re of America, f/k/a Cologne Life Reinsurance Company ("Cologne"), is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business in Stamford, Connecticut.

14. Defendant Aon Re, Inc. ("Aon") is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois. Aon is a licensed insurance and reinsurance intermediary in the State of New Jersey.

15. Defendant Rattner Mackenzie Limited ("Rattner") is a corporation organized and existing under the laws of England with a principal place of business in London, England.

16. Defendant Cragwood Managers, L.L.C., formerly known as Unicover Managers, L.L.C., and successor-in-interest to defendant Unicover Managers, Inc. (collectively, "Unicover"), is a limited liability company organized under the laws of the State of New Jersey with its principal place of business in South Plainfield, New Jersey.

-4-

17. Defendant John E. Pallat III ("Pallat") is a citizen of the State of New Jersey.

18. Defendant Thomas J. Dunn Jr. ("Dunn") is a citizen of the State of Illinois.

19. Defendant Robert J. Wojtowicz ("Robert Wojtowicz") is a citizen of the State of New Jersey.

20. Defendant Joseph P. Wojtowicz ("Joseph Wojtowicz") is a citizen of the State of New Jersey.

21. Defendant Kenneth C. Griebell ("Griebell") is a citizen of the State of New Jersey.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs and any claim for punitive damages.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the defendants are subject to personal jurisdiction here.

## GENERAL FACTUAL ALLEGATIONS

A. **Unicover, Its Shareholders and the Unicover Pool**

24. In December 1994, defendants Pallat, Dunn and Robert and Joseph Wojtowicz created Unicover, an MGU specializing in the reinsurance of the accident and health portions of workers' compensation insurance policies, otherwise known as workers' compensation carve-out insurance.

25. Defendant Pallat is a founding shareholder and the current Chairman and CEO of Unicover. Mr. Pallat was active in all aspects of Unicover's business and was responsible for

- 5 -

many of Unicover's business practices. Mr. Pallat controlled Unicover's operations from the company's New Jersey headquarters.

26. Defendant Dunn is a founding shareholder and was formerly the President of Unicover. On information and belief, defendant Dunn began working in Unicover's New Jersey headquarters but later moved to Unicover's office in Lisle, Illinois. After the move and throughout the relevant time period, Mr. Dunn was in regular contact with defendant Pallat and the New Jersey office and frequently traveled to New Jersey to conduct Unicover-related business.

27. On information and belief, Robert Wojtowicz is a founding shareholder and a director of Unicover and actively participated in the formation and management of the company.

28. On information and belief, Joseph Wojtowicz is a founding shareholder and the Chief Financial Officer of Unicover.

29. Defendant Griebell was actively involved in the early stages of Unicover's development. Throughout the relevant time period, Griebell participated in numerous aspects of Unicover's business including, without limitation, overseeing Unicover's marketing, corresponding with pool members and retrocessionaires and producing, structuring and negotiating treaty reinsurance programs. On information and belief, Griebell became a shareholder in Unicover effective June 1998.

30. In 1995, Unicover, along with Chris Mays of Nicholson Leslie Group, Aon's London Market reinsurance brokerage affiliate ("Nicholson Leslie"), recruited life insurers to participate in the Unicover Managers Occupational Accident Reinsurance Pool (the "Pool"), a risk-bearing reinsurance pool formed to provide workers' compensation carve-out reinsurance. On information and belief, Unicover and its agent, Mr. Mays of Nicholson Leslie, represented to

potential participants in the Pool that the Pool was formed to provide reinsurance to the niche market of high quality, relatively small workers' compensation insurance policies.

31.  From March 1, 1995 to March 1, 1998 (Pool Year 1 through Pool Year 3), the members of the Pool were Connecticut General Life Insurance Company ("CIGNA"), Lincoln National Life Insurance Company ("Lincoln"), Phoenix and Life Reassurance Corporation of America ("Life Re"). Life Re withdrew from the Pool as of March 1, 1998. Cologne and ReliaStar Life Insurance Company ("ReliaStar") joined the Pool beginning March 1, 1998 (Pool Year 4). The other members of the original Pool continued to participate (collectively, with Life Re, ReliaStar and Cologne, the "Pool members").

32.  Phoenix and Cologne became members of the Pool with the expectation and understanding that the business accepted on their behalf would be protected in whole or in part by retrocessional coverage.

