MAY-22-2003 THU 06:08 P     EDWARDS&ANGELL LLP     FAX NO.     P. 04/83
NO.227    P.6

Andrew P. Fishkin (#AF-7571)
Edwards & Angell, LLP
51 John F. Kennedy Parkway
Short Hills, NJ 07078
Attorneys for the plaintiffs

RECEIVED-CLERK
U.S. DISTRICT COURT

2003 MAY 22 P 2: 51

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

PHOENIX LIFE INSURANCE COMPANY
and GENERAL & COLOGNE LIFE RE
OF AMERICA,

    Plaintiffs,

v.

UNICOVER MANAGERS, INC.,
UNICOVER MANAGERS, LLC, CRAGWOOD
MANAGERS, LLC, JOHN R. PALLAT III,
THOMAS J. DUNN, JR., ROBERT J.
WOJTOWICZ, JOSEPH P. WOJTOWICZ,
KENNETH C. GRIBBELL, AON RE, INC.,
and RATTNER MACKENZIE LIMITED,

    Defendants.

Civil Action No. _____

COMPLAINT

    Plaintiffs Phoenix Life Insurance Company and General & Cologne Life Re of America

(collectively, the "Plaintiffs"), by their attorneys, Edwards & Angell, LLP, hereby allege:

## NATURE OF THE ACTION

    1.    This is an action for damages arising out a complex pooling arrangement for the

reinsurance of the accident and health portions of workers' compensation insurance policies by

life and health insurers, otherwise known as workers' compensation carve-out reinsurance.

    2.    Reinsurance is a transaction whereby one insurance company, the "reinsurer," in

exchange for payment of a premium, agrees to indemnify or reimburse another insurance

MAY-22-2003 THU 05:09 P        EDWARDS&ANGELL LLP        FAX NO.        NO.227   P.7   P. 05/83

company, the "reinsured," against all or part of a loss that the reinsured may sustain under insurance policies the reinsured has issued. Reinsurance arrangements are common among insurers.

3.     A reinsurer may further reinsure its risk with another reinsurer. The reinsured in such situations is called the "retrocedent," and the reinsurer that receives the premium and assumes risk from the retrocedent is called the "retrocessionaire." A retrocessionaire can, in turn, cede risks to another reinsurer, the former labeled a first-level retrocessionaire and the latter labeled a second-level retrocessionaire. Additional levels of reinsurance are also possible.

4.     A reinsurer or retrocessionaire is dependent upon its reinsured or retrocedent to provide information material to the reinsured risk and to carefully underwrite and manage the reinsured business. Every reinsured or retrocedent owes its reinsurer or retrocessionaire a duty of "utmost good faith" in performing its duties.

5.     A "broker" is often retained by the reinsured or retrocedent to arrange for reinsurance for all or part of the reinsured's book of business. In brokered transactions, the broker typically handles all dealings between a reinsured and a reinsurer, or between a retrocedent and a retrocessionaire. Although the broker is not a party to the reinsurance contract, its proper understanding of the risk reinsured and handling of funds and transmittal of information is crucial to the transaction of business between the seller and the buyer of reinsurance.

6.     In the context of a reinsurance transaction, a "slip" is a short document memorializing the essential terms of the parties' reinsurance agreement.

7.     A managing general underwriter or "MGU" is a legal entity that has the authority to underwrite insurance or reinsurance risks on behalf of an insurer. An MGU is an agent of the

- 2 -

insurer and earns management fees for underwriting business for its principal.   It is not uncommon for an insurer to retain an MGU to underwrite insurance or reinsurance on the insurer's behalf, and to obtain reinsurance when desired.

8.       A "reinsurance pool" is comprised of a group of insurance and/or reinsurance companies that provide reinsurance protection to reinsureds.  Each member of the pool assumes a predetermined and fixed interest in the reinsurance business underwritten on behalf of the pool.

9.       A "pool manager" is an MGU that has authority, pursuant to a pool management agreement, to underwrite insurance or reinsurance risks on behalf of its pool members and, in many instances, to obtain reinsurance or retrocessional coverage for the pool members for all or a portion of those risks.

10.      For the purposes of this Complaint, "gross premium" is the total premium written under the original policies of workers' compensation insurance, without regard to reinsurance.  In addition, for purposes of this Complaint, "gross subject premium" is that portion of the gross premium to which a reinsurance contract applies; that is, gross premium multiplied by the reinsurer's or retrocessionaire's percentage of participation on the account.  For example, for accounts where a reinsurer's participation is 100%, the gross subject premium would be equal to the gross premium, but the gross subject premium would be less than the gross premium where a reinsurer's participation is less than 100%.

11.      As more fully set forth below, the Plaintiffs were members of a reinsurance pool formed, managed and operated by the MGU defendants (Unicover Managers, Inc.; Unicover Managers, LLC; and Cragwood Managers, LLC) and their principals (John E. Pallat III; Thomas J. Dunn, Jr.; Robert J. Wojtowicz; Joseph P. Wojtowicz; and Kenneth C. Griebell) in conjunction with the broker defendants (Aon Re, Inc. and Rattner Mackenzie Limited).   The broker

~ 3 ~

defendants also acted as brokers with respect to the placement of retrocessional reinsurance to protect the Plaintiffs. Due to defendants' breaches of contract, violations of their legal duty and tortious acts, as specified below, the retrocessional reinsurance protection in large part failed. The Plaintiffs bring this action to recover, among other things, all damages they sustained due to the loss of the retrocessional reinsurance protection, and the return of all monies held in trust by certain defendants and the consequential damages resulting from the misappropriation of such funds.

## PARTIES

12.    Plaintiff Phoenix Life Insurance Company, f/k/a Phoenix Home Life Mutual Insurance Company ("Phoenix"), is a corporation organized and existing under the laws of the State of New York with its principal place of business in Hartford, Connecticut.

13.    Plaintiff General & Cologne Life Re of America, f/k/a Cologne Life Reinsurance Company ("Cologne"), is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business in Stamford, Connecticut.

14.    Defendant Aon Re, Inc. ("Aon") is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois. Aon is a licensed insurance and reinsurance intermediary in the State of New Jersey.

15.    Defendant Rattner Mackenzie Limited ("Rattner") is a corporation organized and existing under the laws of England with a principal place of business in London, England.

16.    Defendant Cragwood Managers, L.L.C., formerly known as Unicover Managers, L.L.C., and successor-in-interest to defendant Unicover Managers, Inc. (collectively, "Unicover"), is a limited liability company organized under the laws of the State of New Jersey with its principal place of business in South Plainfield, New Jersey.

- 4 -

HFD_112501_14

MAY-22-2003 THU 05:10 P   ...............   FAX NO.                   NO.227   P.10   P. 08/83

17.   Defendant John E. Pallat III ("Pallat") is a citizen of the State of New Jersey.

18.   Defendant Thomas J. Dunn Jr. ("Dunn") is a citizen of the State of Illinois.

19.   Defendant Robert J. Wojtowicz ("Robert Wojtowicz") is a citizen of the State of New Jersey.

20.   Defendant Joseph P. Wojtowicz ("Joseph Wojtowicz") is a citizen of the State of New Jersey.

21.   Defendant Kenneth C. Griebell ("Griebell") is a citizen of the State of New Jersey.

## JURISDICTION AND VENUE

22.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs and any claim for punitive damages.

23.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the defendants are subject to personal jurisdiction here.

## GENERAL FACTUAL ALLEGATIONS

A.   Unicover, Its Shareholders and the Unicover Pool

24.   In December 1994, defendants Pallat, Dunn and Robert and Joseph Wojtowicz created Unicover, an MGU specializing in the reinsurance of the accident and health portions of workers' compensation insurance policies, otherwise known as workers' compensation carve-out insurance.

