FILED & RECEIVED
2003 MAY 22 PM 3: 33
CLERK
COURT

William J. O'Shaughnessy
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

John E. Beerbower
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019

Attorneys for Plaintiff

| | |
|---|---|
| RELIASTAR LIFE INSURANCE COMPANY,<br><br>                              Plaintiff,<br><br>                −v.−<br><br>JOHN E. PALLAT III, THOMAS J. DUNN, JR., ROBERT J. WOJTOWICZ, ROGER SMITH, CHRIS MAYS, AON RE, INC., and RATTNER MACKENZIE LIMITED,<br><br>                              Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MIDDLESEX COUNTY<br>DOCKET NO.<br><br>Civil Action<br><br>**COMPLAINT, JURY DEMAND, and R. 4:5-1 CERTIFICATION** |

Plaintiff, ReliaStar Life Insurance Company ("ReliaStar"), by way of complaint against the defendants, states:

## NATURE OF THE ACTION

1.    This action arises from one of the largest insurance frauds of the twentieth century.  The complex scheme was implemented by a mere handful of reinsurance brokers/intermediaries over a period of just 16 months, from late-1997 until early 1999.  Yet, during that brief period, these intermediaries pocketed hundreds of millions of dollars while creating for the reinsurance industry billions of dollars of expected net losses.   These events have become known in the industry as the "Unicover Debacle".

2.    The central vehicle for the scheme was the entity Unicover Managers Inc. ("Unicover"), a company organized under the laws of the State of New Jersey with the principal place of business in South Plainfield, New Jersey.  Through the scheme constructed around Unicover, Unicover's three principals and two brokers, one from Aon Re Inc. ("Aon") and the other from Rattner Mackenzie Limited ("Rattner") (collectively, the "Co-Conspirators"), defrauded ReliaStar and others.   The Co-Conspirators created a reinsurance pyramid in which risks were purportedly transferred from the original insurer to a number of ultimate retrocessionaires, or reinsurers, through a series of steps.  At each step substantial fees and commissions were extracted.   A significant percentage of such amounts went to the Co-Conspirators.   In the end, enormous net losses resulted for the companies actually bearing the risks.

3.    Although the Co-Conspirators exploited and defrauded a host of reinsurance companies through this scheme, the significant victims, in the end, were members of the Unicover Occupational Accident Reinsurance Pool (the "Unicover Pool" or the "Pool"), including ReliaStar.

4.    ReliaStar joined the Pool for Pool Year 4, effective March 1, 1998.  To induce ReliaStar to participate in the Pool, the Co-Conspirators knowingly misrepresented the security of the retrocessional protections for the Pool, the extent of the risks to be assumed by the Pool members and the nature and volume of

the business to be written by the Pool and retroceded to the Pool's retrocessionaires.

5.    The Co-Conspirators acted out of greed, with a reckless disregard for the interests of the Pool members, including ReliaStar.  During the implementation of the scheme, the Co-Conspirators made material misrepresentations to ReliaStar and also disguised and concealed from ReliaStar the conduct that ultimately led to the enormous losses now faced by ReliaStar and the other Pool members.  In the implementation of this scheme, various Co-Conspirators committed breaches of duties, breaches of contract and multiple tortious acts.

6.    This action seeks damages for the various losses suffered by plaintiff ReliaStar as a consequence of defendants' fraudulent scheme and of their conduct in the implementation thereof.

## PARTIES

7.    Plaintiff ReliaStar is a corporation organized and existing under the laws of the State of Minnesota with its principal place of business in Minneapolis, Minnesota.

8.    Defendant John E. Pallat III ("Pallat") is a citizen of the State of New Jersey, residing at 211 Winant Road, Princeton, New Jersey 08540-6759.  Pallat was a founding shareholder and is the current Chairman and CEO of Unicover.  Pallat was active in all aspects of Unicover's business, was responsible for many of Unicover's business practices and controlled Unicover's operations from the company's New Jersey headquarters.  Pallat was a Co-Conspirator.

9.    Defendant Thomas J. Dunn, Jr. ("Dunn") is a citizen of the State of Illinois, residing at 91 Alexander Drive, Geneva, Illinois 60134.  Dunn was a founding shareholder and was formerly the President of Unicover.  On information and belief, Dunn initially worked in Unicover's New Jersey headquarters but later moved to Unicover's office in Lisle, Illinois.  After the move and throughout

the relevant time period, Dunn was in regular contact with
Pallat and the New Jersey office and frequently traveled to
New Jersey to conduct Unicover-related business.  Dunn was
a Co-Conspirator.

10.  Defendant Robert J. Wojtowicz ("Wojtowicz")
is a citizen of the State of New Jersey, residing at 13
Hill Hollow Road, Warren, New Jersey 07059.  Wojtowicz was
a founding shareholder and a director of Unicover.
Wojtowicz was a Co-Conspirator.  Pallat, Dunn and Wojtowicz
are referred to as the "Unicover Principals".

11.  Defendant Roger Smith ("Smith") is a citizen
of the State of Illinois, residing at 1314 Scott Avenue,
Winnetka, Illinois 60093.  Smith is an employee of Aon and,
from 1995 to 1999, acted as an agent and broker for the
Unicover Pool.  Throughout the relevant time period, Smith
conducted business in the State of New Jersey.  Smith had
regular contact with defendant Pallat, who controlled
Unicover's operations from the company's New Jersey
headquarters.  Smith frequently visited Unicover's New
Jersey headquarters for Pool-related business.  Smith was a
Co-Conspirator.

