<u>The Last Three Months</u>

101. By mid-December 1998, Pallat acknowledged that Unicover's volume "materially exceeds" its projections to the retrocessionaires such that he had become "concerned that the volume and the likely ensuing losses might cause a soft hearted arbitrator to restrict [Unicover's] cessions to the treaty". Pallat also confirmed his awareness of rumors that the Retrocessionaires might eventually have collectibility problems from their own reinsurers, which Pallat thought could "lead to a panic mode" by the Retrocessionaires and "a possible domino effect".  The Unicover Principals never disclosed these facts to ReliaStar.

102. In the first quarter of 1999, without any prior warning to ReliaStar and as a result of the drastic increases in the volume of business being ceded by Unicover, Sun attempted to terminate its obligations to reinsure the Pool.  By letter of January 25, 1999, Sun advised the Pool members that it was terminating its obligations under the Whole Account and reserving its right to seek rescission.  In light of this development, the Pool members directed Unicover to cease underwriting new or renewal business.

103. After January 25, 1999, despite having lost one of the Retrocessionaires to the Pool because of its misconduct, the Unicover Principals attempted to bind the Pool to additional reinsurance obligations, so as to generate for Unicover and the Co-Conspirators additional fees and commissions, while creating substantial additional risks for the Pool.

104. Unicover's authority to write business on behalf of the Pool ended on March 1, 1999.  Nevertheless, the Unicover Principals continued to attempt to write business on behalf of the Pool even after March 1, 1999, by falsely claiming that they were just completing the documentation on business that they had already "bound" before that date in order to increase the profits from their scheme.

27

105. At the direction and through the actions of Pallat and the Unicover Principals, Unicover underwrote as much business as possible to the detriment of the Pool members and the Retrocessionaires. On information and belief, Unicover accepted reinsurance with respect to gross premium in excess of $7 billion on behalf of the Pool and the Facilities.

106. On information and belief, the Co-Conspirators generated in excess of $200 million for themselves as a result of this fraudulent scheme.

### Olga Re

107. On information and belief, in 1997 Pallat, Dunn and Wojtowicz formed Olga Re. On information and belief, Olga is wholly owned by the Unicover Principals.

108. The Unicover Principals formed Olga in part to provide reinsurance of the employers' liability portion of the workers' compensation insurance policies written by the Pool.

109. The formation of Olga provided the Unicover Principals with a unique profit-skimming mechanism. Since the Unicover Principals controlled the underwriting for both the Pool and Olga, they could and did manipulate the reinsurance pricing so as to divert monies from the Pool members to Olga for their own benefit. The Unicover Principals charged excessive rates for the employers' liability portion accepted by Olga, diverting premiums that would otherwise have been for the benefit of the Pool.

110. On information and belief, the Unicover Principals used Olga to divert funds from the Pool into undisclosed offshore bank accounts.

111. At no time did defendants disclose the existence of Olga or its use as a profit-skimming mechanism to Reliastar.

## The Stripping of Funds from Unicover

112. On information and belief, Unicover transferred the preponderance of all of its net cash flow to the Unicover Principals, at their direction, in order to keep those amounts out of the reach of the Pool members, including ReliaStar. On information and belief, the Unicover Principals then transferred most of those funds to secret, offshore accounts.

113. In November 1998, Unicover's principals completed a sale of the company to Delphi Financial Group, Inc. ("Delphi"). In connection with the sale, at least one of the Principals recovered over $22 million immediately, while Delphi paid additional sums exceeding $30 million to complete its "investment" in the Company. On information and belief, a substantial portion of that $30 million investment was transferred to the Principals' private accounts. Delphi also earned over $13 million in net income from Unicover's operations in 1998.

114. The Unicover Principals caused "dividend payments" to be made to them despite the fact that they knew that their up-front fees and commissions had not been earned because the business was not bound pursuant to the terms of the Management Agreement, that there were or were likely to be disputes concerning its management of the Pool and that proceedings would, in all likelihood, be brought against Unicover by parties seeking damages for losses incurred as a result of the Unicover actions caused by the Unicover Principals.

115. On information and belief, Unicover made such "dividend" payments to the Unicover Principals in 1998 in amounts of about $10 million.

116. On information and belief, Unicover made further "dividend" payments to the Unicover Principals in 1999 that totaled approximately $45 million.

117. On information and belief, Unicover made additional dividend payments in 2000 and 2001 totaling approximately $4.6 million.

29

118. On information and belief, these dividend payments rendered Unicover insolvent.

119. On information and belief, the sums received by the Unicover Principals were transferred to offshore accounts or entities to hide them from the Pool members and other actual and potential creditors.

## The Pool's Efforts to Mitigate the Consequences

120. After receipt of Sun's letter dated January 25, 1999, purporting to terminate its obligations under the Whole Account, the Pool members, in order to reduce potential exposure and mitigate damages for themselves and the Retrocessionaires, began identifying and investigating reinsurance contracts to which Unicover had purported to bind the Pool and as to which there were contract formation issues or where favorable commutation was otherwise a possibility.

