| |
|---|
| In the Matter of the Arbitration Between<br><br>CRAGWOOD MANAGERS, LLC (f/k/a Unicover Managers, LLC and successor-in-interest to Unicover Managers, Inc.)<br><br>vs.<br><br>PHOENIX LIFE INSURANCE COMPANY (f/k/a Phoenix Home Life Mutual Insurance Company), GENERAL & COLOGNE LIFE RE OF AMERICA (f/k/a Cologne Life Reinsurance Company), LINCOLN NATIONAL LIFE INSURANCE COMPANY, and RELIASTAR LIFE INSURANCE COMPANY |

**AMENDED AND SUPPLEMENTAL ARBITRATION DEMAND AGAINST POOL YEAR 4 MEMBERS**

Cragwood Managers, LLC, formerly known as Unicover Managers, LLC and the successor-in-interest to Unicover Managers, Inc. (hereinafter, "Unicover"), hereby amends and supplements its June 20, 2003 arbitration demand against Phoenix Life Insurance Company, formerly known as Phoenix Home Life Mutual Insurance Company, (hereinafter, "Phoenix"), General & Cologne Life Re of America, formerly known as Cologne Life Reinsurance Company, (hereinafter, "Cologne"), Lincoln National Life Insurance Company (hereinafter, "Lincoln"), and ReliaStar Life Insurance Company (hereinafter, "ReliaStar") (collectively, the "Pool Year 4 Members")[1], as follows:

---

[1] Although not a party to this arbitration, Connecticut General Life Insurance Company ("CGLIC") was an original and continuous member of the Pool (as hereinafter defined) from
(footnoted continued...)

issued by the Pool are reinsured by other reinsurers); and

- Do all other things that, in its professional discretion, are appropriate and necessary to the administration of the Pool.

30. The PMA also contained a non-competition clause, which was designed to protect Unicover's relationships with its customers:

> Each [Pool Member] agrees that it shall not, as it pertains to the term of this Agreement and for a period of one year following its termination, knowingly solicit, directly or indirectly any active accounts hereunder from any third-party used by Unicover in the production of Reinsurance Business hereunder, without the prior written consent of Unicover. This paragraph does not prohibit the [Pool Members], or any of them, from participation in any agreements, operations, or relationships which are already in force as of the effective date of this Agreement or those relationships assented to in writing by Unicover.

31. In addition, the Pool Members expressly agreed to indemnify Unicover and hold Unicover harmless with respect to any loss, damage or expense incurred in connection with its performance of the PMA.

32. At all relevant times during the operation of the Pool, the Pool Members were kept informed of Unicover's activities on behalf of the Pool. This was accomplished through, among other means, regular reports, regular pool meetings (attended by representatives of the Pool Members and the Pool's brokers) and frequent informal contacts (telephone and in-person) between Unicover personnel and representatives of the Pool Members, including Aon and Rattner Mackenzie. Moreover, under the PMA, the Pool Members enjoyed liberal rights to inspect Unicover's books and operations.

### *The Pool Members Were Fully Aware Of The Rates Negotiated For The Retrocessional Program*

33. During Pool Years 1-3, the Pool steadily increased the number and size of programs underwritten. During this time, Unicover also successfully expanded its client base of cedents, which included significant participants in the industry, such as Amerisafe, Clarendon and HIH America.

34. From early on, the Pool Members and/or their agents, Aon and Rattner Mackenzie, were advised (i) that Unicover's underwriting decisions were based on the Pool's net (not gross) position, and (ii) of the loss ratios to the Pool's Retrocessionaires.