33.  In connection with their membership in the Pool, the Pool members executed an Occupational Accident Reinsurance Pool Management Agreement (the "Management Agreement"), which governed the relationship between and among Unicover and the Pool members. By the terms of the Management Agreement, Unicover became the administrator and MGU for the Pool members. The Management Agreement provided Unicover with exclusive authority to bind reinsurance risks on behalf of the Pool. The Management Agreement also expressly required Unicover to "act in accordance with reasonable professional standards in all matters subject to [the Management Agreement]."

34.  The Management Agreement contains an arbitration provision applicable to disputes between Unicover and the Pool members arising out of the Management Agreement.

- 7 -

However, as described in the Fifth Claim for Relief of this Complaint, the arbitration provision does not apply to the sole claim for relief asserted by Phoenix and Cologne against Unicover.

35. Pursuant to the Management Agreement, Unicover was obligated to hold all premiums and other Pool-related funds in an interest bearing account known as the Unicover Managers, Inc. Pool Trust Account (the "Pool Trust Account") and remit portions of such funds when necessary. The Management Agreement required that Unicover retain in the Pool Trust Account a specific amount of premium to pay for claims arising from business underwritten on behalf of the Pool that was not retroceded. The Management Agreement expressly required that Unicover hold all premium and other monies in a fiduciary capacity for the Pool members.

36. Pursuant to the terms of the Management Agreement, Unicover earned a management fee of 7.5% of the gross premium ceded by an insurer to the Pool members for each piece of business accepted on their behalf. Thus, Unicover would receive more money as more premium was accepted on behalf of the Pool members. Unicover also had the right to earn an annual profit commission, which was calculated according to the net profit for each Pool year.

37. In addition to the business written on behalf of the Pool members, Unicover separately wrote and managed business on behalf of Lincoln National Life Insurance Company and Lincoln National Health and Casualty Insurance Company (the "Lincoln Facility") and Reliance Insurance Company (the "Reliance Facility"). Through Aon and Rattner, Unicover obtained retrocessional protection for the Pool members, the Lincoln Facility and the Reliance Facility.

### B. The Brokers and the Joint Venture

38. Unicover engaged Chris Mays of Nicholson Leslie and Roger Smith of Aon as its chief brokers for securing retrocessional protection for the Pool members. In late 1995, both Mays and Smith worked for Nicholson Leslie. In early 1996, Smith was sent to Aon's Chicago office to develop a reinsurance brokerage practice. In the summer of 1997, Mr. Mays moved to Rattner where he continued to share the Unicover account with Aon. At that time, Rattner and Aon agreed to split the commissions on premiums received from the Pool. Rattner was removed as retrocessional broker for the Pool in December of 1998. Thereafter, Aon acted as the Pool members' sole retrocessional broker.

39. As retrocessional brokers, Aon and Rattner were responsible for obtaining retrocessional protection for the Pool members in exchange for a brokerage fee – a percentage of the premium for the retroceded business. Aon and Rattner were obligated to act as a conduit to their principals, the Pool members, and to disclose to them all material information concerning the retrocessional protections. Aon and Rattner were also obligated to provide retrocessionaires with all material information concerning the business being retroceded by the Pool members.

40. In addition to their roles as retrocessional brokers, Aon and Rattner entered into a joint venture with Unicover in which they shared Pool management fees in exchange for assisting in the management of the Pool. Through this additional role, informally termed "Pool broker," Aon and Rattner became, in essence, business partners with Unicover. As such, Aon and Rattner actively participated with Unicover in forming and managing the Pool. For example, Mr. Smith was a principal facilitator of the Pool's growth and was responsible for communicating directly with Pool members concerning Pool management issues such as developing the Management Agreement. Mr. Mays was a principal architect of the Pool and was

- 9 -

responsible for marketing the Pool within the industry and the London Market in an effort to secure a dominant position in the workers' compensation carve-out market. Both Mr. Smith, on behalf of Aon, and Mr. Mays, on behalf of Nicholson Leslie/Aon and then Rattner, acted as Unicover's conduits to the Pool members concerning all aspects of the Pool's business.

41. In exchange for its efforts, and in furtherance of the joint venture, Aon initially took a one-third share of Unicover's 7.5% management fee for the Pool. Later, when Mr. Mays left Nicholson Leslie for Rattner, Aon and Rattner divided equally the one-third share of the management fee. These profits were in addition to the brokerage fees that Aon and Rattner received as retrocessional brokers for the Pool members. When Rattner was removed as broker in 1998, Aon became Unicover's sole business partner, and its share was increased to 20% of Unicover's management fee for Pool Year 4 (1998-99). Like Unicover, Aon and Rattner received greater fees as more premium was accepted on behalf of the Pool members, regardless of the profitability of the business that generated that premium.