25.   Defendant Pallat is a founding shareholder and the current Chairman and CEO of Unicover.   Mr. Pallat was active in all aspects of Unicover's business and was responsible for

- 5 -

MAY-22-2003 THU 06:10 P    FAX NO.    P. 09/83
MAY.22.2003    3:53PM    EDWARDS&ANGELL LLP    NO.227    P.11

many of Unicover's business practices. Mr. Pallat controlled Unicover's operations from the company's New Jersey headquarters.

26. Defendant Dunn is a founding shareholder and was formerly the President of Unicover. On information and belief, defendant Dunn began working in Unicover's New Jersey headquarters but later moved to Unicover's office in Lisle, Illinois. After the move and throughout the relevant time period, Mr. Dunn was in regular contact with defendant Pallat and the New Jersey office and frequently traveled to New Jersey to conduct Unicover-related business.

27. On information and belief, Robert Wojtowicz is a founding shareholder and a director of Unicover and actively participated in the formation and management of the company.

28. On information and belief, Joseph Wojtowicz is a founding shareholder and the Chief Financial Officer of Unicover.

29. Defendant Griebell was actively involved in the early stages of Unicover's development. Throughout the relevant time period, Griebell participated in numerous aspects of Unicover's business including, without limitation, overseeing Unicover's marketing, corresponding with pool members and retrocessionaires and producing, structuring and negotiating treaty reinsurance programs. On information and belief, Griebell became a shareholder in Unicover effective June 1998.

30. In 1995, Unicover, along with Chris Mays of Nicholson Leslie Group, Aon's London Market reinsurance brokerage affiliate ("Nicholson Leslie"), recruited the insurers to participate in the Unicover Managers Occupational Accident Reinsurance Pool (the "Pool"), a risk-bearing reinsurance pool formed to provide workers' compensation carve-out reinsurance. On information and belief, Unicover and its agent, Mr. Mays of Nicholson Leslie, represented to

- 6 -

HFD_112501_14

potential participants in the Pool that the Pool was formed to provide reinsurance to the niche market of high quality, relatively small workers' compensation insurance policies.

31.    From March 1, 1995 to March 1, 1998 (Pool Year 1 through Pool Year 3), the members of the Pool were Connecticut General Life Insurance Company ("CIGNA"), Lincoln National Life Insurance Company ("Lincoln"), Phoenix and Life Reassurance Corporation of America ("Life Re"). Life Re withdrew from the Pool as of March 1, 1998. Cologne and ReliaStar Life Insurance Company ("ReliaStar") joined the Pool beginning March 1, 1998 (Pool Year 4). The other members of the original Pool continued to participate (collectively, with Life Re, ReliaStar and Cologne, the "Pool members").

32.    Phoenix and Cologne became members of the Pool with the expectation and understanding that the business accepted on their behalf would be protected in whole or in part by retrocessional coverage.

33.    In connection with their membership in the Pool, the Pool members executed an Occupational Accident Reinsurance Pool Management Agreement (the "Management Agreement"), which governed the relationship between and among Unicover and the Pool members. By the terms of the Management Agreement, Unicover became the administrator and MGU for the Pool members. The Management Agreement provided Unicover with exclusive authority to bind reinsurance risks on behalf of the Pool. The Management Agreement also expressly required Unicover to "act in accordance with reasonable professional standards in all matters subject to [the Management Agreement]."

34.    The Management Agreement contains an arbitration provision applicable to disputes between Unicover and the Pool members arising out of the Management Agreement.

- 7 -

However, as described in the Fifth Claim for Relief of this Complaint, the arbitration provision does not apply to the sole claim for relief asserted by Phoenix and Cologne against Unicover.

35.    Pursuant to the Management Agreement, Unicover was obligated to hold all premiums and other Pool-related funds in an interest bearing account known as the Unicover Managers, Inc. Pool Trust Account (the "Pool Trust Account") and remit portions of such funds when necessary. The Management Agreement required that Unicover retain in the Pool Trust Account a specific amount of premium to pay for claims arising from business underwritten on behalf of the Pool that was not retroceded. The Management Agreement expressly required that Unicover hold all premium and other monies in a fiduciary capacity for the Pool members.

36.    Pursuant to the terms of the Management Agreement, Unicover earned a management fee of 7.5% of the gross premium ceded by an insurer to the Pool members for each piece of business accepted on their behalf. Thus, Unicover would receive more money as more premium was accepted on behalf of the Pool members. Unicover also had the right to earn an annual profit commission, which was calculated according to the net profit for each Pool year.

37.    In addition to the business written on behalf of the Pool members, Unicover separately wrote and managed business on behalf of Lincoln National Life Insurance Company and Lincoln National Health and Casualty Insurance Company (the "Lincoln Facility") and Reliance Insurance Company (the "Reliance Facility"). Through Aon and Rattner, Unicover obtained retrocessional protection for the Pool members, the Lincoln Facility and the Reliance Facility.

HFD_112501_14

MAY-22-2003 THU 05:11 PM    EDWARDS&ANGELL LLP    FAX NO.    NO.227    P.14    P. 12/63

**B.**    **The Brokers and the Joint Venture**

38.    Unicover engaged Chris Mays of Nicholson Leslie and Roger Smith of Aon as its chief brokers for securing retrocessional protection for the Pool members. In late 1995, both Mays and Smith worked for Nicholson Leslie. In early 1996, Smith was sent to Aon's Chicago office to develop a reinsurance brokerage practice. In the summer of 1997, Mr. Mays moved to Rattner where he continued to share the Unicover account with Aon. At that time, Rattner and Aon agreed to split the commissions on premiums received from the Pool. Rattner was removed as retrocessional broker for the Pool in December of 1998. Thereafter, Aon acted as the Pool members' sole retrocessional broker.

39.    As retrocessional brokers, Aon and Rattner were responsible for obtaining retrocessional protection for the Pool members in exchange for a brokerage fee – a percentage of the premium for the retroceded business. Aon and Rattner were obligated to act as a conduit to their principals, the Pool members, and to disclose to them all material information concerning the retrocessional protections. Aon and Rattner were also obligated to provide retrocessionaires with all material information concerning the business being retroceded by the Pool members.

40.    In addition to their roles as retrocessional brokers, Aon and Rattner entered into a joint venture with Unicover in which they shared Pool management fees in exchange for assisting in the management of the Pool. Through this additional role, informally termed "Pool broker," Aon and Rattner became, in essence, business partners with Unicover. As such, Aon and Rattner actively participated with Unicover in forming and managing the Pool. For example, Mr. Smith was a principal facilitator of the Pool's growth and was responsible for communicating directly with Pool members concerning Pool management issues such as developing the Management Agreement. Mr. Mays was a principal architect of the Pool and was

- 9 -

MAY-22-2003 THU 06:11 PM                    FAX NO.                    P. 15/05
                EDWARDS&ANGELL LLP                          NO.227    P.15

responsible for marketing the Pool within the industry and the London Market in an effort to secure a dominant position in the workers' compensation carve-out market. Both Mr. Smith, on behalf of Aon, and Mr. Mays, on behalf of Nicholson Leslie/Aon and then Rattner, acted as Unicover's conduits to the Pool members concerning all aspects of the Pool's business.

41.    In exchange for its efforts, and in furtherance of the joint venture, Aon initially took a one-third share of Unicover's 7.5% management fee for the Pool. Later, when Mr. Mays left Nicholson Leslie for Rattner, Aon and Rattner divided equally the one-third share of the management fee. These profits were in addition to the brokerage fees that Aon and Rattner received as retrocessional brokers for the Pool members. When Rattner was removed as broker in 1998, Aon became Unicover's sole business partner, and its share was increased to 20% of Unicover's management fee for Pool Year 4 (1998-99). Like Unicover, Aon and Rattner received greater fees as more premium was accepted on behalf of the Pool members, regardless of the profitability of the business that generated that premium.

42.    The Pool members did not have contemporaneous knowledge of the fee-sharing agreement between Unicover and Aon and Rattner. Without that knowledge, the Pool members were ignorant of Aon's and Rattner's divided loyalties throughout the relevant time period.

43.    On information and belief, Aon and Rattner earned no less than $40 million as a result of the Unicover joint venture.