12.  Defendant Chris Mays ("Mays") is a citizen
of the United Kingdom, residing at Squirrels Wood, Park
Lane, Ashtead, Surrey, UK.  On information and belief, Mays
was employed by Nicholson Leslie Group, Aon's London Market
reinsurance brokerage affiliate ("Nicholson Leslie"), from
1995 to the summer of 1997 and, thereafter, was employed by
Rattner.  From 1995 to December of 1998, Mays acted as an
agent and broker for the Unicover Pool.  On information and
belief, throughout the relevant time period, Mays conducted
business in the State of New Jersey.  Mays had regular
contact with Pallat, who controlled Unicover's operations
from the company's New Jersey headquarters.  Mays
frequently visited Unicover's New Jersey headquarters for
Pool-related business.  Mays was a Co-Conspirator.

13.  Defendant Aon is a corporation organized and
existing under the laws of the State of Illinois, with its
principal place of business at 200 East Randolph, 16th
Floor, Chicago, Illinois 60601.  Aon is a licensed
insurance and reinsurance intermediary in the State of

4

New Jersey. Aon, through its agent Smith, was a
Co-Conspirator.

14. Defendant Rattner is a corporation organized
and existing under the laws of England, with its principal
place of business at 35 Seething Lane, London, England EC3N
4AH. Rattner, through its agent Mays, conducted business
in the State of New Jersey. Rattner, through its agent
Mays, was a Co-Conspirator.

## OTHER PARTICIPANTS IN THE FRAUDULENT SCHEME

15. Cragwood Managers, L.L.C., formerly known as
Unicover Managers, L.L.C., and successor-in-interest to
Unicover Managers, Inc. (collectively, "Unicover"), is a
limited liability company organized under the laws of the
State of New Jersey with its principal place of business in
South Plainfield, New Jersey. On information and belief,
as a result of the fraudulent conduct of the Unicover
Principals, Unicover is now a shell entity, effectively
insolvent. Unicover has been sued in the past by other
victims of the fraudulent scheme described herein, such as
Reliance Insurance Company and Reliance Group Holdings,
Inc. (collectively, "Reliance"). At all times, the
Unicover Principals directed Unicover's activities.

16. Olga Reinsurance Company, Ltd. ("Olga"), is
a company organized under the laws of Barbados with a
principal place of business in Bridgetown, Barbados. On
information and belief, Olga is owned and controlled by the
Unicover Principals.

## BACKGROUND TERMINOLOGY

17. Reinsurance is a transaction whereby one
insurance company, the "reinsurer," in exchange for payment
of a premium, agrees to indemnify or reimburse another
insurance company, the "reinsured", against all or part of
a loss that the reinsured may sustain under insurance
policies the reinsured has issued to insured companies.
Reinsurance arrangements are common among insurers.

18.   A reinsurer may further reinsure its risk with another reinsurer.  The reinsured in such situations is called the "retrocedent", and the reinsurer that receives the premium and assumes risk from the retrocedent is called the "retrocessionaire".

19.   A "broker" is often retained by the reinsured or retrocedent to place reinsurance for all or part of the reinsured's book of business.  In brokered transactions, the broker typically handles all dealings between a reinsured and a reinsurer, or between a retrocedent and a retrocessionaire.

20.   A managing general underwriter or "MGU" is a legal entity that has the authority to underwrite insurance or reinsurance risks on behalf of an insurer.  The MGU will generally assess and price the risks and then bind the reinsurer to the coverage, doing so as an agent of the reinsured and earning management fees for underwriting business for its principal.  It is not uncommon for an insurer to retain an MGU to underwrite insurance or reinsurance on the insurer's behalf and to obtain reinsurance.

21.   A "reinsurance pool" is comprised of a group of insurance and/or reinsurance companies that provide reinsurance protection to reinsureds.  Each member of the pool assumes a predetermined and fixed interest in the reinsurance business underwritten on behalf of the pool.

## THE UNICOVER DEBACLE

22.   Unicover was created as an MGU specializing in the reinsurance of workers' compensation policies. Unicover offered reinsurance to insurers that wrote workers' compensation coverage.  The reinsurance was split by Unicover between the accident and health portion of workers' compensation, known as "workers' compensation carve-out" business, and the much smaller employer liability portion.

23.   The Co-Conspirators created entities that could provide each of these types of reinsurance coverage.

6

The Unicover Pool, consisting of life insurance reinsurers, were able to reinsure the accident and health portion of the workers' compensation coverage. The Unicover Principals also created Olga, which could be used to reinsure the employer liability portions. As a result, Unicover had the ability to offer clients "follow-form" workers' compensation coverage.

24. The Co-Conspirators entered into various retrocessional agreements pursuant to which Unicover would be able to retrocede a large portion of the risks under the workers' compensation carve-out business underwritten by Unicover. These agreements were for extended terms and non-cancelable. In addition, these agreements established rates for the retrocessional protection based upon percentages of the premiums charged for the original insurance.