121. As a result of these investigations, the Pool members challenged contracts with EBI/Orion ("EBI"), Zurich Re North America ("Zurich"), and Clarendon National Insurance Company ("Clarendon"). The dispute over the EBI contract was concluded before litigation through a settlement agreement between the Pool members and EBI. The Pool members brought actions against Clarendon and Zurich, seeking declaratory judgments that the contracts between them and the Pool were not valid and enforceable. Both of those actions were or are expected to be resolved through settlement agreements.

122. Through these efforts, the Pool members avoided hundreds of millions of dollars of losses that would have been borne by the Pool members or the Retrocessionaires.

123. In the summer of 1999, the Pool's Retrocessionaires commenced an arbitration against Unicover and the Pool members to rescind the Whole Account. ReliaStar and certain Pool members vigorously opposed the relief sought. After two years of extensive briefing and

discovery, the arbitration culminated in a month-long
hearing in the summer of 2002.

124. On October 8, 2002, the arbitrators declared
that the Retrocessionaires were responsible only for ceded
risks on business written to the Pool on or before August
31, 1998.  As a result, the Pool members could not enforce
the retrocessional protection purportedly obtained by
Unicover under the Whole Account for business written after
that date.  On January 4, 2003, the arbitrators further
clarified their ruling as to the risks for which the Pool
members would not be reinsured.

## The Impact of the Fraud

125. ReliaStar expects to be liable for
approximately $40 million of losses under the reinsurance
written by Unicover, which would have been subject to
retrocessional coverage but for the misconduct of
defendants.  In addition, ReliaStar has expended millions
of dollars in legal fees, costs and management time and
resources in connection with its efforts to mitigate the
damages resulting from the fraudulent scheme.  Further,
ReliaStar has suffered damage to its reputation and its
business relationships in amounts not yet quantified.  All
of these losses are the direct consequences of the
Co-Conspirators' scheme to defraud the Pool members.

## FIRST CAUSE OF ACTION
### (Violation of N.J.S.A. §§ 2C:41-1 - 2C:41-6: Racketeering by All Defendants)

126. ReliaStar re-alleges and incorporates the
allegations contained in paragraphs 1 through 125 as if
fully set forth herein.

127. From 1996 through April 1999, Unicover, Aon,
and Rattner were an enterprise and associated-in-fact as an
enterprise (the "Unicover Enterprise"), the affairs of
which were conducted by the Co-Conspirators, through a
pattern of racketeering activity to fraudulently acquire
millions of dollars in commissions and fees from ReliaStar
and the other Pool members.

128. From 1997 through April 1999, Unicover and Olga were an enterprise and associated-in-fact as an enterprise (the "Olga Enterprise"), the affairs of which were conducted by the Unicover Principals through a pattern of racketeering activity to fraudulently acquire excess premium that the Pool could not accept, thereby creating a profit-generating mechanism through which defendants could carry out part of their scheme.

129. The Unicover Enterprise and Olga Enterprise were each an "enterprise" as defined in N.J.S.A. 2C:41-1(c). The activities of each enterprise affected trade or commerce during the relevant time. Each enterprise had a defined and hierarchical decision-making structure, functioned as an ongoing, continuing unit and carried on business separate and apart from the patterns of racketeering at issue in this case. Defendants are each a "person" within the meaning of N.J.S.A. 2C:41-1(b).

130. The Co-Conspirators conducted and participated in, directly or indirectly, the conduct of the affairs of the Unicover Enterprise. The Unicover Principals conducted and participated in, directly or indirectly, the affairs of the Olga Enterprise.

131. The Unicover scheme, as detailed above, constituted a scheme or artifice to defraud the Pool and the Retrocessionaires to obtain money via commissions and fees by means of false or fraudulent pretense, representations and promises. In the course of business, defendants made false or misleading written statements for the purpose of obtaining property and made false or misleading statements in advertising for the purpose of promoting the purchase of services. Defendants knowingly participated in the scheme and, on two or more occasions, used the United States mails or private interstate carriers in furtherance of the Unicover scheme in violation of N.J.S.A. 2C:20-4 and 720 I.L.C.S. 5/17-24(b); used the interstate or international wires in furtherance of the Unicover scheme in violation of 720 I.L.C.S. 5/17-24(a); and otherwise used fraudulent practices in furtherance of the scheme in violation of N.J.S.A. 2C:21-7. Defendants used private interstate carriers and wires and other fraudulent practices in furtherance of the Unicover scheme in, inter alia, the following manners:

a.    On information and belief, at the 1997 NAII
Conference, the Co-Conspirators fraudulently assured
ReliaStar that there would be retrocessional coverage
for the Pool, and fraudulently concealed defendants'
plan to violate their fiduciary duties by creating the
other facilities to write excessive business to be
retroceded to the Whole Account.

b.    After that meeting, Kersten had several
follow-up conversations across state lines with Smith,
Mays, Pallat, and Dunn, each of whom represented that
the business written to the Pool would generate a
profit of 7.5% to the Pool members because of the
retrocessional protection for the ceded business.