35. Unicover's reputation quickly grew within the broker community, and submissions from these sources and others grew correspondingly. The members of the Pool, virtually all of which sent representatives to the regular Pool meetings conducted by Unicover, continually expressed satisfaction with the job their underwriting manager was doing. For example, Life Re, after completing an audit in May 1997, stated that "the overall results of the audit were quite favorable" and congratulated Unicover "for the job well done in the administration of this reinsurance."[12] During its due diligence in 1998 in connection with its pursuit of a separate reinsurance facility with Unicover, Lincoln stated: "It is our belief that the appropriate thing to do in the short term is to deepen our relationship with Unicover. They are the type of MGU/TPA we would like to be in the medium term."[13]

---

[12] May 1, 1997 Letter from Diane M. Greene to Paul Kelleher
[13] March 25, 1998 Memo from Mark Troutman to Tim Alford (emphasis added)

16

36. As its operations grew, so did Unicover's ability to command favorably-priced ceded reinsurance in the existing soft market. Initially, retrocessional coverage for the several programs the Pool reinsured was obtained on a per-program treaty basis; *i.e.*, rather than having an overall retrocessional reinsurance protection, Unicover would obtain, through Aon, an individual treaty for each program risk it reinsured. Early in 1997, the Pool's retrocessionaires, Sun Life and Phoenix—recognizing Unicover as a potentially significant source of income—proposed a wider retrocessional arrangement covering the entirety of Unicover's book of business under a single, "whole account" retrocessional reinsurance program.

37. In October 1997, Unicover was again approached by the Retrocessionaires who were seeking to lock Unicover into a long-term relationship. In or about December 1997, the Retrocessionaires (which now included Cologne) agreed to provide Unicover with a three-year whole account reinsurance program (the "Retrocessional Program") at rates that, if calculated on a gross basis, were below the losses that were expected on the business. To maximize their own profits, the Retrocessionaires, in turn, retroceded a portion of the risks to their own retrocessionaires (which, again, included some Pool Members).

38. The Retrocessional Program did not contain any cap or limitation on the amount of premium or any limitations on the type of workers' compensation business that could be ceded from the Pool to the Retrocessionaires. In fact, <u>all</u> accounts written by Unicover were required to be ceded to the Retrocessional Program. Thus, in addition to providing protection for the Pool, the Retrocessional Program was

17

set up so that it would also cover any newly created reinsurance facility that was to be managed by Unicover (including the two, single-company facilities).

39. All of the Pool Members knew early on that the Retrocessional Program would be unprofitable on a gross basis to the Retrocessionaires. Indeed, not only was this the acknowledged business model on which the profitability of the Pool was based, but Unicover specifically advised the Pool Members of the nature of the retrocessional coverage. In fact, the Pool Members universally conceded in the prior arbitration proceeding that "the unprofitability of the Whole Account covers would have been plainly evident to any competent underwriter."[14]

40. During a three-day Pool meeting in November 1997, just before the commencement of the three-year Retrocessional Program, Unicover reviewed with the Pool Members the very favorable terms of its in-force one-year whole account program and discussed the prospect of canceling it mid-term in favor of a three-year program. Unicover presented to the Pool Members a financial summary of what was described as an unidentified cedent but, which as explained at the meeting, was an actual Unicover account. These materials clearly illustrated a pricing model in which the projected gross loss ratio of the Pool was 161.3%, the Pool's net underwriting profit was 23.7% and the retrocessional loss ratio was 432.8%. Phoenix, for one, has acknowledged that a simple calculation demonstrated an expected loss ratio on this particular account of 433%.

41. ReliaStar, before joining the Pool in March 1998, conducted a full due diligence review at Unicover's offices in February 1998 and inquired, among other

---

[14] Respondents' Retro Arb. Brief at 115

18

things, whether "the pool members always share in the arbitrage."[15] Indeed, ReliaStar recognized that the success of the Pool was "all premised upon pretty substantial losses being passed under the whole account to the retrocessional protections . . ." and that it as the "brand new pool member with a 5 percent share understood what was being done."[16]

42. Cologne was also advised at the time that it joined the Pool in 1998 that the program would result in a net profit to the Pool Members but that the loss ratios to the Retrocessionaires (of which Cologne was one) would be high. In fact, on February 2, 1998, Rattner Mackenzie (one of the Pool Members' agents) sent to Cologne's own managing general agent (CRF Underwriting Management) a submission for Cologne to become a Pool Year 4 Member. The submission provided, among other things:

- Unicover adapts "reinsurance structures behind existing products that improve the net risk position of [Unicover's] Pool Members relative to its net retained limits. In the simplest terms, [Unicover] . . . maximize[s] premium for their net position."