42. The Pool members did not have contemporaneous knowledge of the fee-sharing agreement between Unicover and Aon and Rattner. Without that knowledge, the Pool members were ignorant of Aon's and Rattner's divided loyalties throughout the relevant time period.

43. On information and belief, Aon and Rattner earned no less than $40 million as a result of the Unicover joint venture.

44. Throughout the relevant time period, Mr. Smith and Mr. Mays consistently conducted Pool-related business in the State of New Jersey. The two had regular contact with Mr. Pallat, who controlled Unicover's operations from the company's New Jersey headquarters. Unicover administered the Pool from its New Jersey headquarters, and Mr. Smith and Mr. Mays visited there regularly for Pool-related business.

HPD_112501_14

45. On information and belief, the commissions paid to Unicover arising from the Lincoln Facility and the Reliance Facility were also shared between Unicover and Rattner. These commissions were based upon the premiums paid for reinsurance accepted by the Lincoln and Reliance Facilities. As in the case of the Pool members, Rattner worked with Unicover in managing the Lincoln and Reliance Facilities to maximize the premiums received.

C. <u>The Pool's Retrocessional Protection</u>

46. During Pool Years 1 and 2 (March 1, 1995 – February 28, 1997), Unicover, on behalf of the Pool members, obtained facultative retrocessional reinsurance, i.e., each risk underwritten on behalf of the Pool members was separately reinsured. Nicholson Leslie was Unicover's broker for these facultative retrocessional placements.

47. Centaur Underwriting Management Ltd. ("Centaur"), acting as MGU for Sun Life Assurance Company of Canada ("Sun"), Phoenix and Phoenix's affiliate American Phoenix Life and Reassurance Company ("American Phoenix"), provided facultative reinsurance protection to the Pool members for a number of accounts arising out of Pool Years 1 and 2. John Cackett was a principal of Centaur and managed the company's operations.

48. In the spring of 1997, Unicover, through its retrocessional brokers, sought to secure "whole account" retrocessional protection through a reinsurance agreement, also called a treaty. A whole account reinsurance treaty obligates a reinsured/retrocedent to cede, and a reinsurer/retrocessionaire to accept, all risks that fall within the terms of the reinsurance treaty. Thus, under a whole account treaty, an entire class of a reinsured's/retrocedent's business (often its entire book) is automatically ceded to the reinsurer/retrocessionaire. It is therefore customary in the industry for the reinsured/retrocedent to retain a financial risk in the business written so as

- 11 -

to provide the reinsured/retrocedent with a continuing stake in the quality of its underwriting analysis. It is also customary for the reinsured/retrocedent to provide the reinsurer/retrocessionaire a reliable, good faith estimate of premium volume because this information is crucial to the reinsurer/retrocessionaire in assessing exposure.

49. In the spring of 1997, Mr. Mays and Aon were instrumental in inducing Mr. Cackett of Centaur, on behalf of its principals, Sun and American Phoenix, to enter into a whole account retrocessional agreement with the Pool incepting March 1, 1997 (the "March Whole Account"). Under the March Whole Account, Sun American Phoenix and Lloyd's Syndicate 957 agreed to provide retrocessional cover to the Pool members for a period of one year. The March Whole Account slips set forth Unicover's gross subject premium volume estimate of $100,000,000.

50. Shortly after securing the March Whole Account, Unicover and Mr. Mays persuaded Mr. Cackett to agree to a significant alteration in the March Whole Account slips. Typically, within the reinsurance industry a cedent is required to retain a portion of the risk in order to ensure that the cedent is underwriting profitable business. Mr. Cackett, on behalf of the Retrocessionaires, agreed to the March Whole Account based, in part, on representations that Unicover would be retaining a portion of the carefully selected risks that it reinsured. Nevertheless, Unicover, through Mr. Mays, persuaded Mr. Cackett to change the retention limits language from "ultimate net loss" to "original gross loss" on the understanding that this would more fairly reflect an appropriate Unicover retention in cases where Unicover itself wrote less than a 100% of a particular risk. This representation was false. Unicover intended to use -- and did use -- the "original gross loss" language to eliminate or drastically reduce the Pool's retention. Unicover's retrocession of business without retaining a meaningful portion of the risk

- 12 -

resulted in Unicover simply selling reinsurance based on Centaur's rates without the need to conduct any underwriting. This reinsurance practice is the diametric opposite of the reinsurance business that Unicover and its brokers represented to Mr. Cackett would be ceded to the Retrocessionaires.