44.    Throughout the relevant time period, Mr. Smith and Mr. Mays consistently conducted Pool-related business in the State of New Jersey. The two had regular contact with Mr. Pallat, who controlled Unicover's operations from the company's New Jersey headquarters. Unicover administered the Pool from its New Jersey headquarters, and Mr. Smith and Mr. Mays visited there regularly for Pool-related business.

HFD_112501_14

MAY-22-2003 THU 06:12 PM   ................... LLP          FAX NO.                NO.227   P.16
                                                                              P. 14/83

45.    On information and belief, the commissions paid to Unicover arising from the Lincoln Facility and the Reliance Facility were also shared between Unicover and Rattner. These commissions were based upon the premiums paid for reinsurance accepted by the Lincoln and Reliance Facilities. As in the case of the Pool members, Rattner worked with Unicover in managing the Lincoln and Reliance Facilities to maximize the premiums received.

## C.    The Pool's Retrocessional Protection

46.    During Pool Years 1 and 2 (March 1, 1995 – February 28, 1997), Unicover, on behalf of the Pool members, obtained facultative retrocessional reinsurance, i.e., each risk underwritten on behalf of the Pool members was separately reinsured. Nicholson Leslie was Unicover's broker for these facultative retrocessional placements.

47.    Centaur Underwriting Management Ltd. ("Centaur"), acting as MGU for Sun Life Assurance Company of Canada ("Sun"), Phoenix and Phoenix's affiliate American Phoenix Life and Reassurance Company ("American Phoenix"), provided facultative reinsurance protection to the Pool members for a number of accounts arising out of Pool Years 1 and 2. John Cackett was a principal of Centaur and managed the company's operations.

48.    In the spring of 1997, Unicover, through its retrocessional brokers, sought to secure "whole account" retrocessional protection through a reinsurance agreement, also called a treaty. A whole account reinsurance treaty obligates a reinsured/retrocedent to cede, and a reinsurer/retrocessionaire to accept, all risks that fall within the terms of the reinsurance treaty. Thus, under a whole account treaty, an entire class of a reinsured's/retrocedent's business (often its entire book) is automatically ceded to the reinsurer/retrocessionaire. It is therefore customary in the industry for the reinsured/retrocedent to retain a financial risk in the business written so as

- 11 -

NPD_112501_14

MAY-22-2003 THU 05:12 PM   EDWARDS&ANGELL LLP          FAX NO.                    P. 15/83
                                                              NO.227    P. 17

to provide the reinsured/retrocedent with a continuing stake in the quality of its underwriting analysis.     It is also customary for the reinsured/retrocedent to provide the reinsurer/retrocessionaire a reliable, good faith estimate of premium volume because this information is crucial to the reinsurer/retrocessionaire in assessing exposure.

49.     In the spring of 1997, Mr. Mays and Aon were instrumental in inducing Mr. Cackett of Centaur, on behalf of its principals, Sun and American Phoenix, to enter into a whole account retrocessional agreement with the Pool incepting March 1, 1997 (the "March Whole Account").   Under the March Whole Account, Sun American Phoenix and Lloyd's Syndicate 957 agreed to provide retrocessional cover to the Pool members for a period of one year.   The March Whole Account slips set forth Unicover's gross subject premium volume estimate of $100,000,000.

50.     Shortly after securing the March Whole Account, Unicover and Mr. Mays persuaded Mr. Cackett to agree to a significant alteration in the March Whole Account slips. Typically, within the reinsurance industry a cedent is required to retain a portion of the risk in order to ensure that the cedent is underwriting profitable business. Mr. Cackett, on behalf of the Retrocessionaires, agreed to the March Whole Account based, in part, on representations that Unicover would be retaining a portion of the carefully selected risks that it reinsured. Nevertheless, Unicover, through Mr. Mays, persuaded Mr. Cackett to change the retention limits language from "ultimate net loss" to "original gross loss" on the understanding that this would more fairly reflect an appropriate Unicover retention in cases where Unicover itself wrote less than a 100% of a particular risk. This representation was false. Unicover intended to use — and did use — the "original gross loss" language to eliminate or drastically reduce the Pool's retention. Unicover's retrocession of business without retaining a meaningful portion of the risk

- 12 -

resulted in Unicover simply selling reinsurance based on Centaur's rates without the need to conduct any underwriting. This reinsurance practice is the diametric opposite of the reinsurance business that Unicover and its brokers represented to Mr. Cackett would be ceded to the Retrocessionaires.

51.    After the March Whole Account had been operating for a few months, Centaur and Unicover, through Aon and Rattner, agreed to cancel the March Whole Account and replace it with a three-year contract incepting December 1, 1997 (the "December Whole Account"). Lloyd's Syndicate 957 did not participate in the December Whole Account and was replaced by Cologne. In addition, American Phoenix was replaced by Phoenix.

52.    Sun and Phoenix participated in the December Whole Account through Centaur, their MGU. Cologne was represented by its agent, CRF Underwriting Agency, Ltd., which did not possess binding authority on its behalf.

53.    Cologne became a Retrocessionaire at approximately the same time that it agreed to participate as a Pool member. In becoming both a Retrocessionaire and a Pool member, Cologne relied on certain representations, including, among others, that Unicover would be operating in a niche market and would not be writing business on a lowest-price basis and that the premium income to the December Whole Account would flow only from the Pool.

54.    The December Whole Account expanded the scope of the reinsured entities beyond the Pool members to include "any additional Pool(s) or Facility(ies) that may hereafter be created and managed by Unicover." At the time the December Whole Account was executed, however, Unicover had not disclosed to Cologne, Sun, or Phoenix (the "Retrocessionaires") its express intention to create additional facilities with Lincoln, Reliance and others. Nevertheless,

- 13 -

when the Lincoln and Reliance Facilities were created, Unicover ceded business from those facilities to the December Whole Account.

55.    The December Whole Account placement slips expressly stated the estimated gross subject premium over the three-year period as:

| | |
|---|---|
| 1st December 1997 to 1st December 1998 ("Year 1"): | $150,000,000 |
| 1st December 1998 to 1st December 1999 ("Year 2"): | $200,000,000 |
| 1st December 1999 to 1st December 2000 ("Year 3"): | $250,000,000. |

Thus, the Retrocessionaires entered into the December Whole Account upon the express representation that the estimated gross subject premium for the entire three years of the December Whole Account would be no more than approximately $600,000,000.    This representation was false when made.

56.    Following the establishment of the December Whole Account, Rattner issued cover notes confirming that the Pool members' reinsurance protection was in place and effective.

D.        The Explosive Growth in the Pool's Premium

57.    In the fall of 1997, Unicover developed bold expansion plans, including broader market initiatives, the creation of new reinsurance facilities and goals for increased writings in general. Accordingly, Unicover began to underwrite an increasingly large volume of business on behalf of the Pool members.

58.    Unicover deliberately engaged in an underwriting practice of providing reinsurance at rates that were certain to generate huge losses to the Pool members, but turning those losses into gains by ceding them to the Retrocessionaires. In other words, Unicover intentionally quoted prices that necessarily resulted in the retrocession of exposures far in excess

- 14 -

HFD_112461_14

of the premium charged. Unicover did not underwrite a single account that it expected to be profitable on a gross basis, that is, without taking retrocessional reinsurance into account. Rather, Unicover knew it was creating profits for the Pool, its brokers -- and Unicover and its shareholders -- and losses for the Retrocessionaires with each contract it wrote. Moreover, the practice of selling underpriced reinsurance gave Unicover the competitive edge that enabled it to underwrite large volumes of such business. Unicover's deliberate practice of underwriting an improperly large volume of underpriced -- and unprofitable -- business was not disclosed either to Phoenix or Cologne as Pool members or to the Retrocessionaires.

59.    Virtually overnight, defendants Pallat, Dunn and Griebell, along with Mr. Smith and Mr. Mays, transformed Unicover from a niche underwriter with a handful of small accounts into one of the largest players in the workers' compensation reinsurance market, with billions of dollars in gross subject premium.