25. The Co-Conspirators convinced ReliaStar to join the Pool through misrepresentations that ReliaStar would be retaining only certain limited risks and would be receiving a modest, but relatively certain net return. The Co-Conspirators misrepresented that the Pool would validly and effectively retrocede a large portion of the risk being reinsured by the Pool to various retrocessionaires under agreements already in place. The Co-Conspirators further misrepresented that the business would be profitable to the Pool members, because they would be able to keep sufficient premium, after fees and commissions, to fully compensate for the limited risks being retained.

26. ReliaStar relied on the Co-Conspirators' representations that Unicover would only write business to the Pool that would generate a net profit to the Pool on the risks retained and that there would be valid retrocessional coverage for the preponderance of the risks assumed.

27. The quality (in terms of the projected risks relative to the insurance premiums) of the business being written by Unicover was such that, after the substantial fees and commissions, the business would be significantly unprofitable for the retrocessionaires under the retrocessional agreements. As a result, it would have been

obvious to anyone in the business that there would be practical constraints on the volume of business Unicover could retrocede and still expect to retain the retrocessional coverage.  It would also have been obvious that significant increases in the volume of business being written would put the retrocessional coverage in jeopardy.

28.  Unicover and the Co-Conspirators, both directly and indirectly, were to receive brokerage commissions and management fees calculated as percentages of the business written, so that the more business Unicover wrote, the more money would be received by the Co-Conspirators.  The premiums for coverage were to be paid during the coverage period, from which the fees and commissions would be subtracted.  The payment of claims and the collections from retrocessionaires, however, would occur over a period of several years.

29.  In order to enrich themselves, the Co-Conspirators caused Unicover to write and purport to cede to the retrocessionaires increasingly large volumes of business, knowing that such conduct would be likely to lead to a refusal by the retrocessionaires to perform and an action to rescind the Agreements, which could leave the Pool members with no retrocessional coverage and expose the Pool members to the large losses created by Unicover's underwriting.

30.  In the second half of 1998, when it appeared that the continuation of the retrocessional coverage was in jeopardy as a result of complaints and protests from the retrocessionaires, Unicover and the Co-Conspirators, while deceiving the retrocessionaires and the Pool members, vigorously and dramatically increased the business written. Indeed, 60% of the total volumes ceded to the retrocessionaires during the 16 months between December 1997 and the end of March 1999 was from business written by Unicover in the final five months of that period. Similarly, over 75% of the total volume written to the Pool in Pool Year 4 was bound in the three-and-one-half months between mid-November 1998 and March 1, 1999.

31.  The Co-Conspirators were able to disguise the volume of business from ReliaStar, other Pool members and the retrocessionaires through various fraudulent

8

artifices such as untimely and false reports about the business written to the Pool and the use of facilities other than the Pool to underwrite business also ceded to the retrocessionaires under the retrocessional agreements. The Co-Conspirators also made misrepresentations and failed to disclose material facts about the state of and developing problems with respect to the retrocessional coverage.

32.  Unknown to ReliaStar, Unicover ceded employer liability risks to Olga.  The Unicover Principals, controlling Unicover and Olga, diverted premiums from the "carve-out" risks by pricing the employer liability portion far above market.  On information and belief, this technique enabled the Unicover Principals to divert premiums from the Pool members into offshore accounts for the ultimate benefit of the Unicover Principals.

33.  On January 25, 1999, one of the retrocessionaires gave formal notice of termination and threatened an action for rescission.  The Unicover Principals assured the Pool members that Unicover would stop writing business.  Nonetheless, immediately thereafter and continuing even beyond March 1, 1999, when Unicover's contractual authority to bind business on behalf of the Pool had terminated, the Co-Conspirators continued to try to write additional business through Unicover.

34.  Thereafter during 1999, the retrocessionaires, having terminated the retrocessional agreements due to the enormous volume of business ceded to them, commenced arbitration seeking to rescind the Whole Account.

35.  On October 8, 2002, as clarified by an order dated January 4, 2003, the arbitration panel relieved the retrocessionaires of responsibility for ceded liabilities relating to business that was bound after August 31, 1998, leaving the Pool members responsible for the risks on business written after that date--approximately 68% of the risks that had been retroceded by the Pool under the retrocessional agreements.

36.  The fraudulent scheme generated huge profits for the Co-Conspirators and left the Pool members, including ReliaStar, with large expected net losses.

37.  On information and belief, a substantial amount of the proceeds from the scheme are being held in offshore accounts in tax haven jurisdictions for the benefit of the Unicover Principals.

## FACTS

### The Unicover Pool

38.  In December 1994, Pallat, Dunn and Wojtowicz created Unicover.

39.  The Unicover Principals set out to create a pool of reinsurers for which Unicover would be the MGU.  In 1995, the Unicover Principals, along with Aon and Nicholson Leslie, recruited life insurers to participate in the Unicover Pool.  The Pool was to be a risk-bearing reinsurance pool for the accident and health portions of workers' compensation insurance policies.

40.  From March 1, 1995, to March 1, 1998 (Pool Year 1 through Pool Year 3), the members of the Pool were Connecticut General Life Insurance Company ("CIGNA"), Lincoln National Life Insurance Company ("Lincoln"), Phoenix Life Insurance Company ("Phoenix") and Life Reassurance Corporation of America ("Life Re").  Life Re withdrew from the Pool as of March 1, 1998.  ReliaStar, along with General & Cologne Life Re of America ("Cologne"), joined the Pool effective March 1, 1998 (Pool Year 4).