c.    On February 12, 1998, Kersten traveled to
Chicago at defendants' invitation.  He was told by
Smith, Dunn, and Pallat that the anticipated premium
for Pool Year 4 would be approximately $150 million.
On information and belief, by that date defendants had
already agreed to bind business to the Pool exceeding
this amount.  In the end, the gross premium for Pool
Year 4 eventually was over $2.5 billion.  The Co-
Conspirators' statements to Kersten were also
materially misleading because they did not disclose
then-existing problems with the Pool's retrocessional
protection and their plans to write excessive business
through other facilities to be retroceded to the Whole
Account.

d.    At that same meeting, the Co-Conspirators
misrepresented the type of business to be ceded to the
Pool's retrocessionaires.  Pallat stated that Unicover
would not write business where the Pool retained
little or no risk, referred to as "buffer business",
because the retrocessionaires objected to the writing
of such business.  Those representations misleadingly
and erroneously assured Kersten that Unicover would
underwrite with the interests and concerns of the
Pool's retrocessionaires in mind.  Unicover, however,
was writing "buffer business" and, by June of 1998,
was involved in an active dispute with the
retrocessionaires about the continued writing of such
business.  In the course of that dispute, Smith's
advice to Pallat was that Unicover should not refrain
from writing "buffer business", but should "pump 'em
in".

33

e.    On March 5, 1998, Dunn faxed a memorandum from Unicover's offices in Illinois to Kersten in Minnesota in response to questions Kersten had asked about the Pool.  Therein, Dunn misrepresented the nature of the risks ceded to the Pool and retroceded to the Whole Account.

f.    On March 30, 1998, Dunn faxed Kersten in Minnesota another memo from Unicover's offices in Illinois in response to Kersten's questions about the Pool.  In the memo, Dunn misrepresented the nature and volume of the risks that Unicover ceded to the Pool and retroceded to the Whole Account.  Dunn also fraudulently concealed the Unicover Principals' plans to write excessive business through the Facilities to be retroceded to the Whole Account and to skim extra profits through the Olga scheme.

g.    On July 22, 1998, Dunn sent a fax message from Unicover's offices in Illinois to Kersten in Minnesota stating that the 1998 Gross Written Premium would not exceed $360 million.  This fax concealed ongoing negotiations to bind premium that would result in hundreds of millions of dollars of new business in excess of that estimate.  It also concealed the volumes of business that had been written to the Facilities and retroceded to the Whole Account.

h.    On July 23, 1998, Kersten spoke with Dunn and Brian Cook ("Cook") of Unicover by telephone. Dunn and Cook falsely asserted that there was a total of $400 million in potential business on the "board", but not all of it would bind.  Dunn and Cook also falsely asserted that the "$360 million projection for our pool year" was accurate.  These fraudulent misrepresentations hid the burgeoning size of the Pool's business as of that date.  Cook and Dunn also concealed from Kersten, in violation of their duty to disclose, that Sun had recently threatened to "void the [retrocessional] contract" if it could not secure adequate retrocessional coverage to protect its own obligations to reinsure the Unicover Pool and the Facilities.  Finally, Cook and Dunn concealed from Kersten, in violation of their duty to disclose, the volume of business that had been written to the Facilities.

34

i.   On August 11, 1998, Kersten traveled to Unicover's offices in Illinois to discuss Pool business.  There he was told that Unicover had $400 million of prospective business on the "board".  This statement fraudulently concealed the fact that by the end of August the Co-Conspirators were to bind over five hundred million dollars in gross written premium to the Pool.

j.   On September 3, 1998, Cook sent Kersten, via interstate carrier, a copy of materials provided at a recent Pool meeting that ReliaStar was not able to attend.  These materials falsely assured ReliaStar that retrocessional protection would remain in place, despite Cackett's recent expressions of concern. These materials also fraudulently concealed from ReliaStar that the Unicover Principals had threatened to write even more business to be retroceded to the Whole Account if Cackett "causes any problems" by complaining about the Co-Conspirator's conduct.  These materials continued to conceal the volume of business written to the Facilities and retroceded to the Whole Account from the Pool.

k.   On October 6, 1998 the Unicover Principals caused Nolan, an employee of Unicover, to send a fax across state lines to Kersten allegedly representing the business bound to the Pool as of October 1, 1998. That document falsely underestimated the total business by forty percent, representing gross written premium as $387,982,000 when it was then in reality $532,738,448.  This document also falsely represented business that was bound to the facilities as being bound to the Pool.

l.   On information and belief (and based on documentary evidence), the Unicover Principals knew that since early 1998 (before ReliaStar joined the Pool) Cackett was beginning repeatedly to complain about the volume of business being retroceded to the Retrocessionaires.  Cackett complained that the volume far exceeded the estimates contained in the Agreements and indicated that the increased volume would cause dramatic problems for the Retrocessionaires' own retrocessional protections which had volume restrictions.  The Unicover Principals fraudulently concealed the fact of these complaints from ReliaStar.