- "Unicover strives to achieve the maximum possible pricing advantage for our net line . . . [Unicover] maximi[z]es its Pool's net risk retention relative to its small retained limits, usually the first $10,000 per accident."

- A sample rating model in which the projected gross loss ratio of the Pool is 115.3%, the Pool's net underwriting profit is 10.1%, and the retrocessional loss ratio is 207.5% (332.0% using the in-force Whole Account rates).

---

[15] February 27, 1998 fax from Paul Kersten to Roger Smith (Aon)
[16] Beerbower Closing Arg. at 5739, 5742

19

Notwithstanding its expressed concern to CRF that the Pool had grown so rapidly because rates were not adequate to cover claims and commissions, Cologne—the very same day—approved joining the Pool.

43. Lincoln recognized that "Unicover makes its money on a retrocession arbitrage" and "it seems likely that [the] reinsurers will lose money on the reinsurance of [t]his program."[17] In addition, Lincoln, looking to establish an individual facility with Unicover to further exploit the favorable retrocessional coverage already locked in place, in April 1998 conducted an extensive due diligence and underwriting review of Unicover and was content to accept the perceived risk of potential retrocessional failure in order to realize substantial profits.

44. For their part, Cologne and Phoenix also plainly understood the structure of the Retrocessional Program, as they were both Pool Members and Retrocessionaires who sought to capitalize on the exact same business model by further passing the risks along at favorable rates to their own retrocessionaires.

45. Not only did all of the Pool Members fully understand that the loss ratios to the Retrocessionaires would be high, they insisted that Unicover obtain the very retrocessional coverage about which they later complained. Indeed, under the PMA and subsequent slips executed by the Pool Members, Unicover was only permitted to purchase the favorable coverage afforded by the Retrocessional Program from a short list of reinsurers in only three approved reinsurance markets: (1) Cologne, ultimately per CRF Underwriting Management; (2) Phoenix and Sun Life, per Centaur Underwriting Management; and (3) Lloyd's of London. In fact, the slip for Pool Year 4

---

[17] Undated Memo from Dale Vollenweider to File re "Misc. Notes from the Unicover Pool Meeting

20

further set forth, among other things, requirements regarding the terms and rates at which Unicover could purchase the reinsurance coverage under the Retrocessional Program. Thus, Unicover was prohibited by the Pool Members from purchasing retrocessional protections from any other reinsurer and at any other rates; in other words, Unicover was required to purchase reinsurance for the Pool at the very rates that the Pool Members acknowledged would obviously yield substantial gross losses to their retrocessionaires.

46. The success of the Retrocessional Program added to Unicover's reputation within the insurance community. Unicover established solid, meaningful relationships with many of the major brokers in the industry.

47. During the time that it was underwriting business, the Pool performed in accordance with everyone's expectations. It assumed more than $1.5 billion in premium, generating net profits to the Pool Members.

### *The Pool Members Were Also Fully Aware Of – And Welcomed – Unicover's Substantial Growth*

48. By September 1997, "all the Pool members knew that Unicover was growing, expanding their focus."[18] At the November 1997 meeting, Unicover further advised in a handout distributed to all of the Pool Members at the time that it "expect[ed] to grow at least 50% in 1998 as our cedent and production relationships season." Indeed, during the first quarter of 1998, Unicover experienced unexpectedly strong growth in submissions and both the Pool Members and the Retrocessionaires were advised of the increased volume of business. For example, John Cackett of Centaur (agent for Phoenix and Sun Life) agreed in January 1998 to accept "stand-

---

[18] September 21, 2001 Deposition of Gary Wolters at 114-15

Cologne, confirmed that Cologne was actually looking to cancel "what looks to be poor or marginal arrangements even if not clearly covered by the CT Bulletin."[34]

105. Moreover, in a subsequent bulletin dated March 17, 1999, the Connecticut Department of Insurance later clarified the February bulletin, making it clear that the first bulletin "was not intended to express an opinion with respect to the enforceability of contracts between parties," and reinsurers could honor previously bound contracts. Despite this clarification—and, thus, the removal of the purported basis for their termination—Cologne and CIGNA still refused to honor their contracts.