51. After the March Whole Account had been operating for a few months, Centaur and Unicover, through Aon and Rattner, agreed to cancel the March Whole Account and replace it with a three-year contract incepting December 1, 1997 (the "December Whole Account"). Lloyd's Syndicate 957 did not participate in the December Whole Account and was replaced by Cologne. In addition, American Phoenix was replaced by Phoenix.

52. Sun and Phoenix participated in the December Whole Account through Centaur, their MGU. Cologne was represented by its agent, CRF Underwriting Agency, Ltd., which did not possess binding authority on its behalf.

53. Cologne became a Retrocessionaire at approximately the same time that it agreed to participate as a Pool member. In becoming both a Retrocessionaire and a Pool member, Cologne relied on certain representations, including, among others, that Unicover would be operating in a niche market and would not be writing business on a lowest-price basis and that the premium income to the December Whole Account would flow only from the Pool.

54. The December Whole Account expanded the scope of the reinsured entities beyond the Pool members to include "any additional Pool(s) or Facility(ies) that may hereafter be created and managed by Unicover." At the time the December Whole Account was executed, however, Unicover had not disclosed to Cologne, Sun, or Phoenix (the "Retrocessionaires") its express intention to create additional facilities with Lincoln, Reliance and others. Nevertheless,

- 13 -

when the Lincoln and Reliance Facilities were created, Unicover ceded business from those facilities to the December Whole Account.

55.   The December Whole Account placement slips expressly stated the estimated gross subject premium over the three-year period as:

| | |
|---|---|
| 1st December 1997 to 1st December 1998 ("Year 1"): | $150,000,000 |
| 1st December 1998 to 1st December 1999 ("Year 2"): | $200,000,000 |
| 1st December 1999 to 1st December 2000 ("Year 3"): | $250,000,000. |

Thus, the Retrocessionaires entered into the December Whole Account upon the express representation that the estimated gross subject premium for the entire three years of the December Whole Account would be no more than approximately $600,000,000. This representation was false when made.

56.   Following the establishment of the December Whole Account, Ratner issued cover notes confirming that the Pool members' reinsurance protection was in place and effective.

D.   **The Explosive Growth in the Pool's Premium**

57.   In the fall of 1997, Unicover developed bold expansion plans, including broader market initiatives, the creation of new reinsurance facilities and goals for increased writings in general. Accordingly, Unicover began to underwrite an increasingly large volume of business on behalf of the Pool members.

58.   Unicover deliberately engaged in an underwriting practice of providing reinsurance at rates that were certain to generate huge losses to the Pool members, but turning those losses into gains by ceding them to the Retrocessionaires. In other words, Unicover intentionally quoted prices that necessarily resulted in the retrocession of exposures far in excess

- 14 -

of the premium charged. Unicover did not underwrite a single account that it expected to be profitable on a gross basis, that is, without taking retrocessional reinsurance into account. Rather, Unicover knew it was creating profits for the Pool, its brokers — and Unicover and its shareholders — and losses for the Retrocessionaires with each contract it wrote. Moreover, the practice of selling underpriced reinsurance gave Unicover the competitive edge that enabled it to underwrite large volumes of such business. Unicover's deliberate practice of underwriting an improperly large volume of underpriced — and unprofitable — business was not disclosed either to Phoenix or Cologne as Pool members or to the Retrocessionaires.

59. Virtually overnight, defendants Pallat, Dunn and Griebell, along with Mr. Smith and Mr. Mays, transformed Unicover from a niche underwriter with a handful of small accounts into one of the largest players in the workers' compensation reinsurance market, with billions of dollars in gross subject premium.

60. In March of 1998, Unicover and the Retrocessionaires revised the December Whole Account slips to include certain substantive changes. However, the $600 million gross subject premium estimate contained in the original December Whole Account slips remained unchanged.

61. On information and belief, prior to revising the December Whole Account, Unicover, Aon and Rattner had full knowledge that the gross subject premium estimates contained in the original December Whole Account slips had already been exceeded. On information and belief, as of March 1, 1998, less than three months after the December Whole Account was signed, Unicover had already bound programs with gross subject premium totals of approximately $1 billion and $800 million for Year 1 and Year 2 of the December Whole