60.    In March of 1998, Unicover and the Retrocessionaires revised the December Whole Account slips to include certain substantive changes. However, the $600 million gross subject premium estimate contained in the original December Whole Account slips remained unchanged.

61.    On information and belief, prior to revising the December Whole Account, Unicover, Aon and Rattner had full knowledge that the gross subject premium estimates contained in the original December Whole Account slips had already been exceeded. On information and belief, as of March 1, 1998, less than three months after the December Whole Account was signed, Unicover had already bound programs with gross subject premium totals of approximately $1 billion and $800 million for Year 1 and Year 2 of the December Whole

- 15 -

MAY-22-2003 THU 05:13 PM                    FAX NO.              P. 19/83
                                                        NO.227    P. 21

Account, respectively. These figures dwarfed the gross subject premium estimates of $150 million and $200 million for those years.

62.    The explosion in premium volume continued and was further fueled by the decision of Unicover's shareholders to sell the company on an earn-out basis. In the spring of 1998, Unicover's shareholders engaged investment banker/business broker, Fox-Pitt, Kelton, Inc. ("Fox-Pitt") to market the company for sale.

63.    In August of 1998, Unicover's shareholders entered into a letter of intent with Delphi Financial Group, Inc. ("Delphi") for the purchase of Unicover for $22 million, plus a proposed earn-out structure based on Unicover's anticipated performance (i.e., premium writings). On information and belief, the earn-out structure was created in a way so that the greater the volume of business or gross subject premium accepted on behalf of the Pool members, the greater the earn-out payments to the shareholders would be, again without regard to the profitability of the business underwritten.

64.    Unicover was purchased by Delphi in November of 1998.

65.    At the direction of Mr. Pallat and the remaining shareholders, Unicover took advantage of the earn-out structure by accepting as much business as possible to the detriment of the Pool members and the Retrocessionaires. On information and belief, the gross subject premium reinsured by Unicover for the year ending December 1, 1998 alone was more than twice the estimated gross subject premium for the entire three-year period of the December Whole Account. Unicover accepted reinsurance written on gross subject premium in excess of $7 billion on behalf of the Pool members and the Lincoln Facility and the Reliance Facility. On information and belief, Aon and Rattner, in furtherance of their fee-sharing joint venture (and

- 16 -

HRD_112501_14

MAY-22-2003 THU 05:14 PM    EDWARDS&ANGELL LLP    FAX NO.    P. 20/03

NO.227    P.22

reinsurance brokerage fee), encouraged Unicover to continue to underwrite as much business on behalf of the Pool as possible.

66.    The sale to Delphi subsequently disintegrated and, on information and belief, a group of Unicover shareholders purchased the company back from Delphi -- at a significantly reduced price -- and renamed it Cragwood Managers, LLC.

**E.**    **Unicover Ignores the Concerns of Sun and Cackett**

67.    In March 1998, Centaur terminated its relationship with Phoenix and American Phoenix and effectively discontinued communication with Phoenix and American Phoenix regarding the December Whole Account business.

68.    Unicover knew that, since the spring of 1998, Mr. Cackett and Sun were concerned about the volume of premium being ceded to the December Whole Account. Specifically, Unicover knew, by the end of May 1998, that Mr. Cackett was insisting that Unicover must find additional retrocessional protection. Unicover never disclosed Mr. Cackett's demands to Phoenix and Cologne.

69.    On or about June 1998, Sun notified Unicover that it would "void the [retrocessional] contract" if it could not secure adequate retrocessional protection to protect itself from Unicover managed facilities. Sun reaffirmed its position in August of 1998. Moreover, throughout the fall of 1998 and early 1999, Unicover knew that Mr. Cackett was having no success in securing additional retrocessional protection for Centaur. Aon and Rattner were aware of Sun's and Cackett's position. Unicover, Aon and Rattner never disclosed this information to Phoenix and Cologne.

- 17 -

"soft-hearted arbitrator" to restrict the Retrocessionaires' obligations to the relatively low-volume premium estimates contained in the slips. Mr. Pallat also stated to Aon that he was aware of rumors that Centaur might have problems enforcing its own retrocessional agreements, which Mr. Pallat thought could lead to "panic mode" by the Retrocessionaires and a possible "domino effect." Unicover and Aon never disclosed this information to Phoenix and Cologne.

75.    Despite its awareness of the tenuous nature of the Pool's retrocessional protection, Unicover did not hesitate in accepting new business on behalf of the Pool members and coding that business to the December Whole Account. Rather, in response to Sun's and Mr. Cackett's complaints Mr. Pallat threatened that "if [John Cackett] causes any problems, then he [Pallat] will write $5 billion of business" and that there was "no way whatsoever [Pallat] was backing off." Of course, Mr. Pallat more than made good on that threat. Indeed, through the late summer and fall of 1998, Unicover accepted more business on behalf of the Pool than at any time previously.

F.    **Aon and Rattner Fail to Disclose Material Information to the Pool Members**

76.    In the summer and fall of 1998, Unicover, in the process of reassessing its retrocessional protection, provided Aon and Rattner with detailed information about the volume of the business that it had underwritten on behalf of the Pool as well as the Lincoln and Reliance Facilities and provided estimates for business that it expected to write in the future.

77.    Aon and Rattner, as the Pool's retrocessional brokers and Unicover's co-venturers sharing in the management fees paid to Unicover, knew of Unicover's plans and its efforts to cause an unauthorized premium surge, and of the grossly understated written statement of estimated gross subject premium made to the Retrocessionaires. Aon and Rattner also knew that

NYD_112501_14

the increase in gross subject premium being reinsured by Unicover was unprecedented in the industry. However, neither Aon nor Rattner disclosed this information to Retrocessionaires, nor did they obtain the Retrocessionaires' consent to such an unauthorized and immediate increase in gross subject premium. As experienced professional reinsurance brokers, Aon and Rattner knew that this was important information which they had to disclose and convey promptly as part of their normal reinsurance brokerage activity, but they failed to do so. On information and belief, Aon and Rattner, through their fee-sharing agreement and knowledge of the workers' compensation carve-out markets and Unicover's business, were well aware that Unicover, through its underwriting practice of accepting a large volume of underpriced reinsurance, was violating its obligations to the Retrocessionaires under the December Whole Account.

78.    In addition, Aon and Rattner were aware no later than August of 1998 that the Pool's retrocessional protection under the December Whole Account was in jeopardy. Specifically, Sun and Cackett informed Aon and Rattner that they had significant concerns with the business that Unicover was underwriting and ceding to the December Whole Account; that they wanted Unicover to stop underwriting and ceding business; and that Sun was considering legal action to terminate or limit its liability as a retrocessionaire. Aon and Rattner, in breach of their contractual and common law duties, failed to disclose to the Pool members any of the concerns or threatened legal action from Sun and Cackett. Indeed, at least as late as December, 1998, Aon continued to advise Unicover that there was no reason to stop underwriting business and ceding it to the December Whole Account.

79.    On information and belief, Unicover and Aon and Rattner protected their joint venture scheme, in part, by concealing the actual level of premium being accepted on behalf of

- 20 -

HPD_112501_14

MAY-22-2003 THU 05:14 PM
MAY.22.2003    3.31PM

FAX NO.                                          P. 23/83

the Pool through, among other things, outdated premium estimates and non-disclosures about the quantity and quality of business being written.

G.        The Termination of the Pool's Retrocessional Protection

80.    In the first quarter of 1999, and without any prior warning to the Pool members, Sun moved to terminate its obligations to reinsure the Pool. By letter of January 25, 1999, Sun advised the Pool members that it was terminating its obligations under the December Whole Account and reserving its right to rescind. In light of this development, the Pool members directed Unicover to cease underwriting new or renewal business.

81.    On information and belief, shortly after Sun's termination letter, each Pool member secured legal counsel and began to evaluate its exposure and what remedies were available. In addition, in early 1999 and throughout the spring and summer of 1999, the insurance marketplace was bursting with publicity regarding the fall of the Pool's retrocessional protection and imminent litigation against Unicover.