41.  In connection with their membership in the Pool, the Pool members executed an Occupational Accident Reinsurance Pool Management Agreement ("Management Agreement"), under which each Pool member was separately liable for it's obligations.  The Management Agreement governed the relationship between and among Unicover and the Pool members.  By the terms of the Management Agreement, Unicover became the administrator and MGU for the Pool members.  The Management Agreement provided Unicover with exclusive authority to accept workers' compensation carve-out risks as an MGU on behalf of the Pool members.  Unicover demanded and received broad discretion to write business, subject only to certain Pool profitability guidelines and the existence of retrocessional coverage.

42.   Pursuant to the Management Agreement, Unicover was obligated to hold all premiums and other Pool-related funds in an interest bearing account known as the Unicover Managers, Inc. Pool Trust Account (the "Pool Trust Account") and remit portions of such funds when necessary. The Management Agreement required that Unicover retain in the Pool Trust Account a specific amount of premium to pay for claims arising from business underwritten on behalf of the Pool that was not retroceded.   The Management Agreement expressly required that Unicover hold all premium and other monies in a fiduciary capacity for the Pool members.

43.   Pursuant to the terms of the Management Agreement, Unicover would receive a management fee of 7.5% of the gross premium ceded by an insurer to the Pool members for each piece of business properly and validly accepted on their behalf.   Thus, Unicover would receive more money as more premium was accepted.   Unicover also had the right to earn an annual profit commission, to be calculated based on the net profit for each Pool year.

44.   The Management Agreement required Unicover to arrange for retrocessional coverage to protect the Unicover Pool members.

45.   During the first two years of the Unicover Pool's existence, Unicover, through Aon and Rattner, arranged for retrocessional coverage to protect the Pool members on a "facultative basis", retroceding the risks for each of the policies reinsured by the Unicover Pool separately.

46.   During this period, the Unicover Principals assessed the appetite of the market for workers' compensation carve-out reinsurance, establishing a business history or track record and gaining the trust and confidence of the Pool members.

## The Brokers

47.   At all times relevant herein, Smith acted as an agent and employee of defendant Aon on its behalf.

12

Therefore, Aon is liable for Smith's conduct alleged herein.

48.  Unicover engaged Mays of Nicholson Leslie and Smith of Aon as its chief brokers for securing retrocessional protection for the Pool members.  In the summer of 1997, Mays moved to Rattner, where he continued to share the Unicover account with Aon.  On information and belief, Rattner was removed as retrocessional broker for the Pool in December of 1998.  Thereafter, Aon acted as the Pool members' sole retrocessional broker.

49.  From the middle of 1997 to the end of 1998, Mays acted as an agent and employee of Rattner on its behalf.  Therefore, Rattner is liable for Mays' conduct alleged herein.

50.  Mays was a principal architect of the Pool and personally handpicked and recruited participating Pool members.  Mays was responsible for marketing the Pool within the industry broadly and within the London market, in particular.  Smith was a principal facilitator of the Pool's growth and was responsible for communicating with Pool members regarding the management of the Pool, including the drafting of the Management Agreement.  However, both Smith, on behalf of Aon, and Mays, on behalf of Rattner, purported to act as brokers for the Pool and its members in the placement of retrocessional coverage.

51.  The retrocessional agreements entered into in 1997 listed Rattner and Aon as the brokers for those agreements.  Pursuant to the terms of these retrocessional agreements, the brokers received a brokerage commission of 10% of the minimum amount of subject premium.

52.  In addition to their roles as retrocessional brokers, Aon and Rattner entered into a joint venture with Unicover in which they shared Pool management fees in exchange for assisting in the management of the Pool.  Through this additional role, Aon and Rattner became, in essence, partners with Unicover and the Unicover Principals.  In this role, Aon and Rattner actively

13

participated with Unicover and the Unicover Principals in forming and managing the Pool.

53.   On information and belief, in exchange for its efforts, and in furtherance of the fraudulent scheme, Aon initially took a one-third share of Unicover's 7.5% management fee for the Pool.  Later, when Mays left Nicholson Leslie for Rattner, Aon and Rattner divided the one-third share of the management fee.  These profits were in addition to the brokerage fees that Aon and Rattner received as retrocessional brokers for the Pool members. When Rattner was removed as broker in 1998, Aon became Unicover's sole business partner, and its share was increased to 20% of Unicover's management fee for the remainder of Pool Year 4, from December 1998 through February 1999.

54.   Like Unicover, Aon and Rattner would receive greater fees if more premium was accepted on behalf of the Pool, regardless of the profitability of the business that generated that premium.  In addition, Aon and Rattner would also receive greater fees if more premium was then retroceded to the retrocessionaires by the Pool.

55.   On information and belief, Aon and Rattner have recognized that their partnership with Unicover renders them culpable for the consequences of the scheme. As Smith wrote to Mays and others on January 25, 1999, when the scheme began to collapse, "at its worst, we are all implicated".

56.   On information and belief, Aon and Rattner jointly received millions of dollars as a result of their participation in this fraudulent scheme.

The Whole Account

57.   A key element in the structure of the fruadulent scheme was retrocessional coverage provided by a retrocessional agreement called the Occupational Accident Excess of Loss Whole Account Retrocession Agreements and Burning Costs Premium Protection Agreements commencing on December 1, 1997 (the "Whole Account").