35

m.   On information and belief (and based on documentary evidence), the Unicover Principals knew, by mid-May 1998, that Cackett was insisting that Aon and Rattner must immediately find additional retrocessional protection for his principals in order to "head off any dispute" regarding the Retrocessionaires' obligation to provide retrocessional coverage to the Pool.  The Unicover Principals fraudulently concealed this fact from ReliaStar.

n.   On information and belief (and based on documentary evidence), the Unicover Principals knew, on or about June 10, 1998, that Sun had threatened to "void the [retrocessional] contract" if it could not secure adequate retrocessional coverage to protect its own obligations to reinsure the Unicover Pool and the Facilities.  The Unicover Principals fraudulently concealed this fact from ReliaStar.

o.   By July 1998, Sun raised concerns with Unicover about: (i) the type and quality of business being retroceded; (ii) the rate adequacy of business being retroceded; and (iii) the volume of business being retroceded.  The Unicover Principals fraudulently concealed these facts from ReliaStar.

p.   Sun audited Unicover on July 27 and 28, 1998 to investigate its business concerns about the business Unicover was retroceding.  The Unicover Principals did not disclose to ReliaStar that Sun conducted the audit until January 1999.  On information and belief (and based on documentary evidence), following the July audit and throughout the fall of 1998, Cackett pressed to have Unicover cancel and rewrite the Whole Account.  At this time, and through late 1998 and early 1999, the Unicover Principals knew that Cackett was having no success in securing additional retrocessional protection for his principals.  The Unicover Principals fraudulently concealed these facts from ReliaStar.

q.   On information and belief (and based on documentary evidence), in mid-August 1998, Cackett advised Smith of Sun's repeated threat that it could deny liability for retrocessional coverage and fight it out in arbitration.  On information and belief, Smith conveyed this information to the Unicover

36

Principals.   The Co-Conspirators never disclosed this
fact to ReliaStar.

     r.   On August 31, 1998, Cackett wrote to Pallat
that "[h]ad Centaur been aware that the income
estimate was one fifth of it's [sic] probable final
figure then Centaur would have written a significantly
smaller share than it did" and that he wanted to
reduce Centaur's share on the Whole Account and
"cancel[] and replac[e] the current whole account with
additional markets".

     s.   On information and belief (and based on
documentary evidence), by the end of September 1998,
Unicover had asked reinsurance brokers to prepare an
action plan for diluting or replacing Sun and Phoenix
as Retrocessionaires.   In October 1998, Aon and
Rattner formulated such an action plan for
restructuring the retrocessional protections behind
the Unicover Pool and the Facilities.   The
Co-Conspirators fraudulently concealed these facts
from ReliaStar.

     t.   In late September 1998, Cackett continued to
express concerns to Smith about the unbridled growth
of Unicover business and emphasized that Sun was under
pressure from its principals to cancel and rewrite the
Whole Account to ensure that Unicover would stop
ceding further business.   Cackett indicated that only
if Sun's principals' responsibilities under the Whole
Account were reduced could he persuade them to honor
their obligations.   By this point, Cackett had accused
Unicover of having embarked on a "'get rich quick'"
scheme and having engaged in "white collar fraud".   On
information and belief, Smith conveyed this
information to the Unicover Principals.   The Co-
Conspirators never disclosed these events to
ReliaStar.

     u.   On information and belief, defendants
fraudulently transferred assets held by Unicover in
trust for the Pool members to the Unicover Principals
who then transferred those monies to secret offshore
accounts.

     132. The Olga scheme constituted a scheme or
artifice to defraud the Pool and obtain money through the
acquisition of excess premium by means of false or

37

fraudulent pretense, representations and promises.  In the course of business, defendants made false or misleading written statements for the purpose of obtaining property and made false or misleading statements in advertising for the purpose of promoting the purchase of services. Defendants knowingly participated in the scheme and, on two or more occasions, used the United States mails or private interstate carriers in furtherance of the Olga scheme in violation of N.J.S.A. 2C:20-4 and 720 I.L.C.S. 5/17-24(b); used the interstate or international wires in furtherance of the Olga scheme in violation of 720 I.L.C.S. 5/17-24(a); and otherwise used fraudulent practices in furtherance of the scheme in violation of N.J.S.A. 2C:21-7.  Defendants used the mails and wires and other fraudulent practices in furtherance of the Olga scheme in, inter alia, the following manners:

    a.    Defendants fraudulently charged excessive rates for the employers' liability insurance accepted by Olga.

    b.    At no time did defendants disclose the existence of Olga or its use as a profit-skimming mechanism to ReliaStar.

    c.    The Unicover Principals used Olga to divert funds from the pool into undisclosed offshore bank accounts.

    133. These predicate acts constitute a "pattern" of racketeering activity because they were related to each other and shared the same perpetrators, goals, and victims, and occurred continually over a substantial period of time.

    134. In reliance on defendants' fraudulent misrepresentations regarding retrocessional coverage and Pool volume, and as a result of defendants' fraudulent concealment of the existence and use of Olga and the Facilities, ReliaStar joined the Pool.  As a result of ReliaStar's membership in the Pool, ReliaStar has been injured.

    135. As a result of the defendants' violation of N.J.S.A. 2C:41-2, ReliaStar has been injured and has suffered damage to its business and property.  Because of

the nature of defendants' racketeering conduct, ReliaStar
requests that the damages be trebled and that it receive
reasonable attorney's fees and costs.

## SECOND CAUSE OF ACTION
### (Fraudulent Misrepresentation by All Defendants)

136. ReliaStar re-alleges and incorporates the
allegations contained in paragraphs 1 through 135 as if
fully set forth herein.