## UNICOVER'S CLAIMS AGAINST THE POOL YEAR 4 MEMBERS

### FIRST CLAIM
### (Breach of Contract – Failure to Pay Management Fees and Commissions)

106. Unicover repeats and realleges paragraphs 1 through 105 above as if set forth at length herein.

107. As described above, pursuant to the PMA governing the Pool, Unicover was to receive certain management fees and commissions as compensation for it services as manager of the Pool reinsurance facility.

108. Specifically, Unicover was to receive for its services a management fee of 7.5 percent of the gross premium written to the Pool.

109. In accordance with the parties' agreement, Unicover was also to receive a profit commission based upon the net profitability of the business underwritten by the Pool Year 4 Members through the Pool.

---

[34] Undated, handwritten notes

44

110. During the period that the Pool was operational, Unicover successfully performed all of the services required of it as manager of the Pool.

111. As a result of the premium written to the Pool for Pool Year 4, the Pool Year 4 Members owe Unicover, and Unicover earned and is entitled to payment of, contractual management fees and expenses in excess of $34,000,000.

112. The Pool Year 4 Members, without any valid basis in fact or law, have failed and refused to pay to Unicover the contractual management fees and expenses rightfully due and owing to Unicover for Pool Year 4.

113. The Pool Year 4 Members' failure to pay to Unicover the contractual management fees earned and expenses incurred by and due and owing to Unicover for Pool Year 4 constitutes a breach of the parties' PMA governing the Pool.

114. By virtue of the Pool Year 4 Members' breach of the parties' agreement and their obligations to pay to Unicover the contractual management fees earned and expenses incurred by Unicover, Unicover has been damaged in an amount in excess of $34,000,000.

## SECOND CLAIM
### (Unjust Enrichment)

115. Unicover repeats and realleges paragraphs 1 through 114 above as if set forth at length herein.

116. As detailed above, Unicover acted as manager of the Pool.

117. As manager of the Pool, Unicover performed substantial services on behalf of and for the benefit of the Pool Year 4 Members.

118. As a result of the services performed by Unicover on the Pool Year 4 Members' behalf, the Pool Year 4 Members did in fact realize substantial benefit.

119. The Pool Year 4 Members have failed and refused to compensate Unicover for the substantial services that Unicover successfully performed for the substantial benefit of the Pool Year 4 Members.

120. By virtue of the Pool Year 4 Members' failure and refusal to compensate Unicover for the services that Unicover performed for the benefit of the Pool Year 4 Members, the Pool Year 4 Members have been unjustly enriched, and Unicover has suffered substantial damages in an amount in excess of $34,000,000.

### THIRD CLAIM
*(Confirmation of Unicover's Right to Indemnification)*

121. Unicover repeats and realleges paragraphs 1 through 120 above as if set forth at length herein.

122. As described above, pursuant to the PMA governing the Pool, the Pool Year 4 Members agreed to indemnify, defend and hold Unicover harmless as to any liability, loss or expense directly or indirectly related to its good faith performance under the PMA.

123. Unicover has incurred substantial legal fees and other costs and expenses in, among other things, responding to legal actions and other proceedings related directly or indirectly to its performance under the PMA.

124. Such legal fees and other costs and expenses qualify for indemnification under the PMA.

### FOURTH CLAIM
*(Tortious Interference with Unicover's Business and Contractual Relationships/Prospective Economic Advantage)*

125. Unicover repeats and realleges paragraphs 1 through 124 above as if set forth at length herein.

126. As set forth hereinabove, over the course of several years, Unicover developed a highly successful and well-respected reinsurance underwriting business, establishing itself in the process as one of the premier work-accident reinsurance markets in the world and developing solid and profitable relationships with all of the major brokers and agents in the industry.

127. As a result of the successful growth of its business and cultivation of its business relationships, Unicover was able to, among other things, solicit and write reinsurance programs for many well-respected primary insurers. Indeed, as described above, Unicover successfully expanded its reputation and client base through the years to the point where almost every major piece of workers' compensation reinsurance business that became available was presented to Unicover for a quote.

128. Until the wrongful and tortious actions of the Pool Year 4 Members, among others, Unicover had a reasonable expectation of continuing and growing said business relationships.