82.    Despite Sun's termination, Unicover attempted to bind the Pool to additional reinsurance obligations, so as to generate additional profits for Unicover, while incurring substantial risks for the Pool members. Unicover's authority to write business on behalf of the Pool ceased on March 1, 1999. Nevertheless, Unicover continued to write business on behalf of the Pool even after March 1, 1999, by claiming that it was just completing the documentation on business that it had already "bound." The Pool members were forced to engage in lengthy and costly litigation in an attempt to mitigate the effect of Unicover's unauthorized actions in this regard.

- 21 -

HFD_112501_14

83.    In the summer of 1999, Sun commenced arbitration against Unicover, seeking to eliminate or reduce its obligations as retrocessionaire (the "Pool Arbitration"). Thereafter, in the fall of 1999, Phoenix and Cologne each joined with Sun in the Pool Arbitration.

84.    The hearing in the Pool Arbitration on the claims of the Retrocessionaires was held from July 8 through August 7, 2002. On October 8, 2002, the arbitration Panel issued an award that, in relevant part, relieved the Retrocessionaires of responsibility to provide retrocessional protection to the Pool members for business that Unicover had bound or renewed after August 31, 1998.

## H.    The Unicover Shareholder's Cash-Out

85.    On information and belief, despite the pending and imminent litigation surrounding the Pool, Unicover withdrew monies from the Pool trust account. The Pool members first learned of this conduct on September 14, 1999 when Mr. Pallat informed the Pool that he and the other Unicover shareholders had caused Unicover to withdraw $21,836,066 for its "management fee." Unicover made additional withdrawals from the Pool Trust Account in 1999, 2000, and 2001.

86.    On information and belief, Unicover made certain dividend payments to its shareholders in the first quarter of 1999 that totaled approximately $45 million.

87.    Unicover's shareholders caused the dividend payments to be made knowing that there were disputes concerning its management of the Pool and that proceedings would, in all likelihood, be brought against it by parties seeking damages for losses incurred as a result of Unicover's actions.

HFD_112601_14

88.    On information and belief, Unicover made additional dividend payments in 2000 and 2001 totaling approximately $4.6 million. The 2000 and 2001 dividend payments came after the Retrocessionaires had commenced the Pool Arbitration and after Reliance Insurance Company commenced litigation against Unicover and Mr. Pallat concerning the Reliance Facility (the "Reliance Litigation").

89.    On information and belief, the dividend payments, in their totality, effectively rendered Unicover insolvent. For example, Unicover raised its lack of funds as an issue in defending against a motion for security in the Reliance Litigation.

### FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duty by Defendants Pallat, Dunn, Robert Wojtowicz and Griebell)

90.    Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 89 as if fully set forth herein.

91.    As MGU, Unicover owed fiduciary and common law duties to the Pool members to act honestly, loyally, and in good faith. By virtue of its relationship as agent of the Pool members, Unicover was in a fiduciary relationship of trust and confidence with the Pool members, pursuant to which Unicover owed the Pool members duties of utmost loyalty, candor, integrity and care.

92.    By virtue of their domination and control of Unicover, defendants Pallat, Dunn, Robert Wojtowicz and Griebell (collectively, the "Active Shareholders"), were in a fiduciary relationship of trust and confidence with the Pool members, pursuant to which the Active Shareholders owed the Pool members duties of utmost loyalty, candor, integrity and care,

- 23 -

HFB_112501_14

93.   As further alleged above, the Active Shareholders intentionally adopted an underwriting strategy whereby Unicover sold underpriced reinsurance, reinsurance that required underpriced retrocessional protection in order for the Pool members to achieve a profit. The Active Shareholders, using the instrument of Unicover, then intentionally wrote an improperly large volume of such business for their own personal gain. This conduct directly resulted in the failure of the majority of the retrocessional contracts protecting the Plaintiffs as Pool members.

94.   The Active Shareholders knew that their underwriting strategy and reinsurance practices were in violation of their fiduciary duties owed to the Pool members.

95.   In addition, in furtherance of their own self-interests, the Active Shareholders intentionally withheld material information from Phoenix and Cologne including, without limitation, material adverse information concerning the willingness of Sun and Cackett to continue under the December Whole Account.

96.   The Active Shareholders directed Unicover's negligent business practices and actively participated in the company's tortious conduct.

97.   As a direct and proximate result of the Active Shareholders' breach of fiduciary duties, Phoenix and Cologne have sustained substantial damages.

98.   In committing the breaches detailed above, the Active Shareholders acted jointly, as agents for each other, and in conspiracy, thus making each defendant liable jointly and severally for all damages to Phoenix and Cologne caused by such breaches.

99.   The Active Shareholders' conduct was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

HPD_112501_14

## SECOND CLAIM FOR RELIEF

### (Tortious Interference with Contract by the Active Shareholders)

100.   Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 99 as if fully set forth herein.

101.   Unicover and the Pool members entered into the Management Agreement, which imposed certain contractual and common law duties on Unicover including, without limitation, conducting business as MGU in accordance with reasonable professional standards in all matters subject to the Management Agreement.

102.   The Active Shareholders intentionally adopted an underwriting strategy whereby Unicover sold underpriced reinsurance, reinsurance that required underpriced retrocessional protection in order for the Pool members to achieve a profit. The Active Shareholders, using the instrument of Unicover, then intentionally wrote an improperly large volume of such business for their own personal gain.  This conduct directly resulted in the failure of the majority of the retrocessional contracts protecting the Plaintiffs as Pool members.

103.   The Active Shareholders acted in bad faith, solely for their own benefit and without regard to the best interests of Unicover or the Pool members.

104.   The Active Shareholders knowingly caused Unicover to breach its contractual duties owed to the Pool members by engaging in deceptive and negligent reinsurance practices.

105.   As a direct and proximate result of the Active Shareholders causing Unicover to breach the Management Agreement, Phoenix and Cologne have sustained substantial damages.

106.   In committing the wrongful conduct detailed above, the Active Shareholders acted jointly, as agents for each other, and in conspiracy, thus making each defendant liable jointly and severally for all damages to Phoenix and Cologne caused by such breaches.

- 25 -

HFD_112501_14

107. The Active Shareholders' conduct was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

## THIRD CLAIM FOR RELIEF

### (Willful and Wanton Misconduct against the Active Shareholders)

108. Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 107 as if fully set forth herein.

109. As MGU, Unicover owed the Pool members a duty to exercise due care under the circumstances and to carry out its obligations in a commercially reasonable fashion.

110. By virtue of their domination and control of Unicover, the Active Shareholders owed the Pool members common law duties of care.

111. As further alleged above, the Active Shareholders, acting by and through Unicover, intentionally adopted an underwriting strategy whereby Unicover sold underpriced reinsurance, reinsurance that required underpriced retrocessional protection in order for the Pool members to achieve a profit. The Active Shareholders, using the instrument of Unicover, then intentionally wrote an improperly large volume of such business for their own personal gain. This conduct directly resulted in the failure of the majority of the retrocessional contracts protecting the Plaintiffs as Pool members.

112. The Active Shareholders actively participated in all aspects of Unicover's business and were the principal architects of Unicover's negligent underwriting and reinsurance practices.

113. In addition, in furtherance of their own self-interests, the Active Shareholders intentionally withheld material information from Phoenix and Cologne including, without

- 26 -

HFD_112501_14

limitation, material adverse information concerning the willingness of Sun and Cockett to continue under the December Whole Account.

114.    The Active Shareholders knew that the Pool's retrocessional protection was in jeopardy and that injury would result to the Pool members if Unicover continued to write large amounts of business to the December Whole Account.  In disregard of the consequences, the Active Shareholders, acting by and through Unicover, intentionally increased the amount of business being accepted on behalf of the Pool and retroceded to the December Whole Account.

115.    As a direct and proximate result of the Active Shareholders' willful and wanton misconduct, Phoenix and Cologne have sustained substantial damages.