14

58.   The Whole Account was to provide retrocessional coverage for all the reinsurance policies underwritten by the Unicover Pool.  The Whole Account, on its face, would provide retrocessional protection for business written at any time during its three year life.

59.   The basic platform for the fraud was put in place in 1997 when Unicover, through the efforts of Aon and Rattner, entered into the Whole Account.

60.   In the spring of 1997, Mr. Mays, on behalf of Aon, participated in persuading Cackett of Centaur, on behalf of its principals, Sun Life Assurance Company of Canada ("Sun"), Phoenix and Phoenix's affiliate American Phoenix Life and Reassurance Company ("American Phoenix"), to enter into the One Year Whole Account.  Under the One Year Whole Account, Sun, Phoenix, American Phoenix and Lloyd's Syndicate 957 agreed to provide retrocessional coverage to the Pool members for a period of one year.

61.   After the One Year Whole Account had been operating for a few months, the Unicover Principals, acting through Aon and Rattner, agreed to cancel the One Year Whole Account and replace it with the Whole Account, beginning on December 1, 1997.  At this time, Collins was approached by the Unicover Principals about committing his principal, General & Cologne Life Re of America ("Cologne"), to participate as a retrocessionaire, and he agreed.  The retrocessionaires for the Whole Account were Sun and Phoenix, represented by Cackett, and Cologne, represented by Collins (collectively, the "Retrocessionaires").

62.   The Whole Account expressly stated that the estimated gross subject premium over the three-year period would be approximately $600 million, with an estimated annual breakdown of $150 million from December 1, 1997, to December 1, 1998, $200 million from December 1, 1998, to December 1, 1999, and $250 million from December 1, 1999, to December 1, 2000.

63.   In March of 1998, Unicover and the Retrocessionaires revised the Whole Account to include

15

certain substantive changes.  However, the $600 million gross subject premium estimate contained in the original Whole Account remained unchanged.

64.  On information and belief, prior to revising the Whole Account, the Co-Conspirators had full knowledge that the gross subject premium estimates contained in the original Whole Account had already been exceeded.

## Defendants' Solicitation of ReliaStar

65.  On February 6, 1995, Dunn wrote Theresa Carroll ("Carroll") of Northwestern National Life Insurance Company, the company now known as ReliaStar, to announce Unicover's presence in the marketplace.  Paul Kersten ("Kersten") responded to this letter in a telephone conversation with Dunn in late February or early March 1995.

66.  In October 1996, Smith contacted Carroll at ReliaStar and asked her to meet with Unicover at the National Association of Independent Insurers ("NAII") conference in San Francisco in November 1996.  Carroll, Bill Merriam, Paul Larson, and Kersten from ReliaStar, and Smith, Mays, Dunn and Pallat attended the meeting.  Smith and Mays led the meeting.  They described and introduced the Unicover Principals and gave a basic description of the type of business that they were seeking to underwrite for the Unicover Pool.

67.  On December 19, 1996, Aon sent ReliaStar, via Federal Express, a document entitled "Workers' Compensation Alternatives Quota Share Workers' Compensation Reinsurance Pool Overview of Proposed Facility" in furtherance of this solicitation.

68.  In furtherance of the fraudulent scheme, in late 1997, Mays and Smith actively solicited and recruited additional reinsurers, including plaintiff ReliaStar, to join the Unicover Pool.  On November 5, 1997, Mays sent a fax to Carroll to alert them to defendants' presentation at the 1997 NAII Conference.  That fax induced ReliaStar to attend defendants' presentation at the 1997 NAII

16

Conference.  Carroll, Kersten, Smith, Mays, Dunn and Pallat met in November 1997, at the NAII conference in San Antonio.

69.  On information and belief, at the 1997 NAII Conference, the Co-Conspirators fraudulently assured ReliaStar that there would be retrocessional coverage for the Pool, and fraudulently concealed defendants' plan to violate their fiduciary duties by creating the other facilities to write excessive business to be retroceded to the Whole Account.

70.  After that meeting, Kersten had several follow-up conversations across state lines with Smith, Mays, Pallat, and Dunn, each of whom represented that the business written to the Pool would generate a profit of 7.5% to the Pool members because of the retrocessional protection for the ceded business.

71.  On February 12, 1998, Kersten traveled to Chicago at defendants' invitation.  He was told by Smith, Dunn, and Pallat that the anticipated premium for Pool Year 4 would be approximately $150 million.  On information and belief, by that date defendants had already agreed to bind business to the Pool exceeding this amount.  In the end, the Direct Written Premium for Pool Year 4 eventually was over $2.5 billion.  The Co-Conspirators' statements to Kersten were also materially misleading because they did not disclose then-existing problems with the Pool's retrocessional protection and their plans to write excessive business through other facilities to be retroceded to the Whole Account.

72.  At that same meeting, the Co-Conspirators misrepresented the type of business to be ceded to the Pool's retrocessionaires.  Pallat stated that Unicover would not write business where the Pool retained little or no risk, referred to as "buffer business", because the retrocessionaires objected to the writing of such business. Those representations misleadingly and erroneously assured Kersten that Unicover would underwrite with the interests and concerns of the Pool's retrocessionaires in mind.