137. As specified above, each defendant knowingly
made false statements of material facts to ReliaStar
regarding the existence of adequate retrocessional coverage
for the Pool.

138. As specified above, each defendant knowingly
made false statements of material facts to ReliaStar
regarding the volume of business being written to the Pool.

139. Defendants made these statements in order to
induce ReliaStar to join the Pool and to perpetuate the
existence of their fraudulent scheme.

140. In reliance on these statements, ReliaStar
joined the Unicover Pool.

141. ReliaStar sustained damages to its business
and property as a result of its membership in the Unicover
Pool.

## THIRD CAUSE OF ACTION
### (Fraudulent Concealment by All Defendants)

142. ReliaStar re-alleges and incorporates the
allegations contained in paragraphs 1 through 141 as if
fully set forth herein.

39

143. As ReliaStar's agents, each defendant owed fiduciary and common law duties to the Pool members of utmost loyalty, candor, honesty, integrity, care and good faith.

144. As specified above, each defendant, in soliciting ReliaStar to join the Pool, failed to disclose to ReliaStar the creation and use of the Facilities. These individuals and entities also failed to disclose the volume of business written to the Facilities, the Retrocessionaires' significant concerns about the volume of business that Unicover was underwriting and ceding, failed to disclose to ReliaStar that the Retrocessionaires wanted Unicover to stop underwriting and ceding business, failed to disclose to ReliaStar that one of the Retrocessionaires was considering legal action to terminate or limit its liability as a retrocessionaire and failed to disclose to ReliaStar the actual volume of business being written to the Pool.

145. The fiduciary relationship between ReliaStar and each defendant required disclosure of these material facts.

146. As a result of defendants' fraudulent concealment, ReliaStar has suffered damages to its business and property.

FOURTH CAUSE OF ACTION
(Civil Conspiracy to Defraud by All Defendants)

147. ReliaStar re-alleges and incorporates the allegations contained in paragraphs 1 through 146 as if fully set forth herein.

148. Each of the Unicover Principals, by words or conduct, knowingly agreed and conspired in a common plan to defraud and did defraud the plaintiffs by writing excessive, poorly priced business to the Pool for which there was no retrocessional coverage. The Unicover Principals acted to conceal their fraudulent scheme and shared the large profits that resulted from the scheme.

40

ReliaStar has suffered and continues to suffer substantial damages as a result of defendants' conspiracy.

149. As MGU of the Pool, Unicover owed certain contractual, fiduciary and common law duties to the Pool members. As the Pool's agents, the Unicover Principals owed the same duties to the Pool members. Aon, Rattner, Smith and Mays possessed actual knowledge of the duties Unicover and its Principals owed to the Pool members.

150. On information and belief, Aon, Rattner, Smith and Mays engaged in a conspiracy with Unicover and the Unicover Principals to increase gains for each defendant through the premium-volume based fee structure contained in the Management Agreement. Each defendant knew that the purpose of the conspiracy--to maximize personal profits without regard to the best interests of the Pool members--violated Unicover's duties to the Pool.

151. The Unicover Principals underwrote reinsurance on behalf of the Pool members at rates that required significant retrocessional protection in order to achieve a profit for the Pool members. In furtherance of the conspiracy and at the direction and with the assistance of the Co-Conspirators, Unicover wrongfully underwrote large volumes of such business to an extent and in a manner that resulted in the failure of the Pool members' retrocessional protection.

152. In furtherance of the conspiracy, the Unicover Principals failed to disclose to ReliaStar the volume of business written to the Facilities, failed to disclose to ReliaStar that the Retrocessionaires had significant concerns about the volume of business that Unicover was underwriting and ceding, failed to disclose to ReliaStar that the Retrocessionaires complained that too much business was being retroceded to them and they wanted Unicover to stop underwriting and ceding business, failed to disclose to ReliaStar that one of the Retrocessionaires was considering legal action to terminate or limit its liability as a retrocessionaire and failed to disclose to ReliaStar the true volume of business being written to the Pool.

41

153. In furtherance of the conspiracy, the Unicover Principals fraudulently misrepresented to ReliaStar the existing and anticipated amount of premium volume bound to the Pool and the status of the Pool's retrocessional coverage.

154. In furtherance of this conspiracy, Aon and Rattner, through Smith and Mays, among other things: failed to disclose their creation and use of the Facilities when they solicited ReliaStar's participation in the Pool; failed to disclose to ReliaStar the volume of business written to the Facilities; failed to disclose to ReliaStar the true volume of business being written to the Pool; and withheld material information from the Pool members concerning the Retrocessionaires' threatened rescission of the Whole Account. By withholding such information, Aon and Rattner protected the conspiracy and ensured that the plan to accept large volumes of premium would continue.

155. In furtherance of the conspiracy, Aon and Rattner, through Smith and Mays, fraudulently misrepresented to ReliaStar the existing and anticipated amount of premium volume bound to the Pool and the status of the Pool's retrocessional coverage.

156. In furtherance of the conspiracy, the Unicover Principals responded when problems began to arise with Cackett and the Retrocessionaires, by causing Unicover to accelerate the underwriting of business to the direct detriment of the Pool members, including ReliaStar.