129. However, as described above, the Pool Year 4 Members, among others, with full knowledge of Unicover's existing business relationships and Unicover's expectations that such relationships would continue, engaged in conduct directed toward Unicover's clients that was intentionally and purposefully designed to interfere with and destroy Unicover's existing and future business and contractual relationships with its clients and others. Such wrongful conduct by the Pool Year 4 Members, among others, was further designed to destroy Unicover's reputation within the reinsurance industry.

130. The Pool Year 4 Members had no justification or excuse for such intentional, wrongful conduct.

131. The aforesaid conduct by the Pool Year 4 Members, among others, interfered with Unicover's existing and future business and contractual relationships from which Unicover had a reasonable expectation of economic advantage.

132. As a result of the interference detailed herein, Unicover's successful business has been destroyed, and Unicover has suffered damages in an amount in excess of $300,000,000.

## FIFTH CLAIM
### (Business/Commercial Disparagement)

133. Unicover repeats and realleges paragraphs 1 through 132 above as if set forth at length herein.

134. As set forth hereinabove, Unicover was a successful reinsurance underwriting manager that had established a good reputation within the reinsurance community.

135. Since its inception, Unicover's client base, business and profits had steadily expanded.

136. Beginning in 1999, the Pool Year 4 Members, among others, embarked on a campaign to malign and disparage Unicover to its existing and prospective clients, which ultimately destroyed Unicover's business and reputation.

137. As described herein, in their desperate attempt to avoid their contractual obligations with the hope of reducing their exposure to liability, the Pool Year 4 Members, among others, falsely represented to nearly all of Unicover's business partners that Unicover had engaged in wrongdoing, had been removed as underwriting

agent and lacked authority to act on behalf of its risk-bearing principals, all with the intent to hinder Unicover's business.

138. Such wrongful acts by the Pool Year 4 Members, among others, irreparably destroyed Unicover's business and reputation in the industry and alienated Unicover from the business partners and the relationships that it had built to that point.

139. As a result of such conduct by the Pool Year 4 Members, among others, Unicover's business has been irreparably destroyed, and Unicover has suffered damages in an amount in excess of $300,000,000.

### SIXTH CLAIM
*(Conspiracy to Tortiously Interfere with Unicover's Business and Contractual Relationships/Prospective Economic Advantage)*

140. Unicover repeats and realleges paragraphs 1 through 139 above as if set forth at length herein.

141. As set forth hereinabove, each of the Pool Year 4 Members, among others, knowingly and voluntarily participated in a common scheme to unlawfully destroy Unicover's business and contractual relationships and prospective economic advantage.

142. As part of their conspiratorial efforts, the Pool Year 4 Members, among others, agreed to undertake concerted action for the purpose of maligning and denigrating Unicover's business and committed numerous overt acts in furtherance of their common scheme including, but not limited to, (i) improperly contacting Unicover's customers to void properly bound business and disparage Unicover's business, and (ii) engaging in a concerted publicity campaign to destroy Unicover's reputation in the industry.

143. The Pool Year 4 Members, among others, acted in concert in agreeing to destroy Unicover's business and contractual relationships and prospective economic advantage.

144. The Pool Year 4 Members, among others, all shared in the objective to destroy Unicover's business and contractual relationships and prospective economic advantage, and the general scope and intent of the tortious scheme detailed herein above was known to each of the Pool Year 4 Members.

145. Each of the Pool Year 4 Members, among others, agreed to the tortious scheme set forth hereinabove with full knowledge that the intent of their actions was to destroy Unicover's business and contractual relationships and prospective economic advantage.

146. The aforesaid acts of the Pool Year 4 Members as set forth herein above constitute dishonest conduct committed against Unicover which, absent the unlawful agreement of the Pool Year 4 Members, gives Unicover an independent right of action against the Pool Year 4 Members, among others.

147. This conspiracy among the Pool Year 4 Members and others has destroyed Unicover's successful business and caused Unicover to suffer damages in an amount in excess of $300,000,000.

*SEVENTH CLAIM*
*(Violation of the Federal Racketeer Influenced*
*and Corrupt Organizations Act ("RICO"))*

148. Unicover repeats and realleges paragraphs 1 through 147 above as if set forth at length herein.