116.    In committing the breaches detailed above, the Active Shareholders acted jointly, as agents for each other, and in conspiracy, thus making each defendant liable jointly and severally for all damages to Phoenix and Cologne caused by such breaches.

117.    The Active Shareholders' conduct was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

## FOURTH CLAIM FOR RELIEF

### (Negligence Against the Active Shareholders)

118.    Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 117 as if fully set forth herein.

119.    As MGU, Unicover owed the Pool members a duty to exercise due care under the circumstances and to carry out its obligations in a commercially reasonable fashion.

120.    By virtue of their domination and control of Unicover, the Active Shareholders owed the Pool members common law duties of care.

- 27 -

121.    As further alleged above, the Active Shareholders, acting by and through Unicover, failed to exercise due care and were negligent in performing Unicover's duties.

122.    The Active Shareholders actively participated in all aspects of Unicover's business and were the principal architects of Unicover's negligent underwriting and reinsurance practices.

123.    As a direct and proximate result of the Active Shareholders' negligent conduct, Phoenix and Cologne have sustained substantial damages.

124.    In committing the breaches of duty detailed above, the Active Shareholders acted jointly, as agents for each other, and in conspiracy, thus making each defendant liable jointly and severally for all damages to Phoenix and Cologne caused by such breaches.

## FIFTH CLAIM FOR RELIEF

**(Violation of N.J.S.A. §§ 25: 2-20: Fraudulent Transfer by Defendants Unicover, Pallat, Griebell, Robert Wojtowicz and Joseph Wojtowicz)**

125.    Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 124 as if fully set forth herein.

126.    By virtue of their domination and control over Unicover, defendants Pallat, Griebell, Robert Wojtowicz and Joseph Wojtowicz (collectively, the "Principal Shareholders"), caused Unicover to transfer essentially all of its assets to themselves under the guise of dividend payments.

127.    In 1999 alone, Unicover's dividend payments totaled approximately $45 million. The Principal Shareholders, acting by and through Unicover, made these payments knowing that disputes concerning their management of the Pool were imminent and that proceedings would, in

- 28 -

MAY-22-2003 THU 05:17 P                      FAX NO.                    P. 31/83

all likelihood, be brought against Unicover and themselves by parties seeking damages for losses incurred as a result of Unicover's actions.

128. The Principal Shareholders, acting by and through Unicover, made additional dividend payments to themselves in 2000 and 2001 totaling approximately $4.6 million. The 2000 and 2001 dividend payments were made after Unicover ceased its underwriting operations and after the Pool Arbitration and Reliance Litigation began.

129. As a result of the dividend payments, Unicover is currently a corporate shell with minimal corporate assets from which creditors, including Phoenix and Cologne, cannot achieve repayment of indebtedness.

130. The Principal Shareholders, acting by and through Unicover, made the dividend payments with the actual intent to hinder, delay and defraud creditors of the company.

131. Phoenix and Cologne have been injured as a result of the fraudulent transfers made by Unicover and the Principal Shareholders, and these fraudulent transfers violated the provisions of the New Jersey Unfair Fraudulent Transfer Act, N.J.S.A. §§ 25:2-20.

132. In committing the fraud detailed above, the Principal Shareholders acted jointly, as agents for each other, and in conspiracy, thus making each defendant liable jointly and severally for all damages to Phoenix and Cologne caused by such fraudulent conduct.

133. The Principals Shareholders' and Unicover's conduct was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

134. This claim for relief does not fall within the scope of the arbitration clause contained in the Management Agreement.

NPD_112501_14

## SIXTH CLAIM FOR RELIEF

### (Unjust Enrichment Against the Principal Shareholders)

135.    Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 134 as if fully set forth herein.

136.    The Principal Shareholders intentionally adopted an underwriting strategy whereby Unicover sold underpriced reinsurance, reinsurance that required underpriced retrocessional protection in order for the Pool members to achieve a profit. The Principal Shareholders, using the instrument of Unicover, then intentionally wrote an improperly large volume of such business for their own personal gain. This conduct directly resulted in the failure of the majority of the retrocessional contracts protecting the Plaintiffs as Pool members.

137.    The purpose of the underwriting strategy was to generate profit for Unicover and the above named defendants through the premium-volume-based fee structure contained in the Management Agreement.

138.    The Principal Shareholders concealed their fraudulent scheme from the Plaintiffs and intentionally withheld material adverse information concerning the willingness of Sun and Cockett to continue under the December Whole Account.

139.    By virtue of their control and influence, the Principal Shareholders were able to authorize the distribution of substantially all of Unicover's profit received from the Pool members pursuant to the Management Agreement. In particular, and as further alleged above, Unicover, at the direction of the Principal Shareholders, made a number of dividend payments to the above named defendants totaling approximately $50 million.

140.    The Principal Shareholders knew that the dividend payments were a direct product of their fraudulent scheme and were made to the detriment of the Pool members.

- 30 -

MAY-22-2003 THU 06:17 PM
MAY. 22. 2003   3:32 M                        FAX NO.                        P. 33/83

141.    The dividend payments made to the Principal Shareholders were done so at the expense and to the detriment of the Pool members.

142.    As a result, the Principal Shareholders have been unjustly enriched in an amount to be determined at trial, but believed to be in excess of $50 million.

143.    In committing the wrongful conduct detailed above, the Principal Shareholders acted jointly, as agents for each other, and in conspiracy, thus making each defendant liable jointly and severally for all damages to Phoenix and Cologne caused by such wrongful conduct.

144.    The conduct of the Principal Shareholders was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty Against the Principal Shareholders in Connection with the Pool Trust Account)

145.    Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 144 as if fully set forth herein.

146.    Pursuant to the Management Agreement, Unicover was obligated to hold all premiums and other funds in the Pool Trust Account.

147.    The Management Agreement required that Unicover retain in the Pool Trust Account a specific amount of premium to pay for claims arising from business underwritten on behalf of the Pool that was not ceded to the Retrocessionaires.

148.    The Management Agreement expressly required Unicover to hold the premiums and other monies as a fiduciary. Given its position as a fiduciary of the Pool Trust Account, Unicover owed the Pool members a duty to manage the Pool Trust Account with utmost loyalty, candor, integrity and care.

- 31 -

NFD_112501_14

149.    By virtue of their domination and control over Unicover, the Principal Shareholders owed the Pool members a fiduciary duty with respect to monies held in the Pool trust account.

150.    On information and belief, the Principal Shareholders, acting by and through Unicover, breached fiduciary duties owed to the Pool members by misappropriating monies held in the Pool Trust Account.

151.    On information and belief, despite the Pool members' demands, Unicover has refused to return the monies held in the Pool Trust Account to the Pool members.

152.    On information and belief, the Principal Shareholders actively participated in and directed Unicover's breach of its fiduciary duties with respect to the Pool Trust Account. On information and belief, the Principal Shareholders directed Unicover to misappropriate the monies held in the Pool Trust Account and/or were the direct beneficiaries of such misappropriation.

153.    As a direct and proximate result of the Principal Shareholders' misappropriating money being held in the Pool Trust Account, Phoenix and Cologne have sustained substantial damages.

154.    In committing the breaches detailed above, the Principal Shareholders acted jointly, as agents for each other, and in conspiracy, thus making each defendant liable jointly and severally for all damages to Phoenix and Cologne caused by such breaches.

155.    The Principal Shareholders' conduct was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

- 32 -

HTD_112501_16

## EIGHTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty by Aon and Rattner as Retrocessional Brokers)

156.   Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 155 as if fully set forth herein.

157.   As retrocessional brokers for the Pool members, Aon and Rattner were in a fiduciary relationship of trust and confidence with the Pool members, pursuant to which Aon and Rattner owed duties of good faith, utmost loyalty, candor, integrity and care.