73. Unicover, however, was writing "buffer business" and, by June of 1998, was involved in an active dispute with the retrocessionaires about the continued writing of such business. In the course of that dispute, Smith's advice to Pallat was that Unicover should not refrain from writing "buffer business", but should "pump 'em in".

74. On March 5, 1998, Dunn faxed a memorandum from Unicover's offices in Illinois to Kersten in Minnesota in response to questions Kersten had asked about the Pool. Therein, Dunn misrepresented the nature of the risks ceded to the Pool and retroceded to the Whole Account.

75. On March 30, 1998, Dunn faxed Kersten another memorandum from Unicover's offices in Illinois in response to Kersten's questions about the Pool. Therein, Dunn misrepresented the nature and volume of the risks that Unicover ceded to the Pool and retroceded to the Whole Account. Dunn also fraudulently concealed the Unicover Principals' plans to write excessive business through other facilities to be retroceded to the Whole Account and to skim extra profits through the Olga scheme.

76. On April 1, 1998, based on repeated assurances of retrocessional coverage through the Whole Account, which would enable the Pool to earn a 7.5% net profit, ReliaStar joined the Pool for Pool Year 4, effective March 1, 1998. Pool Year 4 would continue by its terms through February 28, 1999.

Defendants' Exploitation of the Fraudulent Scheme

77. With the structure of the scheme in place, the Co-Conspirators began dramatically increasing the amounts of business being written to the Pool and being retroceded to the Whole Account, reaching levels far beyond the outer limits of the risk-bearing principals' reasonable expectations.

78. In order to achieve volume, Unicover accepted risks at prices that it knew would result in the retrocession of exposures with expected losses far in

18

excess of the premium being transferred.  The
Co-Conspirators knew or should have known that the
retrocession of such large volumes of unprofitable business
to the Retrocessionaires would ultimately lead to protests
and would jeopardize the retrocessional protection to the
detriment of the Pool.

79.  Moreover, Unicover also began retroceding
very substantial additional risks to the Whole Account from
two other facilities.  In addition to the business written
on behalf of the Pool members, Unicover separately wrote
and managed business on behalf of Lincoln National Life
Insurance Company and Lincoln National Health and Casualty
Insurance Company (the "Lincoln Facility") and Reliance
Insurance Company (the "Reliance Facility") (collectively,
the "Facilities").  In soliciting ReliaStar to join the
Pool, the Co-Conspirators had concealed their plans to
create and so use the Facilities.

80.  On information and belief, Unicover
approached Lincoln and Reliance in late 1997 about forming
the Facilities to reinsure workers' compensation carve-out
risks.  Although neither Lincoln nor Reliance ever
finalized management agreements with Unicover for the
Facilities, on information and belief, Unicover began
writing business to the Facilities in the spring of 1998
and retroceding the risks to the Whole Account.  On
information and belief, by the spring of 1999, Unicover had
underwritten through the Facilities reinsurance for close
to $5 billion of original premium and had attempted to
retrocede most of the reinsured risks to the Whole Account.
On information and belief, Smith and Mays knew the
magnitude of the business Unicover was retroceding as a
result of the Facilities.  The Co-Conspirators did not
disclose to ReliaStar the volume of the business they wrote
to the Facilities or retroceded therefrom to the Whole
Account.

81.  Under the Whole Account, Unicover had
secured retrocessional coverage based on an estimate of
business volume measured in original premiums of over three
years of $600 million.  However, on information and belief,
at the time ReliaStar joined the Pool, Unicover was already
engaged in negotiations to bind business with original

premiums of approximately $1.8 billion on behalf of the
Pool and the Facilities.

82.    Instead of curtailing the underwriting as
the Retrocessionaires began to express growing concerns
regarding the volume of business, Unicover continued to
increase the volume of business written.    Indeed, Pallat
threatened to write even more business and cede it to the
Retrocessionaires under the Whole Account.    In July 1998,
Pallat told Mays that "if JC's [John Cackett] causes any
problems then JP [John Pallat] will write $5 billion of
business" and that there was "no way whatsoever he [Pallat]
is 'backing off'".    Neither Mays nor Pallat informed
ReliaStar of Cackett's concerns or of Pallat's response to
those concerns.

## Defendants' Concealment of the Volume of Business

83.    Even as to Pool business, the Unicover
Principals prevented ReliaStar from discovering the rapid
growth in the volume of business being written.    The
periodic reports provided by Unicover to the Pool members
were usually at least four months late, were materially
incomplete and, in the context of what was happening, were
highly misleading.

84.    On July 22, 1998, Dunn sent a fax message
from Unicover's offices in Illinois to Kersten in Minnesota
stating that the 1998 Gross Written Premium would not
exceed $360 million.    This fax concealed ongoing
negotiations to bind premium that would result in hundreds
of millions of dollars of new business in excess of that
estimate.    It also concealed the volumes of business that
had been written to the Facilities and retroceded to the
Whole Account.

85.    On July 23, 1998, Kersten spoke with Dunn
and Brian Cook ("Cook") of Unicover by telephone.    Dunn and
Cook falsely asserted that there was a total of $400
million in potential business on the "board", but not all
of it would bind.    Dunn and Cook also falsely asserted that
the "$360 million projection for our pool year" was
accurate.    These fraudulent misrepresentations hid the
burgeoning size of the Pool's business as of that date.