157. As a direct and proximate result of the conspiracy between the defendants to engage in fraudulent and tortious conduct, ReliaStar has sustained significant damages to its business and property.

158. As Co-Conspirators, Aon, Rattner, Mays and Smith are liable for all damages resulting from Unicover and the Unicover Principals' conduct committed in furtherance of the conspiracy.

## FIFTH CAUSE OF ACTION

42

(Civil Conspiracy to Defraud by Defendants Pallat, Dunn,
and Wojtowicz)

159. ReliaStar re-alleges and incorporates the
allegations contained in paragraphs 1 through 158 as if
fully set forth herein.

160. As MGU of the Pool, Unicover owed certain
contractual, common law and fiduciary duties to the Pool
members.  As agents, the Unicover Principals owed the same
duties to the Pool members.  The Unicover Principals
possessed actual knowledge of the duties Unicover and its
Principals owed to the Pool members.

161. On information and belief, the Unicover
Principals and Olga engaged in a conspiracy with Unicover
to provide follow-form workers' compensation coverage to
clients whereby Olga would reinsure the employers'
liability portion of the workers' compensation business
with Unicover accepting the accident and health portion on
behalf of the Pool.  As part of the conspiracy, and in
violation of their duties to the Pool members, the Unicover
Principals manipulated the reinsurance pricing to divert
profits to Olga that would otherwise have been for the
benefit of the Pool.

162. The Unicover Principals and Olga knew that
the purpose of the conspiracy--to direct premium rightfully
intended for the Pool to Olga--violated Unicover's duties
to the Pool members.

163. The Unicover Principals and Olga actively
participated in the conspiracy.

164. As a direct and proximate result of the
conspiracy between the Unicover Principals and Olga to
engage in tortious conduct, ReliaStar has sustained
significant damages to its business and property.

165. As Co-Conspirators, the Unicover Principals
are liable for all damages resulting from Unicover's
conduct committed in furtherance of the conspiracy.

## SIXTH CAUSE OF ACTION
(Aiding and Abetting of Fraud by All Defendants)

166. ReliaStar re-alleges and incorporates the allegations contained in paragraphs 1 through 165 as if fully set forth herein.

167. As MGU of the Pool, Unicover owed certain contractual, fiduciary and common law duties to the Pool members. As agents, the Unicover Principals owed the same duties to the Pool members. Aon, Rattner, Smith and Mays possessed actual knowledge of the duties Unicover and its Principals owed to the Pool members.

168. On information and belief, each defendant aided and abetted Unicover in its fraudulent scheme to maximize personal profits without regard to the best interests of the Pool members.

169. Each defendant knew that the purpose of the fraudulent scheme violated Unicover's and Unicover Principal's duties to the Pool.

170. Each defendant, by words or conduct, knowingly and substantially participated in the plan to defraud ReliaStar by intentionally failing to disclose material facts to ReliaStar, including but not limited to the volume of business written to the Facilities, the true volume of business being written to the Pool, that the Retrocessionaires had significant concerns about the volume of business that Unicover was underwriting and ceding, that the Retrocessionaires wanted Unicover to stop underwriting and ceding business and that one of the Retrocessionaires was considering legal action to terminate or limit its liability as a retrocessionaire.

171. ReliaStar has suffered and will continue to suffer substantial damages to its business and property as a result of defendants' conduct.

44

SEVENTH CAUSE OF ACTION
(Conversion by Defendants Pallat, Dunn, Wojtowicz and Aon)

172. ReliaStar re-alleges and incorporates the allegations contained in paragraphs 1 through 171 as if fully set forth herein.

173. On information and belief, the Unicover Principals converted premium funds belonging to ReliaStar and other Pool members by wrongfully paying themselves dividends out of the Pool Trust Account in 1998, 1999, 2000 and 2001. ReliaStar first learned of such payments on September 14, 1999, when Pallat informed the Pool that the Unicover Principals had caused Unicover to withdraw $21,836,066 for its "Management Fee". That converted sum was then disbursed to the Unicover Principals through extraordinary dividend payments. Despite ReliaStar's protests, additional improper conversions of its premium funds continued in 1999, 2000 and 2001.

174. Upon information and belief, in 1999 alone, the Unicover Principals caused Unicover to make dividend payments to them totaling approximately $45 million. The Unicover Principals caused these payments to be made knowing that disputes concerning Unicover's management of the Pool were imminent and that proceedings would, in all likelihood, be brought against Unicover by parties seeking damages for losses incurred as a result of the Unicover Principals' actions.

175. Upon information and belief, the Unicover Principals caused Unicover to make additional dividend payments to them in 2000 and 2001 totaling approximately $4.6 million. The 2000 and 2001 dividend payments were made after Unicover ceased its underwriting operations and after the Pool Arbitration and Reliance Litigation began.

176. The Unicover Principals converted additional premium income belonging to ReliaStar by diverting to Olga premium that was disproportionately large compared to the amount of risks ceded to Olga. This conversion breached fiduciary duties owed by the Unicover Principals to

45

ReliaStar.  ReliaStar had no contemporaneous knowledge of this self-dealing activity.