158.   Aon and Rattner breached their fiduciary duties by engaging in self-dealing practices including, without limitation:   failing to disclose to the Retrocessionaires material information concerning the ceded business; failing to inform the Plaintiffs of the existence of the Reliance and Lincoln Facilities and Unicover's practice of ceding improperly large amounts of business from such Facilities to the December Whole Account; failing to inform the Pool members of their conflict of interest arising out of their joint venture with Unicover; and withholding material adverse information concerning the willingness of Sun and Cackett to continue under the December Whole Account.

159.   As a direct and proximate result of Aon's and Rattner's breach of their fiduciary duties, Phoenix and Cologne have sustained substantial damages.

160.   In committing the breaches detailed above, Aon and Rattner acted jointly, as agents for each other, and in conspiracy, thus making each defendant liable jointly and severally for all damages to Phoenix and Cologne caused by such breaches.

161.   Aon and Rattner's conduct was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

- 33 -

## NINTH CLAIM FOR RELIEF

### (Negligence by Aon and Rattner as Retrocessional Brokers)

162.    Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 161 as if fully set forth herein.

163.    The Pool members engaged Aon and Rattner to ensure that the Pool members were protected from unreinsured risks by securing retrocessional protection.

164.    As retrocessional brokers, Aon and Rattner owed the Pool members a duty to exercise due care under the circumstances and to carry out their obligations in a commercially reasonable fashion.  In addition, Aon and Rattner owed the Pool members a duty of care arising from their Joint Venture with Unicover.

165.    As further alleged above, Aon and Rattner failed to exercise due care and were negligent in performing their duties.

166.    As a direct and proximate result of Aon's and Rattner's negligent conduct, Phoenix and Cologne have sustained substantial damages.

167.    In committing the breaches detailed above, Aon and Rattner acted jointly, as agents for each other, and in conspiracy, thus making each defendant liable jointly and severally for all damages to Phoenix and Cologne caused by such breaches.

## TENTH CLAIM FOR RELIEF

### (Joint Venture – Willful and Wanton Misconduct
### by Aon and Rattner as Pool Brokers)

168.    Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 167 as if fully set forth herein.

- 34 -

HFD_112561_14

169.   Aon and Rattner entered into a joint venture with Unicover ("Joint Venture") whereby Aon and Rattner would assist in managing the Pool in exchange for a percentage of Unicover's management fees.

170.   Both Aon and Rattner exercised control over and contributed to the furtherance of the Joint Venture.

171.   As MGU, Unicover owed the Pool members a duty to exercise due care under the circumstances and to carry out their obligations in a commercially reasonable fashion.

172.   In furtherance of the Joint Venture, Unicover, Aon and Rattner engaged in a practice whereby Unicover sold underpriced reinsurance, reinsurance that required underpriced retrocessional protection in order for the Pool members to achieve a profit.  Unicover, in furtherance of the Joint Venture, intentionally wrote an improperly large volume of such business for its own benefit as well as the personal benefit of its shareholders and Aon and Rattner.  This conduct directly resulted in the failure of the majority of the retrocessional contracts protecting the Plaintiffs as Pool members.

173.   Aon and Rattner knew that the Pool's retrocessional protection was in jeopardy and that injury would result to the Pool members if Unicover continued to write large amounts of business to the December Whole Account.  In disregard of the consequences, and in furtherance of the Joint Venture, Aon and Rattner intentionally withheld material information from Phoenix and Cologne including, without limitation, material adverse information concerning the willingness of Sun and Cackett to continue under the December Whole Account.

174.   As a direct and proximate result of Aon and Rattner's wanton and willful misconduct, Phoenix and Cologne have sustained significant damages.

- 35 -

HFD_112601_14

175.   As Unicover's Joint Venture partners, Aon and Rattner are jointly and severally liable for Plaintiffs' damages.

176.   Aon and Rattner's conduct was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

## ELEVENTH CLAIM FOR RELIEF

**(Aiding and Abetting Breach of Fiduciary Duty by Aon and Rattner as Pool Brokers)**

177.   Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 176 as if fully set forth herein.

178.   As MGU of the Pool, Unicover and the Active Shareholders owed fiduciary duties to the Pool members.

179.   The Active Shareholders, acting by and through Unicover, breached such duties by engaging in self-dealing and negligent underwriting and reinsurance practices.

180.   On information and belief, Aon and Rattner had actual knowledge of Unicover's fiduciary duties to the Pool members, and substantially assisted the Active Shareholders, as part of the Joint Venture, in achieving Unicover's breach of such duties.

181.   As a direct and proximate result of Aon's and Rattner's substantial assistance to Unicover in Unicover's breaches of its fiduciary duties, Phoenix and Cologne have sustained substantial damages.

182.   In aiding and abetting in the breaches detailed above, Aon and Rattner acted jointly, as agent for each other, and in conspiracy, thus making each defendant liable jointly and severally for all damages to Phoenix and Cologne caused by such breaches.

- 36 -

HFD_113501_14

183.   Aon and Rattner's conduct was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

## TWELFTH CLAIM FOR RELIEF

### (Unjust Enrichment Against Aon and Rattner)

184.   Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 183 as if fully set forth herein.

185.   The Pool members entered into an agreement with Aon and Rattner whereby Aon and Rattner would secure retrocessional protection in exchange for payment of a brokerage fee.

186.   Pursuant to the agreement, the Pool members paid Aon and Rattner a brokerage fee that was based on a percentage of the premium for the retroceded business.

187.   Aon and Rattner breached their contract with the Pool members by engaging in negligent and deceptive practices, which ultimately caused the failure of the majority of the Pool's retrocessional protection.

188.   Aon and Rattner also received monies from the Pool members through their Joint Venture with Unicover in which Aon and Rattner assisted in managing the Pool in exchange for a percentage of Unicover's Pool-related management fees.   To the detriment of the Pool members, Aon, Rattner and Unicover engaged in negligent underwriting and reinsurance practices, including, providing reinsurance on behalf of the Pool members at rates that were well below the market price; withholding material information from the Pool members concerning the creation of the Lincoln Facility and the Reliance Facility; failing to disclose the existence of their Joint Venture with Unicover; and withholding material adverse information concerning the willingness of Sun and Cackett to continue under the December Whole Account.

- 37 -

189.    As a result, Aon and Rattner have been unjustly enriched in an amount to be determined at trial, but believed to be in excess of $100 million.

190.    In committing the wrongful conduct detailed above, Aon and Rattner acted jointly, as agent for each other, and in conspiracy, thus making each defendant liable jointly and severally for all damages to Phoenix and Cologne caused by such wrongful conduct.

191.    Aon and Rattner's conduct was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.


### THIRTEENTH CLAIM FOR RELIEF

#### (Breach of Contract Against Rattner as Retrocessional Broker)

192.    Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

193.    The Pool members entered into a contract with Rattner whereby Rattner would secure retrocessional protection and perform all customary duties of a retrocessional broker in exchange for brokerage fees.

194.    Rattner materially breached its agreement with the Pool members.

195.    As a direct and proximate result of Rattner's breach of contract, Phoenix and Cologne have sustained substantial damages.


### FOURTEENTH CLAIM FOR RELIEF

#### (Breach of Contract Against Rattner as Pool Broker)

196.    Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 195 as if fully set forth herein.


- 38 -

197.    Rattner entered into a Joint Venture with Unicover whereby Rattner, along with Aon, would assist in managing the Pool in exchange for a percentage of Unicover's Pool management fee.

198.    Rattner exercised control over and contributed to the furtherance of the Joint Venture.

199.    In exchange for its efforts, Unicover agreed to share with Rattner profits that resulted from the Joint Venture.

200.    In furtherance of the Joint Venture, Unicover materially breached its contractual duties owed to the Pool members.

201.    In furtherance of the Joint Venture, Rattner substantially assisted Uncover in violating the terms of the Management Agreement.

202.    As a direct and proximate result of Unicover's breach of contract, Phoenix and Cologne have sustained substantial damages.

203.    As Unicover's Joint Venture partner, Rattner is liable to the Pool members for damages arising from Unicover's breach of the Management Agreement.