Cook and Dunn also concealed from Kersten, in violation of their duty to disclose, that Sun had recently threatened to "void the [retrocessional] contract" if it could not secure adequate retrocessional coverage to protect its own obligations to reinsure the Unicover Pool and the Facilities.  Finally, Cook and Dunn concealed from Kersten, in violation of their duty to disclose, the volume of business that had been written to the Facilities.

86.  On August 11, 1998, Kersten traveled to Unicover's offices in Illinois to discuss Pool business. There, he was again told that Unicover had $400 million of prospective business on the "board".  This statement fraudulently concealed the fact that by the end of August the Co-Conspirators were to bind over five hundred million in gross written premium to the Pool.

87.  On September 3, 1998, Cook sent Kersten, via interstate carrier, a copy of materials provided at a recent Pool meeting that ReliaStar was not able to attend. These materials falsely assured ReliaStar that retrocessional protection would remain in place, despite Cackett's recent expressions of concern.  These materials also fraudulently concealed from ReliaStar that the Unicover Principals had threatened to write even more business to be retroceded to the Whole Account if Cackett "causes any problems" by complaining about the Co-Conspirator's conduct.  These materials continued to conceal the volume of business written to the Facilities and retroceded to the Whole Account from the Pool.

88.  On October 6, 1998 the Unicover Principals caused Tim Nolan ("Nolan"), an employee of Unicover, to send a fax across state lines to Kersten allegedly representing the business bound to the Pool as of October 1, 1998.  That document falsely underestimated the total business by forty percent, representing gross written premium as $387,982,000 when it was then in reality $532,738,448.  This document also falsely represented business that was bound to the facilities as being bound to the Pool.

89.  From October 7, 1998, to January 25, 1999, the Co-Conspirators fraudulently concealed several

materially relevant facts: (1) volume was increasing
dramatically; (2) negotiations with the retrocessionaires
had broken down; and (3) the Co-Conspirators were
desperately searching for new retrocessionaires for the
Pool without success.  The Co-Conspirators had multiple
opportunities to inform ReliaStar of these facts throughout
this period.  For example, on December 30, 1998, Cook spoke
with Kersten on the phone to inform him, for the first
time, that business bound to the Pool could exceed
$1 billion.  At that time, Cook concealed the volume of
business written by the Facilities, which, on information
and belief, had already written billions in additional
business to the Pool's retrocessionaires.  Cook also
concealed the credible threat from the Retrocessionaires to
withdraw from the Whole Account.

90.  Through repeated reassurances by the
Co-Conspirators that the Whole Account fully protected the
Pool Members and through misrepresentations and non-
disclosures about the quantity and quality of business
being written, the Co-Conspirators were able to hide their
improper conduct from ReliaStar.

### Defendants' Concealment of the
### Retrocessionaires' Protests

91.  By the spring of 1998 (before ReliaStar had
decided to join the Unicover Pool), the conduct of the
Co-Conspirators was beginning to cause Cackett to become
seriously concerned.  Although Cackett benefited
financially from the increased volumes, the staggering
magnitude of the volume increases was felt by him to put in
jeopardy the retrocessionaires' ability to provide
retrocessional protection.  The Unicover Principals reacted
to these concerns with hostility and deception.

92.  From the spring of 1998 and continuing
throughout 1998 into early 1999, the Unicover Principals
were given material adverse information with respect to the
willingness of the Retrocessionaires to comply with their
obligations to provide retrocessional protection to the
Unicover Pool but did not disclose that information to
ReliaStar.  Specifically, on information and belief (and
based on documentary evidence):

a.    The Unicover Principals knew that since
early 1998 (before ReliaStar joined the Pool), Cackett
was beginning repeatedly to complain about the volume
of business being retroceded to the Retrocessionaires.
Cackett complained that the volume far exceeded the
estimates contained in the Agreements and indicated
that the increased volume would cause dramatic
problems for the Retrocessionaires' own retrocessional
protections which had volume restrictions.    The
Unicover Principals never disclosed the fact of these
complaints to ReliaStar.

b.    The Unicover Principals knew, by mid-May
1998, that Cackett was insisting that Aon and Rattner
must immediately find additional retrocessional
protection for his principals in order to "head off
any dispute" regarding the Retrocessionaires'
obligation to provide retrocessional coverage to the
Pool.    The Co-Conspirators never disclosed this fact
to ReliaStar.

c.    The Unicover Principals knew, on or about
June 10, 1998, that Sun had threatened to "void the
[retrocessional] contract" if it could not secure
adequate retrocessional coverage to protect its own
obligations to reinsure the Unicover Pool and the
Facilities.    The Unicover Principals never disclosed
this fact to ReliaStar.

d.    In July 1998, Pallat told Mays that he would
not stop writing in response to Cackett's complaints
and would respond to problems from Cackett by
increasing the volume of business being retroceded to
the Whole Account. Neither Pallat nor Mays disclosed
the fact of Cackett's complaints or the response of
Pallat to ReliaStar.

e.    By July 1998, Sun raised concerns with
Unicover about: (i) the type and quality of business
being retroceded; (ii) the rate adequacy of business
being retroceded; and (iii) the volume of business
being retroceded.    The Unicover Principals never
disclosed these facts to ReliaStar.