177. As a result of these unlawful conversions, Unicover is currently a corporate shell with minimal corporate assets from which creditors can achieve repayment of indebtedness.

178. As a result of these unlawful conversions, the Unicover Principals unlawfully received a substantial sum of money--the exact amount to be proved at trial.  A portion of the amount unlawfully converted by the Unicover Principals belongs to ReliaStar.

179. On information and belief, in 1998 and 1999, Aon converted premium funds belonging to ReliaStar and other Pool members by wrongfully taking from escrow funds a brokerage fee as well as a share of the funds converted by the Unicover Principals.

180. As a result of this unlawful conversion, Aon unlawfully received a substantial sum of money--the exact amount to be proved at trial.  A portion of the amount unlawfully converted by Aon belongs to ReliaStar.

<u>EIGHTH CAUSE OF ACTION</u>
(Breach of Fiduciary Duty by All Defendants)

181. ReliaStar re-alleges and incorporates the allegations contained in paragraphs 1 through 182 as if fully set forth herein.

182. By virtue of their relationship as agents to the Pool, the defendants were in a fiduciary relationship of trust and confidence with the Pool members, pursuant to which they owed the Pool members duties of utmost loyalty, candor, integrity and care.

183. The Unicover Principals intentionally adopted an underwriting strategy whereby Unicover sold underpriced reinsurance, which required retrocessional

protection in order for its principals to achieve a profit, but then intentionally jeopardized such retrocessional protection by writing a large volume of such business for their own personal gain.

184. The Unicover Principals knew that Unicover's underwriting strategy and reinsurance practices were in violation of fiduciary duties owed to the Pool members.

185. The Unicover Principals directed Unicover's negligent business practices and actively participated in the company's tortious conduct.

186. As a direct and proximate result of the Unicover Principals directing and actively participating in Unicover's tortious conduct, they breached their fiduciary duty to the Pool, resulting in substantial damages to ReliaStar.

187. Pursuant to the Management Agreement, Unicover was obligated to hold all premiums and other funds in the Pool Trust Account.

188. The Management Agreement required that Unicover retain in the Pool Trust Account a specific amount of premium to pay for claims arising from business underwritten on behalf of the Pool that was not ceded to the Retrocessionaires.

189. The Management Agreement expressly required Unicover, and therefore the Unicover Principals, to hold the premiums and other monies as a fiduciary. Given its position as a fiduciary of the Pool Trust Account, Unicover and the Unicover Principals owed the Pool members a duty to manage the Pool Trust Account with utmost loyalty, candor, integrity and care.

190. On information and belief, Unicover and the Unicover Principals breached their fiduciary duties to the Pool members by misappropriating monies held in the Pool Trust Account.

47

191. On information and belief, despite the Pool members' demands, Unicover, at the direction of the Unicover principals, has refused to return the monies held in the Pool Trust Account to the Pool members.

192. On information and belief, the Unicover Principals were the direct beneficiaries of Unicover's misappropriation of monies held in the Pool Trust Account.

193. As retrocessional brokers for the Pool members, Aon and Rattner were in a fiduciary relationship of trust and confidence with the Pool members, pursuant to which Aon and Rattner owed duties of good faith, utmost loyalty, candor, integrity and care.

194. Aon and Rattner breached their fiduciary duties by engaging in self-dealing practices including, without limitation:  failing to disclose to the Retrocessionaires material information concerning the ceded business and failing to provide full, fair and prompt disclosure of the Retrocessionaires' concerns related to the volume of business being ceded from the Pool.

195. As a direct and proximate result of Aon's and Rattner's breach of their fiduciary duties, ReliaStar has sustained substantial damages.

196. As a direct and proximate result of the Unicover Principals' direction of and active participation in Unicover's misappropriation of monies held in the Pool Trust Account, ReliaStar has sustained substantial damages.

NINTH CAUSE OF ACTION
(Aiding and Abetting Breach of Fiduciary Duty by All Defendants)

197. ReliaStar re-alleges and incorporates the allegations contained in paragraphs 1 through 196 as if fully set forth herein.

48

198. As MGU of the Pool, Unicover owed fiduciary duties to the Pool members.

199. Unicover breached such duties by engaging in self-dealing and negligent underwriting and reinsurance practices.

200. On information and belief, the Unicover Principals, Aon, Rattner, Smith and Mays had actual knowledge of Unicover's fiduciary duties to the Pool members, and substantially assisted Unicover, as part of a fraudulent scheme, in achieving Unicover's breach of such duties.

201. The Unicover Principals, Aon, Rattner, Mays and Smith knew that the purpose of the fraudulent scheme violated Unicover's duties to the Pool.

202. As a direct and proximate result of the substantial assistance of the Unicover Principals, Aon, Rattner, Smith and Mays to Unicover in Unicover's breaches of its fiduciary duties, ReliaStar has sustained substantial damages.

TENTH CAUSE OF ACTION
(Breach of Contract by Aon and Rattner (as Retrocessional Brokers))

203. ReliaStar re-alleges and incorporates the allegations contained in paragraphs 1 through 204 as if fully set forth herein.