## FIFTEENTH CLAIM FOR RELIEF

### (Breach of Duty of Good Faith and Fair Dealing Against Rattner)

204.    Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 203 as if fully set forth herein.

205.    By virtue of its contractual relations with the Pool members, Rattner owed a duty to act in good faith and fair dealing.

- 39 -

MAY-22-2003 THU 06:19 PM                         FAX NO.                      P. 42/63

206. As alleged above, Rattner materially breached the duty of good faith and fair dealing by engaging in negligent and deceptive practices that were in violation of its contract obligations to the Pool members.

207. As a direct and proximate result of Rattner's breach of the duty of good faith and fair dealing, Phoenix and Cologne have sustained substantial damages.

### SIXTEENTH CLAIM FOR RELIEF

**(Fraud / Intentional Misrepresentation Against the Active Shareholders, Aon and Rattner)**

208. Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 207 as if fully set forth herein.

209. Acting personally and through Unicover, the Active Shareholders, along with Aon and Rattner, knowingly and intentionally withheld material information from the Plaintiffs, including, but not limited to, material adverse information concerning the willingness of Sun and Cackett to continue under the December Whole Account; the existence of the Joint Venture; and the existence of the Lincoln Facility and Reliance Facility.

210. The Active Shareholders, Aon and Rattner knowingly and intentionally withheld the material information from the Plaintiffs in furtherance of their Joint Venture and to ensure the continued growth in the volume of premium accepted on behalf of the Pool, and, in turn, continued growth in profit to themselves through the premium-volume-based fee structure contained in the Management Agreement.

211. As a result of their fiduciary relationships with the Pool members, Unicover, the Active Shareholders, Aon and Rattner were obligated to disclose those material facts.

- 40 -

HFD_112501_14

MAY-22-2003 THU 06:19 PM    FAX NO.    P. 43/83
MAY. 22, 2003    4:42PM

212.   The above referenced nondisclosures were material because had Phoenix and Cologne been informed of the above facts, they immediately would have directed Unicover to stop writing new business on behalf of the Pool.

213.   The Active Shareholders, Aon and Rattner withheld the material information knowing that the Pool members relied on Unicover, the Active Shareholders and Aon and Rattner to disclose all information that was material to the Pool, and Cologne and Phoenix did reasonably and foreseeably so rely.

214.   Phoenix and Cologne did not discover and, through the exercise of reasonable diligence, could not have discovered the fraudulent scheme perpetrated by Unicover, the Active Shareholders and Aon and Rattner until discovery was completed in the Arbitration to rescind the December Whole Account.

215.   As a direct and proximate result of the fraud perpetrated by the Active Shareholders, Aon and Rattner, Phoenix and Cologne have sustained significant damages.

216.   In committing the fraud detailed above, the Active Shareholders, Aon and Rattner acted jointly, as agent for each other, and in conspiracy, thus making each defendant liable jointly and severally for all damages to Phoenix and Cologne caused by such fraudulent conduct.

217.   The conduct of the Active Shareholders, Aon and Rattner was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

## SEVENTEENTH CLAIM FOR RELIEF

### (Civil Conspiracy Against the Active Shareholders, Aon and Rattner)

218.   Phoenix and Cologne re-allege and incorporate the allegations contained in paragraphs 1 through 217 as if fully set forth herein.

- 41 -

HFD_112121_14

MAY-22-2003 THU 05:20 PM
MAY.22.2003    4:02PM                                    FAX NO.                                    P. 44/00

219.   As MGU of the Pool, Unicover owed certain contractual, fiduciary and common law duties to the Pool members.  The Active Shareholders, Aon and Rattner possessed actual knowledge of the duties Unicover owed to the Pool members.

220.   On information and belief, Aon and Rattner knowingly engaged in a conspiracy with the Active Shareholders, acting by and through Unicover, to increase revenues for Unicover and Aon and Rattner through the premium-volume-based fee structure contained in the Management Agreement.  The Active Shareholders, Aon and Rattner knew that the purpose of the conspiracy – to maximize personal profits without regard to the best interests of the Pool members – violated Unicover's duties to the Pool.

221.   In furtherance of the conspiracy, the Active Shareholders, acting by and through Unicover, provided reinsurance on behalf of the Pool members at rates that were well below the market price, which required retrocessional protection in order to achieve a profit for the Pool members.  The Active Shareholders, however, in furtherance of the agreement with Aon and Rattner, wrongfully underwrote large volumes of underpriced business, a practice that jeopardized and ultimately resulted in the failure of the Pool members' retrocessional protection.

222.   In furtherance of this conspiracy, the Active Shareholders, Aon and Rattner, among other things:  withheld material information from the Retrocessionaires concerning the ceded business; failed to disclose the existence of the Joint Venture; failed to disclose the existence of the Lincoln Facility and the Reliance Facility; and withheld material adverse information concerning the willingness of Sun and Cackett to continue under the December Whole Account.  By withholding such information, the Active Shareholders, Aon and Rattner protected the conspiracy and ensured that the plan to accept large volumes of premium would continue.

HRD_110501_14

MAY-22-2003 THU 05:20 PM                                    FAX NO.                      P. 45/05

223.    As a direct and proximate result of the conspiracy between the Active Shareholders, Aon and Rattner to defraud the Pool members and engage in tortious conduct, Phoenix and Cologne have sustained significant damages.

224.    As co-conspirators, the Active Shareholders, Aon and Rattner are jointly and severally liable for all damages resulting from Unicover's conduct committed in furtherance of the conspiracy.

225.    The conduct of the Active Shareholders, Aon and Rattner was wanton, willful, and malicious, thereby justifying the imposition of punitive damages.

**WHEREFORE**, Phoenix and Cologne demand judgment against the above named defendants as follows:

As to:

(a)    On Claims I through III, for damages in an amount to be proved at trial not less than $100 million with interest and costs;

(b)    On Claims IV and V, for an order declaring that Unicover's 1999, 2000 and 2001 dividend payments were fraudulent and directing defendants Pallat, Grisbell and Robert and Joseph Wojtowicz to return the proceeds of those dividend payments into a constructive trust created for the benefit of Unicover's creditors;

(c)    On Claim VI, for damages in an amount to be proved at trial not less that $50 million with interest and costs;

(d)    On Claim VII, for damages in an amount to be proved at trial not less than $20 million with interest and costs;

(e)    On Claims VIII through XII, for damages in the amount to be proved at trial not less than $100 million with interest and costs;

(f)    On Claims XIII through XV, for damages in the amount to be proved at trial not less than $100 million with interest and costs;

(g)    On Claims XVI and XVII, for damages in the amount to be proved at trial not less than $100 million with interest and cost; and

(h)    Such other and further relief as this Court deems just and proper.

- 43 -

HFD_112501_14

## DESIGNATION OF TRIAL COUNSEL

Plaintiff hereby designates Andrew P. Fishkin, Esq.; E. Paul Kanefsky, Esq.; John

B. Rosenquest III, Esq.; and Robert D. Laurie, Esq.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULES 11.2 AND 201.1

Pursuant to Local Rule 11.2 of the United States District Court, District of New

Jersey, it is hereby certified that the matter in controversy in this action is not the subject of

any other action pending in any court, or of any pending arbitration or administrative

proceeding.

Pursuant to Local Rule 201.1(d)(1) of the United States District Court, District of

New Jersey, it is hereby certified that the damages recoverable in this action exceed the sum

of $150,000, exclusive of interest and costs and any claim for punitive damages, and that this

action in not subject to arbitration under Local Rule 201.1.


Dated:    May 21, 2003


                              PHOENIX LIFE INSURANCE COMPANY
                              and GENERAL & COLOGNE LIFE RE
                              OF AMERICA
                              By their attorneys



                              Andrew P. Fishkin (#AP-7571)
                              Edwards & Angell, LLP
                              51 John F. Kennedy Parkway
                              Short Hills, NJ 07078
                              Telephone: (973) 376-7700
                              Facsimile: (973) 376-3380


- 44 -                                          HFD_112501_14