f.    Sun audited Unicover on July 27 and 28, 1998
to investigate their business concerns about the
business Unicover was retroceding.    The Unicover

23

Principals did not disclose to ReliaStar that Sun conducted the audit until January 1999.

g.  Following the July audit and throughout the fall of 1998, Cackett pressed to have Unicover cancel and rewrite the Whole Account.  At this time, and through late 1998 and early 1999, the Unicover Principals knew that Cackett was having no success in securing additional retrocessional protection for his principals.  The Unicover Principals never disclosed these facts to ReliaStar.

h. . Again, in mid-August 1998, Cackett advised Smith of Sun's repeated threat that it could deny liability for retrocessional coverage and fight it out in arbitration.  On information and belief, Smith conveyed this information to the Unicover Principals. The Co-Conspirators never disclosed this fact to ReliaStar.

i.  On August 31, 1998, Cackett wrote to Pallat that "[h]ad Centaur been aware that the income estimate was one fifth of it's [sic] probable final figure then Centaur would have written a significantly smaller share than it did" and that he wanted to reduce Centaur's share on the Whole Account and "cancel[] and replac[e] the current whole account with additional markets".

j.  On information and belief, by the end of September 1998, Unicover had asked reinsurance brokers to prepare an action plan for diluting or replacing Sun and Phoenix as Retrocessionaires.  In October 1998, Aon and Rattner formulated such an action plan for restructuring the retrocessional protections behind the Unicover Pool and the Facilities.  The Co-Conspirators never disclosed these facts to ReliaStar.

k.  In late September 1998, Cackett continued to express concerns to Smith about the unbridled growth of Unicover business and emphasized that Sun was under pressure from its principals to cancel and rewrite the Whole Account to ensure that Unicover would stop ceding further business.  Cackett indicated that only if Sun's responsibilities under the Whole Account were reduced could he persuade them to honor their obligations.  By this point, Cackett had accused

24

Unicover of having embarked on a "'get rich quick'" scheme and having engaged in "white collar fraud".  On information and belief, Smith conveyed this information to the Unicover Principals.  The Co-Conspirators never disclosed these events to ReliaStar.

### Defendants' Other Deceptive Conduct
### to Prolong the Fraudulent Scheme

93.  In mid-November 1998, in order to prolong the life of the fraudulent scheme, the Unicover Principals, together with Mays, conspired to deceive Lincoln in response to questions posed by Lincoln about the history of Unicover's dispute with the Retrocessionaires.

94.  The Co-Conspirators knew that the business they were writing was in such volumes and at such low prices that they would be unable to secure alternative or additional retrocessional coverage beyond the Whole Account.  Nevertheless, they informed Cackett that they were arranging additional retrocessional coverage that would potentially alleviate risk to the Whole Account. These false reassurances enabled Unicover to continue to write business for the Pool and to continue to receive millions of dollars of fees and commissions, while the exposure of the Pool members was being increased.

### Other Examples of Participation in the
### Fraudulent Scheme by Aon and Rattner

95.  On information and belief, the Unicover Principals and Smith and Mays coordinated their conduct to hide from ReliaStar and the other Pool members the growing concerns and protests of Cackett.  In addition, on information and belief, Smith and Mays encouraged Unicover to continue to underwrite as much business as possible on behalf of the Pool.

96.  In the summer/fall of 1998, Unicover, in the process of reassessing the retrocessional protection for the Pool, provided Aon and Rattner with detailed information about the volume of the business that it had

underwritten on behalf of the Pool as well as the Lincoln
and Reliance Facilities and provided estimates for business
that it expected to write in the future.

97.   Aon and Rattner, as the Pool's
retrocessional brokers and Unicover's joint venturers, knew
of the plans of the Unicover Principals to cause a premium
surge, vastly in excess of the written statement of
estimated gross subject premium made to the
Retrocessionaires.   Aon and Rattner also knew that the
increase in estimated gross subject premium being reinsured
by Unicover was unprecedented.   However, neither Aon nor
Rattner disclosed this information to ReliaStar or to the
Retrocessionaires or took any actions to stop the increase
in the volumes of business being written.

98.   In addition, Aon and Rattner were
specifically aware, no later than August of 1998, that the
Pool's retrocessional protection under the Whole Account
was in jeopardy.   Sun and Cackett informed Aon and Rattner
that they had significant concerns with the business that
Unicover was underwriting and ceding; that they wanted
Unicover to stop underwriting and ceding business and that
Sun was considering legal action to terminate or limit its
liability as a retrocessionaire.   In July 1998, Pallat
informed Mays of Cackett's protests and of Pallat's
intentions to increase, rather than decrease, the volume of
business being written.   Aon and Rattner did not disclose
to ReliaStar these concerns and threats of legal actions by
the Retrocessionaires or of Pallat's intended response
thereto.

99.   On information and belief, at least as late
as December 1998, despite the knowledge of the expressed
concerns and threatened legal action, Aon, through Smith,
advised Unicover that it should continue underwriting new
business and ceding the risks to the Retrocessionaires
under the Whole Account.   Specifically, on December 9,
1998, Smith advised Pallat that there was "[n]o reason we
should stop writing business".

100. On information and belief, throughout 1998,
Aon and Rattner encouraged Unicover to underwrite as much
business as possible on behalf of the Pool.