204. The Pool members entered into agreements with Rattner and Aon whereby Rattner and Aon would secure retrocessional protection and perform all customary duties of a retrocessional broker in exchange for a brokerage fee.

205. Rattner and Aon breached their agreements with the Pool members.

49

206. As a direct and proximate result of Rattner and Aon's breach of contract, ReliaStar has sustained substantial damages in an amount to be proved at trial.

### ELEVENTH CAUSE OF ACTION
(Unjust Enrichment by Defendants Aon and Rattner)

207. ReliaStar re-alleges and incorporates the allegations contained in paragraphs 1 through 206 as if fully set forth herein.

208. The Pool members entered into an agreement with Aon and Rattner whereby Aon and Rattner would secure retrocessional protection in exchange for payment received of a brokerage fee.

209. Pursuant to the agreement, the Pool members paid Aon and Rattner a brokerage fee that was based on a percentage of the premium for the retroceded business.

210. Aon and Rattner breached their contract with the Pool members by engaging in negligent and deceptive practices, which ultimately caused the failure of the majority of the Pool's retrocessional protection.

211. Aon and Rattner also received monies from the Pool members through their fee-sharing arrangement with Unicover in which Aon and Rattner assisted in managing the Pool in exchange for a percentage of Unicover's Pool-related commissions.  To the detriment of the Pool members, Aon, Rattner and Unicover engaged in negligent underwriting and reinsurance practices, including: providing reinsurance on behalf of the Pool members at rates that were well below the market price; withholding material information from the Pool members concerning the use of the Lincoln Facility and the Reliance Facility; and withholding material information from the Pool members concerning the Retrocessionaires' threatened rescission of the Whole Account.

212. As a result, Aon and Rattner have been unjustly enriched in an amount to be proved at trial.

TWELFTH CAUSE OF ACTION
(Breach of Duty of Good Faith and Fair Dealing by Aon and Rattner)

213. ReliaStar re-alleges and incorporates the allegations contained in paragraphs 1 through 212 as if fully set forth herein.

214. By virtue of their contractual relations with the Pool members, Aon and Rattner were under a duty to act in good faith and fair dealing.

215. As alleged above, Aon and Rattner breached the duty of good faith and fair dealing by engaging in negligent and deceptive practices that were in violation of its contract obligations to the Pool members.

216. As a direct and proximate result of Aon and Rattner's breach of the duty of good faith and fair dealing, ReliaStar has sustained substantial damages in an amount to be proved at trial.

51

WHEREFORE, Plaintiff ReliaStar demands judgment against Defendants as follows:

a.   On its first cause of action, awarding ReliaStar compensatory damages against each defendant in an amount to be proved at trial plus reasonable attorney's fees and costs;

b.   On its second cause of action, awarding ReliaStar compensatory damages against each defendant in an amount to be proved at trial;

c.   On its third cause of action, awarding ReliaStar compensatory damages against each defendant in an amount to be proved at trial;

d.   On its fourth cause of action, awarding ReliaStar compensatory damages against each defendant in an amount to be proved at trial;

e.   On its fifth cause of action, awarding ReliaStar compensatory damages against each of defendants Pallat, Dunn and Wojtowicz in an amount to be proved at trial;

f.   On its sixth cause of action, awarding ReliaStar compensatory damages against each defendant in an amount to be proved at trial;

g.   On its seventh cause of action, awarding ReliaStar compensatory damages against each of defendants Pallat, Dunn, Wojtowicz and Aon in an amount to be proved at trial;

h.   On its eighth cause of action, awarding ReliaStar compensatory damages against each defendant in an amount to be proved at trial;

i.   On its ninth cause of action, awarding ReliaStar compensatory damages against each of defendants Pallat, Dunn, Wojtowicz, Aon and Rattner in an amount to be proved at trial;

j.   On its tenth cause of action, awarding ReliaStar compensatory damages against each of defendants Aon and Rattner in an amount to be proved at trial;

52

k.    On its eleventh cause of action, awarding ReliaStar compensatory damages against each of defendants Smith, Mays, Aon and Rattner in an amount to be proved at trial;

l.    On its twelfth cause of action, awarding ReliaStar compensatory damages against each of defendants Aon and Rattner in an amount to be proved at trial;

m.    On its second through ninth, eleventh and twelfth causes of action, awarding ReliaStar punitive damages against each Defendant in an amount to be proved at trial;

n.    Prejudgment interest and costs; and

o.    Such other and further relief as this Court deems just and proper.

McCARTER & ENGLISH, LLP
Attorneys for Plaintiff

ReliaStar Life Insurance
Company

By: _William J. O'Shaughnessy_
        William J. O'Shaughnessy

Dated:    May 22, 2003

Of Counsel:
John E. Beerbower
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

53

## DEMAND FOR JURY TRIAL

Plaintiff ReliaStar Life Insurance Company hereby demands a trial by jury on all issues so triable.

WILLIAM J. O'SHAUGHNESSY

Dated:  May 22, 1003

## CERTIFICATION PURSUANT TO R.4:5-1(b)(2)

I hereby certify that the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

WILLIAM J. O'SHAUGHNESSY

Dated:  May 22, 1003

NWK2: 1050680.02

54